*To be Argued by:*
LAWRENCE C. GLYNN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

CALPINE CORPORATION, et al,                    Case No.:   08 Civ. 9797 (VM )

                    Debtor-Appellee.


ON APPEAL FROM THE UNITED STATES
BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK


-------------------------------------------------------------x


## BRIEF FOR CLAIMANT-APPELLANT ROBERT MEMBRENO, AS TRUSTEE OF SAI TRUST


**NICOLETTI HORNIG & SWEENEY**
**Attorneys for Robert Membreno,**
*As Trustee of SAI Trust*
**Wall Street Plaza**
**88 Pine Street**
**New York, New York 10005**
**(212) 220-3830**


Of Counsel:
Lawrence C. Glynn

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure and to enable judges and magistrate judges of the court to evaluate possible disqualification or recusal, the undersigned counsel of record for a private (non-governmental) party certifies that the following are corporate parents, subsidiaries or affiliates of that party which are publicly held:

None.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF ISSUES PRESENTED ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            IN REVIEWING BOTH THE DENIAL OF SAI'S MOTION FOR
            SUMMARY JUDGMENT AND THE GRANTING OF CALPINE'S
            MOTION FOR SUMMARY ADJUDICATION, THE COURT
            PROCEEDS DE NOVO WITH RESPECT TO THE LOWER
            COURT'S CONCLUSION OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            THE BANKRUPTCY COURT SHOULD HAVE GRANTED SAI'S
            MOTION FOR   SUMMARY JUDGMENT AND DENIED
            CALPINE'S MOTION FOR SUMMARY ADJUDICATION . . . . . . . . . . . . . . 20

            A)       The Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            B)       Calculation of Net Income and NPI Is Directly
                     Related to the Definition of the Term "Project" . . . . . . . . . . . . . . . . . . 21

C)      The Bankruptcy Court Erred in Determining That "Calpine Has Neither Suggested, Nor Attempted To, Deduct Expenses from NPI That Were Attributable to Any Plant Other Than the West Ford Flat . . . . . . . . . . . . . . . . . . . . . . . . 23

D)      Calpine and/or Its Predecessors-In-Interest Provided and Explanation and Guidance as to Line Items Comprising NPI in 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E)      The 1989 Explanation of Line Items Comprising NPI Prepared by Calpine and/or Its Predecessors-In-Interest Became the Course of Dealing Between the Parties for Eleven Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENTS HAS BEEN THE SUBJECT OF A PRIOR SETTLEMENT AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CALPINE IS ESTOPPED FROM INSERTING "ALLOCATED EXPENSES" AND CHARGING 15% OF SAID EXPENSES UNDER THE DOCTRINES OF CLAIM PRECLUSION AND ISSUE PRECLUSION AS THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN THE SUBJECT OF A PRIOR LAWSUIT AND JUDGMENT . . . . . . . . . . . . . . . . . . 34

POINT V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CALPINE'S USE OF BUDGETED NUMBERS RENDERS ITS "CHARGES" TO NPI MEANINGLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

POINT VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CALPINE HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IMPLICIT IN ALL CONTRACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

POINT VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      GIVEN THE ONGOING NATURE OF CALPINE'S BREACH, THE
      BANKRUPTCY COURT ERRED IN REFUSING TO GRANT
      SAI'S MOTION FOR SUMMARY JUDGMENT AND
      RECOGNIZE THAT SAI'S DAMAGES CONTINUE TO
      INCREASE EACH MONTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

POINT VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      ATTORNEYS' FEES AND COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

POINT IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      SUMMARY OF IMPROPER ALLOCATED EXPENSES & 15%
      OVERHEAD CHARGED BY CALPINE IN MONTHLY NPI
      STATEMENTS BEGINNING IN APRIL 2001 . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**Cases**

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1688, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*City of Hollister v. Monterey Ins. Co.,* 2008 WL 2894844, *23 (Cal.App. 6 Dist. 2008) . . . . . . 40

*In re AroChem Corp.*, 176 F.3d 610 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Bennet Funding Group, Inc.*, 146 F.3d 136 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Black & Geddes, Inc.*, 58 B.R. 547 (Bankr. S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Calpine Corp.*, Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738 *4 (S.D.N.Y. Nov. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*In re Integrated resources*, 157 B.R. 66 (S.D.N.Y. 1993) at 70 . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re McLean Indus.*, Inc., 121 B.R. 704 (Bankr.S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Calpine, et al.*, 394 B.R. 346, 50 Bankr.Ct.Dec. 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

*Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Lawyers' Mut. Ins.*, 885 F.Supp. 202 (S.D.Cal., 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Noble v. Draper*, 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008) . . . . . . . . 35

*Pasadena Live, LLC v. City of Pasadena*, 114 Cal.App.4th 1089, 8 Cal.Rptr.3d 233 (Cal.App. 2 Dist. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, L.P., 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

v

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

*Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (Cal. 1995) . . . . . . . <u>39</u>

*Zevnik v. Superior Court*, 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>


**Federal Statutes**

11 U.S.C.A. §502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>1</u>, <u>7</u>, <u>47</u>

28 U.S.C. §158(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>2</u>


**Federal Rules**

Fed. R. Bankr. 8013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>3</u>, <u>20</u>


**State Rules**

Cal. Civ. Proc. Code. § 1856(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>29</u>


**Treatises and Other Authorities**

31 Cal.Jur.3d Evidence § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>29</u>

## PRELIMINARY STATEMENT

This brief is respectfully submitted on behalf of the appellant, Robert Membreno as Trustee of SAI Trust (hereinafter referred to as "SAI Trust" or "SAI"), who seeks reversal of a Memorandum Decision and Order granting the motion for summary adjudication of Calpine Corporation et al. (hereinafter "Calpine" or "the Debtors"), disallowing and expunging under §502 of the Bankruptcy Code, SAI's Proofs of Claim Nos. 6309, 6314, 6315, 6316, 6327 and 6328 and denying SAI Trust's motion for summary judgment. The Memorandum Decision and Order appealed from was rendered by the Honorable Burton R. Lifland of the United States Bankruptcy Court for the Southern District of New York. Judge Lifland's Memorandum Decision dated September 26, 2008 is reported at 394 B.R. 346, 50 Bankr.Ct.Dec. 172. Reference to the Joint Appendix will be preceded by the letter "A." The decision appealed from appears in the Joint Appendix at A-1751.

## JURISDICTIONAL STATEMENT

This is an appeal pursuant to 28 U.S.C. §158(a)(1) from a final judgment entered on September 30, 2008 which disposed of all claims as to all parties. (See Appendix). Claimant-appellant timely filed its notice of appeal within 10 days of the entry of judgment, as required by Fed. R. Bankr. 8002.

## STANDARD OF REVIEW

In exercising appellate jurisdiction, a district court reviews the Bankruptcy Court's findings of fact under a clearly erroneous standard, see Fed. R. Bankr. 8013, and its conclusions of law *de novo*. *In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999); *In re Bennet Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir. 1998).

## <u>REQUEST FOR ORAL ARGUMENT</u>

It is respectfully requested that Appellant, SAI Trust, be permitted to present oral argument. The issues presented are expected to pose questions that cannot easily be answered by the record of these proceedings.

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1. Whether the Bankruptcy Court erred in ordering that Claim Numbers 6309, 6314, 6315, 6316, 6327 and 6328 are disallowed and expunged in their entirety.

2. Whether the Bankruptcy Court erred in denying SAI Trust's Motion for Summary Judgment.

3. Whether the Bankruptcy Court erred in granting Debtors' Motion for Summary Adjudication and granting the Claims Objection.

4. Whether the Bankruptcy Court erred in determining that the unexplained and unsubstantiated expenses which Calpine unilaterally inserted in the monthly NPI statements beginning in April 2001 are properly included in the calculation of NPI.

5. Whether the Bankruptcy Court erred in failing to apply standard rules of contract interpretation and in so doing, arrived at the incorrect determination that the term "Project direct operating expenses" is broad enough to encompass expenses from 18 other plants which are not the subject of the Agreement for Purchase entered into between SAI and Calpine.

6. Whether the Bankruptcy Court erred in determining that were Calpine to continue to make NPI payments to SAI Trust in accordance with the Agreement of Purchase it would result in a windfall to SAI Trust.

7. Whether the Bankruptcy Court erred in overlooking a December 1989 letter agreement authored by Calpine's predecessor which set forth the precise line item expenses that were to be charged in calculating monthly NPI.

8.     Whether the Bankruptcy Court erred in overlooking an eleven year course of dealing which established the manner in which NPI would be calculated.

9.     Whether the Bankruptcy Court erred in finding that a dispute arose in 1994.

10.    Whether the Bankruptcy Court erred in determining that SAI Trust's collateral estoppel argument is without merit.

11.    Whether the Bankruptcy Court erred in determining that res judicata argument is without merit.

12.    Whether the Bankruptcy Court erred in determining that despite a clear breach of the contract, SAI Trust is nevertheless unable to prove any damages proximately caused from Calpine's failure to provide certified NPI statements.

13.    Whether the Bankruptcy Court erred in overlooking the fact that Calpine uses budgeted as opposed to actual expenses in calculating NPI.

14.    Whether the Bankruptcy Court erred in finding that Calpine has provided adequate underlying information to confirm Debtors' calculation of NPI.

15.    Whether the Bankruptcy Court erred in denying at oral argument SAI Trust's post-petition damages resulting from the continuous breach of contract by Calpine.

16.    Whether the Bankruptcy Court erred in denying at oral argument SAI Trust's petition for attorneys' fees as permitted under the Agreement for Purchase.

## STATEMENT OF THE CASE

Appellant SAI Trust appeals from a Memorandum Decision of the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court) (Hon. Burton R. Lifland) [Docket No.: 7975] and subsequent Order entered on September 30, 2008 (i) granting the Claims Objection (the "Claims Objection Order) [Docket No.: 7981] of appellees Calpine Corporation and the other captioned reorganized Debtors (collectively "Calpine" or "the Debtors"); (ii) granting Calpine's motion for summary adjudication of SAI Trust's Claims; (iii) denying SAI Trust's counter-motion for summary judgment and (iv) disallowing and expunging  under §502 of the Bankruptcy Code, SAI's Proofs of Claim Nos. 6309, 6314, 6315, 6316, 6327 and 6328.

## STATEMENT OF FACTS

On or about May 18, 1987, SAI Geothermal, Inc. (SAI's predecessor) and Freeport McMoRan Resource Partners, L. P. ("Freeport") entered into an agreement entitled "Agreement For Purchase And Sale Of Assets (hereinafter "Agreement For Purchase") (A-1048 through A-1072) and Declaration of Robert Membreno dated August 6, 2008, hereinafter "Membreno Dec." (A-1032 through A-1046 at ¶3). Pursuant the Agreement for Purchase, Article I, ¶1.2(e), after commercial operation of a geothermal power plant to be constructed by Freeport known as West Ford Flat located in Sonoma County, California, Freeport was contractually obligated to pay to SAI Geothermal, Inc. a Net Profits Interest (hereinafter "NPI") representing the right to receive a monthly payment in an amount equal to 6% of the Net Income for the month. (A-1051). SAI Geothermal, Inc. thereafter transferred a portion of its rights to receive NPI to SAI Trust and SAI Trust now holds a 4.55% NPI in the gross revenues of West Ford Flat. (A-1033, ¶¶1-5).

Effective July 2, 1990, Freeport assigned its interest in, to, and under the Agreement for Purchase and a Standard Offer 4 Power Purchase Agreement it received from Pacific Gas & Electric Company ("Assigned Agreements") to Santa Rosa Geothermal Company, L.P. (hereinafter "Santa Rosa"). On January 1, 1994, Santa Rosa amended its partnership name to Calpine Geysers Company, L.P. (hereinafter "Calpine Geysers"). The term "NPI" is unambiguously defined in §§1.5, 1.6, 9.10 and Exhibit "F" of the Agreement for Purchase. (A-1053; A-1033, ¶¶6-8).

At the time of issuance of the very first NPI statement (representing the August, 1989 NPI payment), Calpine's predecessor, Freeport, simultaneously submitted a detailed explanation of the line items comprising the NPI statement for the West Ford Flat power plant on December 13, 1989.

8

(A-1122; A-1033, ¶9). According to this explanation, the following items were to be used in calculating NPI payable to SAI: Electric Revenue, Interest Income from Overnight Deposits, Escrow Balance, Royalty Payments, Lease Operating Expenses, Overhead, Property Taxes, Capital Additions - Major Construction, Capital Additions - Overhead, Capital Additions - Development Capital, Project Financing, Invested Capital and Loan Proceeds. (A-1033, ¶10).

Notably absent from this list is any mention of the term "Allocated Expenses." More notable is the fact that for approximately eleven years thereafter, there was no charge for "Allocated Expenses." (A-1034, ¶11; A-1126 - A-1127), which is the very first NPI statement received from Debtors on or about December 13, 1989, representing the first NPI for August, 1989 to SAI Trust. Under the heading "Operating Expenses", the following line item entries are included:

> Royalty Payments (Not Subject to Overhead);
>
> Lease Operating Expenses,
>
> Overhead 15% (which is 15% of the Lease Operating Expenses).

There is no entry for "Allocated Expenses." (A-1034, ¶12) and (A-1126 through A-1127). The "Operating Expenses" set forth in A-1126 were the only operating expenses that were ever charged over the next eleven years and became the course of dealing established between SAI Trust and Debtors and/or their predecessors-in-interest. (A-1034, ¶13).

Conversely, commencing with the April 2001 NPI statement submitted by Calpine, a new line item entry appeared under the heading "Allocated Expenses." See, e.g., NPI Statement from April, 2006 (A-1129-1136) and NPI Statement from May, 2007 (A-1138-1148); (Membreno Dec., A-1034, ¶14). Prior to April 2001, there was no entry for "Allocated Expenses" and Calpine has offered no explanation for its unilateral decision to include "Allocated Expenses" which prior to

9

April 2001, were not charged. Nor has Calpine explained the basis for charging a 15% overhead charge on the sum of "Allocated Expenses" and "Lease Operating Expenses." (A-1035, ¶¶15-16).

Prior to April 2001, the 15% overhead charge had been based *solely* upon the "Lease Operating Expenses." This had been the course of dealing established between SAI Trust and Debtors and/or their predecessors-in-interest for more than eleven years. Prior to April 2001, the overhead charge on each and every single NPI was 15% of Lease Operating Expense, only (A-1035, ¶16).

In addition to this sudden unexplained change in accounting procedures, Calpine ceased to provide annual certification of its NPI statements as required under the Agreement for Purchase. In accordance with §1.6 of the Agreement for Purchase, NPI statements are to be certified by the chief financial officer of Calpine annually.(A-1053-1054). Prior to 2000, year end NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually. (A-1035, ¶18). In fact, between August, 1989 and approximately the end of the fiscal year, 2000, a period of eleven years, all NPI statements prepared by Calpine and/or its wholly owned subsidiary(ies) were certified by Calpine's and/or its predecessors-in-interest's chief financial officer annually. (A-1035, ¶18). However, since April 2001, annual certifications have ceased to be prepared by Calpine and/or its wholly owned subsidiary(ies). (A-1035, ¶20). Since 2001, no officer of Calpine, or its wholly owned subsidiary(ies) have certified any year end statement as required under the Agreement for Purchase. (A-1035, ¶21).

Failure to provide annual certified NPI statements is a clear breach of the Agreement for Purchase. §1.6 of the Purchase Agreement states, in pertinent part:

Audit Rights of Seller.

10

> Buyer shall maintain complete and accurate accounting records of the accounts which are used to calculate the Net Profits Interest. Within 60 days after the end of each fiscal year of buyer, commencing with the fiscal year of Buyer in which the Date of First Commercial Operation occurs, it shall furnish Seller with a statement **certified by Buyer's chief financial officer** showing in reasonable detail the calculation of the Net Profits Interest for the fiscal year then ended.

Emphasis added. (A-1053-54, A-1036 ¶22)

SAI Trust holds a right to conduct annual audits of the operations of West Ford Flat after receipt of an annual certified NPI Statement in accordance with §1.6 of the Agreement for Purchase. §1.6 of the Purchase Agreement states, in pertinent part:

> Seller (SAI) and its authorized representatives shall have the right, upon reasonable notice to Buyer and between 9 A.M. and 5 P.M. weekdays to audit Buyer's records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with this Agreement.

(A-1053-54, A-1036 ¶22)

Following an auditing for the period July 1, 1990 through December 21, 1990, and calendar year 1991 (the "1990 and 1991 audit") a Settlement Agreement was entered on February 28, 1995 (hereinafter "Settlement Agreement"). (A-1314) As set forth therein, the manner in which future NPI statements would be prepared was agreed[1] by SAI Trust, Sonoma Geotherm Partners, L.P., (hereinafter "Sonoma"), Calpine Sonoma Inc. (hereinafter "Calpine Sonoma") and Calpine , the parties thereto. (A-1036, ¶25). In addition to an agreement as to the manner in which NPI Statements would be prepared, as a result of this Settlement Agreement, the manner in which payments of net profits for 1992 and thereafter was agreed by the parties thereto. (A-1037, ¶26).

---

[1] Now for a second time, including the original agreement entered into on May 18, 1987.

Under §8 A. of the Settlement Agreement entitled "Miscellaneous", it states:

> Except as specifically set forth herein nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement of Purchase, specifically including, but not limited, to Sections 1.6 and 9.5. Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPNE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

(A-1321-22, A-1037, ¶27).

The subject of the Agreement for Purchase was, and still is, a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. (A-1321-22, A-1037, ¶28). The Settlement Agreement governs the relationship of the parties concerning a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. Membreno Dec., There is not now, nor has there ever been, any contract between SAI Trust and Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where the subject of the contract was any power plant other than West Ford Flat. (A-1321-22, A-1037, ¶¶28-30).

On February 24-28, 1992, a trial was held in the Superior Court of the State of California in and for the County of Santa Clara in the case of *Robert J. Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company L.P., Sonoma Geothermal Partners L.P. , Calpine Sonoma, Inc., and Does 1 through 20, inclusive*, and a judgment was entered in that matter. (A-1326-1330, A-1037-38 ¶¶31-32).

12

One of the key issues decided as a result of the 1992 trial and Judgment was an attempt by Calpine to unilaterally alter the manner in which NPI was calculated,[2] a tactic that the trial court determined was not permitted as the COPAS percentage rates "were not part of the (Agreement of Purchase). (A-1326-1330).

Between July, 1994 through December, 2000, **no** NPI statement prepared by Calpine contained a line item entry for "Allocated Expenses." Commencing in or about April 2001, Calpine unilaterally began to include line item expenses under the heading "Allocated Expenses." The uncertified NPI statements that Calpine has provided since April 2001 use budgeted figures, as opposed to actual figures. The uncertified NPI statements that Calpine has provided since April 2001 include costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under the Agreement for Purchase and not chargeable to SAI. (A-1038, ¶¶35-38).

Commencing in April 2001 (effective January, 2001) Calpine calculated the overhead expense based on both Lease Operating Expenses and "Allocated Expenses." From July, 1994 through December, 2000, overhead was calculated solely based on Lease Operating Expenses. Membreno Dec., ¶40. A-1038, ¶¶39-40.

The equation for calculating NPI prior to April 2001 was as follows:

**NPI = Revenue - Lease Operating Expenses - Overhead**

where Overhead = .15 x Lease Operating Expenses.

After April 2001, the equation became:

---

[2] by varying the COPAS (Council of Petroleum Accountants Societies, Inc.)

13

**NPI = Revenue - Lease Operating Expenses - Allocated Expenses - Overhead**

where Overhead = .15 x (Lease Operating Expenses + Allocated Expenses).

Furthermore, journal entries which Debtors' claim support the "Allocated Expenses" are not specific to the West Ford Flat plant and an audit of the journal entries which Debtors claim support the "Allocated Expenses" attributable to West Ford Flat would be impossible given the lack of specificity for said journal entries and the fact that these figures are uncertified as required under the Agreement for Purchase. Journal entries which Debtors claim support the "Allocated Expenses" attributable to West Ford Flat are, in fact, attributable to plants other than West Ford Flat. (A-1039, ¶¶41-43). There is no sound basis, in accordance with generally accepted accounting principles, for the unilateral change in accounting procedures that occurred on or about April 2001. (A-1039, ¶44).

As a result of the unilateral change in accounting procedures undertaken by Debtors, SAI's Net Profit Interest was less in each year over year period compared with any year between 1994 through 2000 inclusive, which is counterintuitive, as the basis for Calpine's consolidation of approximately 19 plants which comprise the Geysers' Region was to reduce costs and increase profits. (A-1039, ¶45).

At no time was there a meeting of the minds between Debtors and SAI Trust to modify or alter the Agreement for Purchase beginning in 2001. Debtors unilaterally altered the terms of the Agreement for Purchase beginning in 2001.

Debtors' decision to unilaterally alter the terms of the Agreement for Purchase beginning in 2001 was a breach of the Agreement of Purchase. (A-1039, ¶¶46-47).

Debtors' decision to unilaterally alter the terms of the Agreement for Purchase beginning in 2001 was a breach of the Settlement Agreement. (A-1039, ¶49).

14

Debtors' decision to unilaterally alter the terms of the Agreement for Purchase beginning in 2001 was contrary to a Judgment on an issue that had already been fully litigated between these identical parties. (A-1040, ¶50).

SAI brought to Debtors' attention that it noticed increases in costs, inclusions of costs, and allocations of costs since receipt of its last statement certified by Debtors' chief financial officer. SAI attempted to communicate with Debtors and determine whether these increases in costs, inclusions of costs, and allocations of costs are in accordance with the Agreement For Purchase and Settlement Agreement. Debtors have not provided SAI with statements certified by their chief financial officer. Debtors have not provided SAI with sufficient access to its records to determine whether the calculation of NPI (although uncertified by the chief financial officer) was in accordance with the Agreement For Purchase. Debtors have not reasonably cooperated with SAI so SAI could conduct an audit of the uncertified records. Debtors have not maintained complete and accurate accounting records of the accounts used to calculate NPI. Debtors have not maintained accounting records sufficient to show in reasonable detail the calculation of NPI in accordance with the Agreement for Purchase. Debtors have not maintained accounting records sufficient to show in reasonable detail the calculation of direct operating expenses and the general and administrative expenses in accordance with the Agreement for Purchase. Debtors have not properly accounted for the general and administrative expenses in accordance with the Agreement for Purchase. Debtors have not identified and accounted for many costs associated with the operation of the power plant governed by the Agreement for Purchase. (A-1040-1041, ¶52).

However, Debtors acknowledged, *inter alia*, that they were unaware of the underlying agreements. Debtors acknowledged, *inter alia,* that they have not complied with the underlying

15

agreements in several respects. Debtors acknowledged, *inter alia,* that they have not maintained the books and records in reasonable detail to properly calculate direct operating expenses and the general and administrative expenses in accordance with the underlying agreements. Debtors acknowledged, *inter alia,* that they have not properly accounted for the general and administrative expenses in accordance with the underlying agreements, but rather, caused SAI to bear the expenses from adjacent plants inconsistent with the underlying agreements due to their own accounting preferences. (A-1041, ¶53).

## SUMMARY OF ARGUMENT

On May 18, 1987,  Calpine's predecessor, Freeport, and SAI entered into an agreement for purchase and sale of a geothermal power plant named West Ford Flat.   Under the agreement, Freeport was contractually obligated to pay to SAI a Net Profits Interest ("NPI") representing the right to receive a monthly payment in an amount equal to 6% of the Net Income for the month. (A-1051). SAI thereafter transferred a portion of its rights to receive NPI to SAI Trust and SAI Trust now holds a 4.55% NPI in the gross revenues of West Ford Flat. (A-1033) On December 13, 1989, the terms of the agreement were memorialized by Debtors predecessor. (A-1122-1124). During the eleven year period thereafter, the only expenses deducted from revenue (to arrive at the NPI) were simply "Lease Operating Expenses" and "Overhead."

In April 2001, Debtors began to charge SAI for the heretofore undefined and unexplained category of expenses sometimes referred to by Calpine as "Allocated Expenses" which are expenses derived from 18 other plants acquired by Debtors subsequent to the 1987 Agreement for Purchase.[3]

In 1995, SAI and Calpine entered into a Settlement Agreement which specifically addressed the manner in which future NPI payments would be made. Importantly, the only plant mentioned in this Settlement Agreement was the same plant set forth in the 1987 Agreement for Purchase, i.e., West Ford Flat and no other.

In 1992, a trial was held between SAI and Calpine and a judgment was entered in that matter. (A-1326-1330, A-1037-38 ¶¶31-32).  One of the key issues decided as a result of the 1992 trial and

---

[3] The Bankruptcy Court incorrectly implied that this dispute arose in 1994. See A-1752, ¶1).

Judgment was an attempt by Calpine to unilaterally alter the manner in which NPI was calculated, a tactic that the trial court determined was not permitted as the COPAS percentage rates "were not part of the (Agreement of Purchase). (A-1326-1330).

The expenses that Calpine unilaterally inserted into the monthly NPI beginning in April 2001 are 1) not a part of the Agreement for Purchase; 2) not mentioned in the December 13, 1989 explanation of NPI line items; 3) not pertaining exclusively to the West Ford Flat power plant; 4) not a part of the 11 year course of dealing that had been established by the parties; 5) in contradiction to the 1995 Settlement Agreement between these same parties; 6) in contradiction to the 1992 Judgment covering identical issues and parties; 7) already accounted for, as they were for eleven years prior, in the Lease Operating Expenses and Overhead charges; 8) not certified by the Chief Financial Officer (or any other employee) of the Debtors, and 9) based wholly on budgeted, not actual expenses. (Calpine's Motion for Summary Judgment, ¶18, A-882).

By granting Calpine's Motion for Summary Adjudication, the Bankruptcy Court erred in its interpretation of the scope of the original Agreement for Purchase by expanding the agreement to cover 18 plants that were never contemplated at the time the agreement was entered into in 1987. The Agreement for Purchase repeatedly references one and only one project - West Ford Flat and only "direct operating expenses" arising from that specific project were chargeable to NPI. The Bankruptcy Court erred in ignoring the term "project" and holding that the term "direct operating expenses" was broad enough to include expenses derived from these 18 other plants.

The Court further erred in ignoring the fact that a 1989 letter from Calpine's predecessor further streamlined that which was to be deducted from revenue to determine NPI. (A-1122-1124).

18

The Court further erred in ignoring the 1995 Settlement Agreement which reinforced the manner in which NPI was to be calculated and, more importantly, the scope of the original agreement, i.e., West Ford Flat. (A-1314-1324).

The Court further erred in ignoring a 1992 Judgment from the Superior Court of the State of California in and for the County of Santa Clara (A-1326-1330, A-1037-38 ¶¶31-32) where an attempt by Calpine to alter the manner in which NPI was calculated was thwarted. In so doing, the Bankruptcy Court completely ignored the preclusive effects of this judgment.

The Court further erred in failing to recognize that this breach by Calpine is systemic and ongoing and that SAI's claim has grown since its original preliminary claim was made in the Bankruptcy Court, and will continue to grow each month that Calpine's breach of no fewer than three agreements and a Judgment are allowed to continue.

The Court erred in implicitly finding that SAI was attempting to exercise control over Calpine's management of its business. SAI seeks no such thing. SAI only seeks what is due and owing under the terms of the 1987 Agreement for Purchase as reinforced by the December 1989 letter agreement drafted by Calpine's predecessor, the 1992 Judgment following a trial between these parties, the 1995 Settlement Agreement between these parties, and the eleven year course of dealing established between these parties. Nothing more. Nothing less.

Finally, the Court erred in failing to enforce a specific contractual obligation on the part of Calpine to pay SAI's attorneys' fees arising from SAI's efforts to enforce the contract.

## ARGUMENT

### POINT I

### IN REVIEWING BOTH THE DENIAL OF SAI'S MOTION FOR SUMMARY JUDGMENT AND THE GRANTING OF CALPINE'S MOTION FOR SUMMARY ADJUDICATION, THE COURT PROCEEDS DE NOVO WITH RESPECT TO THE LOWER COURT'S CONCLUSIONS OF LAW

In exercising appellate jurisdiction, a district court reviews the Bankruptcy Court's findings of fact under a clearly erroneous standard, see Fed. R. Bankr. 8013, and its conclusions of law *de novo*. *In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999); *In re Bennet Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir. 1998).

### POINT II

### THE BANKRUPTCY COURT SHOULD HAVE GRANTED SAI'S MOTION FOR SUMMARY JUDGMENT AND DENIED CALPINE'S MOTION FOR SUMMARY ADJUDICATION

The critical issue that the Bankruptcy Court failed as a matter of law to properly analyze is the scope of the Agreement for Purchase and specifically, whether expenses from 18 other plants that were not contemplated at the time of entering into the Agreement for Purchase could be deducted from NPI.  The only rational interpretation of the Agreement for Purchase is that one, and only one, geothermal power plant is ever mentioned therein, and that plant is known as West Ford Flat. In fact, the Agreement for Purchase goes so far as to set forth the precise location of the plant that is the subject of this contract. Having expanded the scope of this straight forward agreement to cover 18 other Calpine plants acquired long after this agreement, the Bankruptcy Court proceeded to erroneously grant Calpine's motion for summary adjudication and deny SAI's motion for summary judgment.

20

### A)   The Project

Defining the "Project", is a core issue to this contract dispute. The project is succinctly defined in the very first page of the Agreement of Purchase (A-1048) under the section entitled Recitals at ¶ 2. The Agreement for Purchase states:

> Pursuant to the PPA (Power Purchase Agreement), PGandE has agreed to purchase the electricity generated by a thirty (30) megawatt geothermal steam powered electric generating plant (the "Project") to be constructed, maintained and operated by Seller, and to make capacity payments to Seller in respect of the Project, on the terms and conditions set out in the PPA."

(A-1048).

The Agreement for Purchase incorporates by reference the PPA (A-1079) which, under Article 3, ¶(b), states that Seller (SAI Geothermal, the predecessor to SAI Trust) shall provide capacity and energy from its "30,000 kw [equals 30 Megawatts] Facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California," i.e., West Ford Flat.

Thus, there can be no doubt as to the subject matter for the Agreement for Purchase. It was, in May 1987, a 30 Megawatt facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California. It is, today, a 30 Megawatt facility located at Section 33, Township 12 North, Range 9 West (MDBM), Sonoma County, California.

### B)   Calculation of Net Income and NPI Is Directly Related to the Definition of the Term "Project"

In the Agreement for Purchase, Net Income is defined as the gross revenues being received by Buyer from the Project minus the sum of the following:

> (ii) all **Project** *direct operating expenses* (excluding depreciation).

(iii) general and administrative expenses associated with the Project,

(iv) if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of the Project Financing.

(A-1068, §9.10, definition of Net Income). Emphasis added.

The term "Net Profits Interest" is defined next in the Agreement for Purchase.

"Net Profits Interest": shall mean, *with respect to the **Project***, the right to receive a payment each month, commencing as provided in Section 1.5, for the life of the **Project**, but not longer than 30 years from the Date of First Commercial Operation, in an amount equal to 6% of Net Income for the month.

(A-1068, §9.10, definition of Net Profits Interest). Emphasis added.

There is no rational basis for ignoring the fact that the term "project" is inextricably woven into the manner in which NPI was to be calculated. Nevertheless, the Bankruptcy Court held that under California law, the term "direct operating expenses" in the Agreement for Purchase was broad enough to encompass "all 'direct operating expenses' from the calculation of net income." (A-1757). Emphasis in original. The Court cited no cases in support and chose to ignore the word "project" and incorrectly agreed with Calpine's argument that the word "project" in this definition is of no import and that the term "direct operating expenses" is broad enough to encompasses such indirect expenses as those derived from 18 other plants under Calpine's control. Thus, according to Calpine and the lower court, expenses from plants which were never mentioned nor contemplated in the Agreement for Purchase are nevertheless properly included in calculating the NPI owed to SAI.

Despite this inaccurate finding of law, the "project" is the West Ford Flat plant, period. The word "project" immediately preceding the term "direct operating expenses" modifies that term so as to preclude all other interpretations. "California principles of contract construction make it very

22

clear that courts should give effect to all terms of a [contract] where it is possible, reading [the contract] as a whole to determine the meaning of any disputed provisions." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Lawyers' Mut. Ins.*, 885 F.Supp. 202, 206 (S.D.Cal., 1995). By ignoring this word, Calpine, with assistance from the court below, has effectively rewritten the contract to suit its own interests. This word was quite clearly used in both of these definitions to specifically set forth the scope of the agreement to pay NPI to SAI, and the contract is abundantly clear as to what the project is, identifying it by name, address, county, etc. Thus, if one were to question which "direct operating expenses" may be deducted to calculate NPI, the answer is clearly set forth in the contract: direct operating expenses associated with "the Project" and no others. What is the project? The Project is "West Ford Flat" and no other.

**C)    The Bankruptcy Court Erred in Determining That "Calpine Has Neither Suggested, Nor Attempted To, Deduct Expenses from NPI That Were Attributable to Any Plant Other Than the West Ford Plant**

The Bankruptcy Court stated that "SAI Trust has repeatedly (and needlessly) sought to call attention to the use of the phrase 'all project.'" SAI Trust agrees that reference to the term "project" is perhaps superfluous, as any rational reader of the phrase "direct operating expenses" would not equate expenses from 18 other plants as "direct." Nevertheless, had the word "project" been removed from the definition, the Bankruptcy Court still failed to explain how "direct operating expenses" can mean expenses from 18 other plants. The Court compounded this error by erroneously finding that "Calpine has neither suggested, nor attempted to, deduct expenses from NPI that were attributable to any plant other than the West Ford Plant." (A-1757). This finding of fact is clearly erroneous.

First, looking at the facts objectively, by Calpine's unilateral act of inserting a completely new line item of expenses into the monthly NPI, while leaving the existing deductible expenses from the prior eleven years in place, the fact remains that additional expenses derived from Calpine's "consolidated operations" are now being charged to SAI and have been since April 2001. (See, e.g., the pre 2001 NPI Statements set forth at A-1126-1127; the excerpt of all NPI's from 1989 to present, A-1150-1269 and compare to recent NPI statements set forth at A-1129-1148).[4] If this were not the case, then there would be no need for Calpine to have inserted this new line item at all, for all "direct operating expenses" attributable solely to the West Ford Flat plant would have already been accounted for as they had been for eleven years, under "Lease Operating Expenses", "Overhead", "Capital Expenses", etc. Calpine's explanation for this change is illogical.

This argument is an intuitive one. If a person receives a bill from their electric provider every month and that bill has entries for each item being charged to the customer, and then all of a sudden, a new bill arrives one month and it contains all of those previous charges plus a brand new charge, the customer would likely wonder what the basis for the new charge is. If the electric provider's explanation was that the new charge is really just the same thing as the old charge, that would beg the question that if it's really just the same, why include it at all?  And the second question would be, if this is really just the same charge couched in different terminology, why has the bill gone up?

---

[4] It is noteworthy at this juncture to point out a critical factual flaw in the decision rendered by the Bankruptcy Court. Curiously, the Bankruptcy Court implicitly found that this dispute arose in 1994 (A-7152, ¶1). The record below is replete with references to when this dispute arose, i.e., April 2001. Calpine does not dispute that the dispute *sub judice* arose in April 2001. Whether or not this incorrect finding of fact coincides with the lower court's failure to address SAI's compelling argument regarding the eleven year course of dealing between these parties from 1989-2000, is unknown. However, remand on this incorrect finding of fact appears to be necessary.

This is precisely what Calpine has done to SAI. The insertion of the new line item is not for the same expenses as before the consolidation of its plants, and as will be discussed in the next section, Calpine has provided no reasonable explanation for the addition of these "Allocated Expenses." As a result, SAI's NPI has decreased significantly month over month and year over year since April 2001. This reality was either overlooked or purposely ignored by the Bankruptcy Court.

Second, the Bankruptcy Court ignored the plethora of vague definitions provided by Calpine as to what, exactly, these so called "transparent" and "direct operating expenses" actually are. Debtors have referred to various expenses which they claim are chargeable to NPI and have used terms and definitions such as "direct operating expenses," (See Debtors' Brief in Support of its Motion for Summary Adjudication, hereinafter "Debtors Br.", generally at A-876-895); "allocated expenses," (Debtors Br., generally, A-876-895 and the actual term used in each monthly NPI, see e.g.A-1129-1148); "lease operating expenses" and/or "lease overhead expenses," (see Third Tipton Declaration, hereinafter "Third Tipton Dec.", A-1567 at ¶5 and Debtors' Response in Opposition to SAI's Motion for Summary Judgment, hereinafter "Debtors Resp." at A-1410); "budgeted share of various maintenance costs and operation expenses," (Debtors Br., A-883, ¶19); "direct operating expenses associated with departments that directly support the plant on a non-exclusive basis," (Debtors' Br., A-883, ¶20); "direct operating costs associated with departments that are fully and exclusively dedicated to supporting the plant,"(Debtors' Br., A-883, ¶20); "a further refinement of direct operating expenses necessitated by the implementation of operational efficiencies," (Debtors' Br., A-885, ¶24), and "direct operating expenses as the West Ford Plant's specific share of the consolidated operating expenses," (Debtors' Br., A-888, ¶31).

The numerous, circuitous and confusing iterations used by Calpine to support its interpretation of the term "direct operating expenses" is reminiscent of a customer service operator at the theoretical electric company mentioned earlier who tries to explain the "new" billing procedures when an irate customer calls to complain. In this situation, the Calpine jargon is a thinly veiled disguise for its flagrant breach of the agreement. The Bankruptcy Court took no issue with this and instead gave Calpine's confusing, duplicitous, circuitous double speak a judicial endorsement.

Conversely, SAI has offered but one interpretation of the term "direct operating expenses" and that is expenses directly attributable to the West Ford Flat plant and only the West Ford Flat plant, i.e., the same definition the parties had agreed to in 1987 and in December 1989 and over an eleven year course of dealing which ended only when Calpine began to breach the contract in April 2001.

Third, the Bankruptcy Court's erroneous conclusion of fact on the issue of "direct operating expenses" is belied by Calpine's own admission. Calpine has stated as follows:

> [b]y the plain language of the [Agreement for Purchase] - and the only reasonable interpretation of that [Agreement for Purchase] - the Reorganized Debtors were authorized to, and did, properly allocate and attribute a portion of the direct operating expenses *from the consolidated geysers field ("The Geysers")* to the West Ford Plant for purposes of calculating SAI Trust's monthly and annual NPI.

(Debtors' Br., ¶3, A-877-878). Emphasis added.

> [I]n calculating the Net Profit for the West Ford Plant, the Debtors allocate the direct operating expenses at the Plant from the consolidated expenses of the entire Geysers field because the Debtors have operated the Geysers as a consolidated business unit since the 1990's. SAI Trust argues the Debtors err in this calculation because

26

> "direct operating expenses" are operating expenses *solely* attributable to the West Ford Plant without any apportionment to the Plant from consolidated expenses. Yet, the plain language of the Purchase Agreement does not prohibit the Debtors from allocating direct operating expenses for the West Ford Plant in calculating the Net Profit."

(A-778, emphasis in original).

> [d]irect operating expenses' includes operating costs allocated to the West Ford Plant from the consolidated Geyser's business unit." (A-778); "there is no provision of the Purchase Agreement that prohibits the Debtors from allocating direct operating expenses as West Ford Plant's specific share of the consolidated operating expenses." (A-779); "costs are attributed pro rata among the plants based on the yearly budgeted costs. Thus, for example, assuming all other things being equal, in a year in which West Ford Plant is required and budgeted to have an overhaul, a greater portion of the maintenance costs would be attributed to it than in a year in which no such overhaul was scheduled." (A-882-883, footnote 3).

Thus, Calpine is most certainly pooling expenses from its consolidated operations and then charging a portion of these pooled expenses from 18 other plants to West Ford Flat in contradiction to any reasonable interpretation of "direct operating expenses" and in clear contradiction to the Bankruptcy Court's finding of fact. Furthermore, as will be discussed in greater detail *infra*, Calpine is doing this based upon an arbitrary percentage and without having provided certified accounting records to support such arbitrary allocations. The fact that Calpine uses budgeted numbers to calculate expenses charged to the NPI was also disregarded by the lower court time and again throughout the proceedings below, despite the fact that Calpine has admitted it repeatedly. This was an important factual finding which the judge chose not to address, for if Calpine divines that the West Ford Flat plant needs an overhaul, it will charge an arbitrary percentage of the consolidated operation expenses to SAI's NPI factoring in the cost associated with such an overhaul on a pro rata

basis, regardless of whether or not such an overhaul was 1) actually performed and 2) actually necessary, and without ever having to account for this "expense" with certified accounting records as required under the Agreement for Purchase. Also, as will be discussed *infra*, the Bankruptcy Court found no nexus between the admitted fact that certified NPI's had not been provided since April 2001 and damages flowing from that breach. (A-1759). The Bankruptcy Judge stated that "SAI Trust's final argument must also fail as SAI Trust cannot prove any damages proximately caused from Calpine's failure to provide certified NPI statements." (A-1759). The Court overlooked that the lack of transparency in Calpine's post-2001 NPI statements is evident by the fact that nobody at Calpine has been willing to sign their name to a certification of these NPI statements and "supporting material" for nearly eight years.  The Bankruptcy Court found this business accounting practice to be perfectly acceptable and sufficiently transparent within the terms of the Agreement for Purchase and not a basis for awarding SAI summary judgment. The Bankruptcy Court erred and its decision must be overruled.

At a very minimum, there remains a question of fact as to whether the uncertified data Calpine did provide is sufficiently accurate, transparent and reflective of the expenses charged to SAI's NPI statements. Disregarding the existence of this clear issue of fact, the Court nevertheless granted Calpine's motion for summary adjudication. This too was in error.

28

**D)   Calpine and/or Its Predecessors-In-Interest Provided an Explanation and Guidance as to Line Items Comprising NPI in 1989**

The Bankruptcy Court erred when it ignored a December 1989 letter from Calpine's predecessor providing explanation and guidance as to line items comprising NPI in 1989.

The terms of a written contract may be explained or supplemented by the parties' course of dealing. *See* Cal. Civ. Proc. Code. § 1856(c) (West 2008) ("The terms set forth in a writing ... may be explained or supplemented by course of dealing or usage of trade or by course of performance."); *see also* 31 Cal.Jur.3d Evidence § 371 ("[T]he terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may be explained or supplemented by course of dealing or usage of trade or by course of performance.") The parties' course of dealing may determine the meaning of a contract term or may add an agreed but unstated term. *See Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001).

At the time of issuance of the very first NPI statement (representing the August, 1989 NPI payment), Debtors' predecessor, Freeport, simultaneously submitted a detailed explanation of the line items comprising the NPI statement for the West Ford Flat power plant on December 13, 1989. (A-1122-1124). This letter is critical for two reasons. First, as if there was any doubt as to the seemingly unambiguous language of the Agreement for Purchase regarding which plant is at issue, the December 13, 1989 letter reaffirmed exactly which plant was being discussed. It states, in pertinent part, "[a]s requested, the following is an explanation of the line items comprising the SAIT-APT Net Profits Interest Statement for the *Wet Ford Flat power plant*." (Emphasis added).

29

This document further supports SAI Trust's assertion that the NPI was clearly defined nearly 20 years ago. According to the explanation, the following items were used in calculating NPI payable to SAI:

> Electric Revenue
> Interest Income from Overnight Deposits
> Escrow Balance
>
> Royalty Payments
> Lease Operating Expenses
> Overhead
>
> Property Taxes
>
> Capital Additions - Major Construction
> Capital Additions - Overhead
> Capital Additions - Development Capital
>
> Project Financing
>
> Invested Capital and Loan Proceeds

(A-1122-1124)

Notably absent from this list is any mention of the term "Allocated Expenses." More notable is the fact that for approximately eleven years thereafter, there was no charge for "Allocated Expenses." (A-1034, ¶11; A-1126-1127). The document set forth at A-1126-1127 is the very first NPI statement received from Debtors' predecessor on or about December 13, 1989, representing the first NPI for August, 1989 to SAI Trust. Allocated Expenses is not mentioned anywhere therein.

**E)    The 1989 Explanation of Line Items Comprising NPI Prepared by Calpine and/or Its Predecessors-In-Interest Became the Course of Dealing Between the Parties for Eleven Years**

Summarizing that which was to be deducted as "Operating Expenses" (as opposed to capital expenses, taxes, etc.), the following line item entries are included:

Royalty Payments (Not Subject to Overhead)

Lease Operating Expenses

Overhead 15% (which is 15% of the Lease Operating Expenses).

This NPI statement format, including the Operating Expenses listed above, became the course of dealing established between SAI Trust and Debtors and/or their predecessors-in-interest for more than eleven years. (A-1034, ¶13).  In fact, for each monthly NPI statement prepared and submitted by Calpine and/or its predecessors-in-interest from August, 1989 through December, 2000, there was never once any mention of "Allocated Expenses." See A-1150-1269, which is an excerpt of all NPI statements issued since 1989. Due to the voluminous nature of this document, a complete set is available for review upon request.

Conversely, commencing with the April 2001 NPI statement, Debtors unilaterally and without any justification or explanation, inserted "Allocated Expenses" into the calculation for NPI. (A-1034 ¶14; A-1129-1136; A-1138-1148).

In addition, Debtors began calculating overhead expenses as 15% of the sum of "Lease Operating Expenses" plus "Allocated Expenses." For the eleven years prior to April 2001, overhead

31

was only 15% of "Lease Operating Expenses." (A-1034, ¶15; A-1129-1136; A-1138-1148; A-1150-1269).

To further demonstrate the point, the equation for calculating NPI prior to April 2001 was as follows:

**NPI = Revenue - Lease Operating Expenses - Overhead**

where Overhead = .15 x Lease Operating Expenses.

After April 2001, the equation became:

**NPI = Revenue - Lease Operating Expenses - Allocated Expenses - Overhead**

where Overhead = .15 x (Lease Operating Expenses + Allocated Expenses).

The Bankruptcy Court, chose to ignore the reality represented by the above simple equations and justified its decision by ignoring the term "project" and expanding the term "direct operating expenses" to illogical proportions. In so doing, the Court all but ignored the December 1989[5] letter and completely ignored the undisputed eleven year course of dealing between the parties. This holding was in error and must be reversed.

### POINT III

### THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN THE SUBJECT OF A PRIOR SETTLEMENT AGREEMENT

The precise issue of the manner in which NPI is to be calculated was the subject of litigation and a settlement between these identical parties. Following an audit for the period July 1, 1990

---

[5] Mentioning it only in passing in its recitation of the arguments. See A-1754.

through December 21, 1990, and calendar year 1991 (the "1990 and 1991 audit")[6] a Settlement Agreement was entered on February 28, 1995 (hereinafter "Settlement Agreement"). (A-1036, ¶24; A-1314-1324).

As set forth in the Settlement Agreement, the manner in which NPI statements would be prepared going forward was agreed[7] by SAI Trust, Sonoma Geotherm Partners, L.P., (hereinafter "Sonoma"), Calpine Sonoma Inc. (hereinafter "Calpine Sonoma") and Calpine , the parties thereto. In addition, the manner in which payments of net profits for 1992 and thereafter was agreed by the parties thereto. (A-1036-1037, ¶¶25-26, A-1314-1324).

Under §8 A. of the Settlement Agreement entitled "Miscellaneous", it states:

> Except as specifically set forth herein nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement of Purchase, specifically including, but not limited, to Sections 1.6 and 9.5. Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPNE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

A-1037, ¶27; A-1314-1324).

---

[6] SAI Trust holds a right to conduct annual audits of the operations of West Ford Flat after receipt of an annual certified NPI Statement in accordance with §1.6 of the Agreement for Purchase. §1.6 of the Purchase Agreement states, in pertinent part:

> Seller (SAI) and its authorized representatives shall have the right, upon reasonable notice to Buyer and between 9 A.M. and 5 P.M. weekdays to audit Buyer's records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with this Agreement.

(A-1036, ¶23; A-1053-1054)

[7] Now for a second time, including the original agreement entered into on May 18, 1987.

The subject of the Agreement for Purchase was, and still is, a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. The Settlement Agreement too governs the relationship of the parties concerning a geothermal power plant known as West Ford Flat located in Sonoma County, California, exclusively. There is not now, nor has there ever been, any contract between SAI Trust and Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where the subject of the contract was any power plant other than West Ford Flat. (A-1037, ¶¶28-30; A-1314-1324).  The Bankruptcy Court failed to appreciate that this Settlement Agreement reinforced the notion that the mutual intent of the parties at the time of the Agreement for Purchase was that it applied to only one plant, West Ford Flat, and that NPI would be calculated based upon expenses from that plant alone.

**POINT IV**

**CALPINE IS ESTOPPED FROM INSERTING "ALLOCATED EXPENSES" AND
CHARGING 15% OF SAID EXPENSES UNDER THE DOCTRINES OF CLAIM
PRECLUSION AND ISSUE PRECLUSION AS
THE ISSUE OF WHAT IS TO BE INCLUDED IN THE NPI STATEMENT HAS BEEN
THE SUBJECT OF A PRIOR LAWSUIT AND JUDGMENT**

On February 24-28, 1992, a trial was held in the Superior Court of the State of California in and for the County of Santa Clara in the case of *Robert J. Membreno, Trustee of the SAI Trust v. Freeport McMoran Resource Partners, Limited Partnership, Calpine Corporation, Santa Rosa Geothermal Company L.P., Sonoma Geothermal Partners L.P. , Calpine Sonoma, Inc., and Does 1 through 20, inclusive*. See Membreno Dec., ¶¶31-32 and Exhibit "I" thereto.

One of the issues decided at the conclusion of trial and resulting Judgment was identical to the issue sub judice, i.e., an attempt by Calpine to unilaterally alter the manner in which NPI was

34

calculated.[8] The trial court determined that this tactic was not permitted as the COPAS percentage rates (which Calpine took upon itself to insert) "were not part of the (Agreement of Purchase)." (A-1038, ¶33; A-1328, ¶2). Accordingly, the issue of what can and cannot be used in calculating the NPI has already been fully litigated and adjudicated by these identical parties.

Under California law[9], the doctrine of collateral estoppel, or issue preclusion, precludes the re-litigation of an issue in the second action if: "(1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding was final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding." *Zevnik v. Superior Court*, 159 Cal.App.4th 76, 82, 70 Cal.Rptr.23d 817 (Cal.App. 2 Dist 2008); *see also Noble v. Draper*, 160 Cal.App.4th 1, 11, 73 Cal.Rptr.3d 3 (Cal.App. 3 Dist. 2008); *Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1688, 71 Cal.Rptr.3d 185 (Cal.App. 3 Dist. 2008).[10]

Surprisingly, the Bankruptcy Court found there to be no estoppel arising from the 1995 Settlement Agreement or the 1992 Judgment because "both disputes were resolved years before the

---

[8] by varying the COPAS (Council of Petroleum Accountants Societies, Inc.) percentage rates.

[9] See Exhibit A, ¶9.6 which calls for California law to apply to the Agreement for Purchase.

[10] The analysis of collateral estoppel is virtually identical in the Second Circuit. Collateral estoppel, or issue preclusion, precludes the re-litigation of an issue where "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2d Cir. 2005) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

Reorganized Debtors' management made the decision to consolidate the operations at the Geysers and neither disagreement addressed the method of calculating 'operating expenses' at issue here." (A-1759). The Bankruptcy Court erred in two respects on this significant point. First, SAI is at a loss to explain the Court's logic for the assertion that because these disputes were settled years before Calpine decided to consolidate its operations, the 1995 settlement and the 1992 judgment have somehow lost their preclusive effect. Second, the Bankruptcy Court disregarded the fact that the issue of how NPI was to be calculated was most certainly addressed in both the Settlement Agreement and the Judgment.

With due respect to the court below, all of the criteria for issue preclusion have been met. First, the issue, i.e., whether charges to NPI can be unilaterally changed/added by Debtors and/or their predecessors-in-interest, is identical. This issue was, *inter alia*, fully litigated over a four day trial, satisfying the second criteria. The issue was necessarily decided and specifically addressed in the Judgment Following Trial. (A-1326-1330 and specifically A-1328,¶2), thus satisfying the third element. The decision in the prior proceeding was final and on the merits, and the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding, satisfying the remaining two elements. Further, as all of the parties to the 1992 trial and subsequent judgment are identical to parties to this litigation, and based upon the foregoing analysis, Debtors are barred by the doctrine of *res judicata* as well.

In short, this is not the first time Debtors have attempted to surreptitiously alter the manner in which NPI is calculated to the detriment of SAI Trust. Following the four day trial in California Superior Court, a judgment proscribing Debtors from altering the NPI calculation was entered. Debtors are either unaware of this judgment (best case scenario) or believe that they are above the

law of this judgment. However, this is a distinction without a difference as either way, Debtors are barred under the doctrines of collateral estoppel and *res judicata* from once again attempting to alter the NPI calculation. These facts and this issue of law cannot be seriously disputed, and summary judgment in favor of SAI Trust must be granted.

### POINT V

### CALPINE'S USE OF BUDGETED NUMBERS RENDERS ITS "CHARGES" TO NPI MEANINGLESS

While not stated in the contract, it defies logic that Debtors have, for more than seven years commencing in April 2001, chosen to use budgeted or projected numbers in the already meaningless NPI statements provided during that time period. (Membreno Dec., A-1038, 1041-1043, ¶¶37, 51, 54, 58). It also defies generally accepted accounting principles ("GAAP"). In essence, Debtors have inserted an unexplained line item expense (Allocated Expenses) which represent a percentage of indirect expenses arising from 18 other plants. Debtors have then tacked on an additional 15% of this unexplained and unjustified line item expense under the guise of "overhead", despite the fact that overhead had already been properly accounted for some eleven years prior. Calpine has in addition failed to certify any of its NPI statements for the past seven years despite what is contractually required, have ignored a prior settlement agreement that they entered freely and willingly into with SAI Trust, and have ignored a California Superior Court judgment specifically addressing this precise issue in a case with identical parties. As if this is not enough accounting chicanery, Calpine has gone one step further and has made the business decision to base their accounting of NPI due and owing to SAI Trust on budgeted figures. Budgeted figures are projected figures. Budgeted figures are predicted figures. Budgeted figures are fictional and non-existent figures. Debtors are charging

37

unexplained expenses to SAI's account from plants that SAI has no interest nor privity with, and

they're not even using expenses actually incurred. They are fictional expenses that may or may not

have ever been actually incurred.

Tellingly, the failure to certify these numbers serves to reinforce exemplifies the reality that

no one on behalf of Debtors is willing to ascribe their name to such questionable accounting

practices. More importantly, Calpine's consistent failure to certify its numbers since April 2001 is

a clear breach of the Agreement for Purchase terms and despite the erroneous finding of the Court

below, this breach has prevented SAI from conducting any type of meaningful audit to determine if

any, all or none of these charges are accurate, for until someone at Calpine is willing to certify their

numbers as contractually required, an audit would be meaningless. The contract is specifically

written so that Calpine is to certify their numbers first, triggering SAI's right to conduct an audit.

> Within 60 days after the end of each fiscal year...[Calpine] shall
> furnish [SAI] with a statement certified by [Calpine's] chief financial
> officer showing in reasonable detail the calcuation of the Net Profits
> Interest.... SAI and its authorized representative shall have the right,
> upon reasonable notice  to [Calpine]...to audit [Calpine's] records to
> determine whether the calculation of Net Profits Interest during the
> fiscal year then ended was in accordance with this Agreement.

(A-1053-1054, Agreement for Purchase §1.6)

SAI clearly has the right to audit Calpine's records once Calpine has provided a certified

statement. Overlooked by the Bankruptcy Court is the fact that had Calpine certified its statements

since 2001 as it was contractually required to do, a proper audit process could have been conducted

in accordance with the agreement and this entire waste of judicial and attorney time and resources

(and paper and trees, etc.) could likely have been avoided. SAI should not be made to waste its time

investigating accounting records that even Calpine is not willing to certify. SAI suspected from the

38

onset that these mystery charges were not permitted under the Agreement and immediately questioned their validity. Calpine's repeated failure to provide a reasonable explanation of the expenses and certify these improper expenses has only served to confirm SAI's correct suspicion. Once Calpine is willing to swear to the authenticity of its accounting, SAI will be more than willing to perform an audit in accordance with the Agreement for Purchase. Until then, such an exercise would be a fool's errand. The Bankruptcy Court, having found the failure to certify to be in breach of the contract, nevertheless erred when it cavalierly held that there were no damages proximately caused by this breach (A-1759).  As will be discussed *infra*, there are very real damages to SAI that have resulted from Calpine's breach, and those damages total $748,824.49 as of September 16, 2008.

### POINT VI

### DEBTORS HAVE BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IMPLICIT IN ALL CONTRACTS

The Bankruptcy Court failed to directly address SAI's argument Calpine breached the implied covenant of good faith and fair dealing implicit in all contracts.  SAI believes that it has established that commencing in April 2001, Calpine unilaterally decided to ignore the clear intention of the parties at the time of entering into the Agreement for Purchase, and proceeded to breach this contract in all of the ways detailed herein.

It is well established that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party will do anything to destroy or injure the right of the other party to receive the benefits of the contract. *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (Cal. 1995) ("[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that

39

frustrates the other party's right to the benefits of the agreement."); *City of Hollister v. Monterey Ins.*

*Co.,* 2008 WL 2894844, *23 (Cal.App. 6 Dist. 2008) (duty of good faith and fair dealing arises from

every contract as an implied covenant generating both a contractual obligation and a duty in tort);

*Pasadena Live, LLC v. City of Pasadena*, 114 Cal.App.4th 1089, 1094, 8 Cal.Rptr.3d 233 (Cal.App.

2 Dist. 2004) ("This covenant ... not only imposes upon each contracting party the duty to refrain

from doing anything which would render performance of the contract impossible by any act of his

own, but also the duty to do everything that the contract presupposes that he will do to accomplish

its purpose.")

By its decisions to: 1) cease accounting for West Ford Flat as a stand-alone plant, despite the

clear language of the contract; 2) allocate expenses from other facilities it acquired; 3) unilaterally

and unexplainedly add 15% of the unwarranted "Allocated Expenses" as "overhead"; 4) cease to

provide certified NPI's as required under the contract, and 5) use budgeted /projected/fictious

figures as opposed to actual figures in the calculation of NPI's, all commencing in April 2001 and

all in contradiction to that which was set forth in the Agreement for Purchase, Calpine has not acted

in good faith.  The Bankruptcy Court erred, as a matter of law, to find accordingly and should be

overruled.

## POINT VII

### GIVEN THE ONGOING NATURE OF DEBTORS BREACH, THE BANKRUPTCY COURT ERRED IN REFUSING TO GRANT SAI'S MOTION FOR SUMMARY JUDGMENT AND RECOGNIZE THAT SAI'S DAMAGES CONTINUE TO INCREASE EACH AND EVERY MONTH

Given the continuous nature of Debtors breach of the Agreement for Purchase, SAI's

damages will continue to grow so long as the breach continues. The Bankruptcy Court, with no

explanation, found that the reality of the situation was an attempt by SAI to "massage" its damages. (A-1758, footnote 2). SAI is not attempting to "massage" anything. SAI is merely fighting to 1) stop Calpine from continuing with its questionable accounting practices at the expense of SAI, and 2) recoup each and every penny that has been effectively transferred from SAI's account to Calpine's account for seven years and counting - whatever term one may use to define such an act.[11]

Debtors specious arguments in the lower court insinuating that SAI's damages are limited to "pre-petition matters" is illogical. Calpine's breach commenced in April 2001, well before its Chapter 11 filing. Calpine's breach has been continuous from that time and throughout the entire reorganization process. SAI is not seeking to assert any "new" claim but is simply seeking damages from the continuous breach that began pre-petition, i.e., SAI is not seeking damages for any other breach of contract or cause of action it may have against Calpine post-petition and pre-confirmation.

> Under the bankruptcy rules, courts may permit post-bar date amendments to timely filed proofs of claim See Fed. R. Bankr. P. 7015 (Rule 15 of the Federal Rules of Civil Procedure governing amendment of pleadings applied in adversary proceedings); *In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) at 133. In determining whether a proposed amendment relates back to a timely-filed claim, courts first examine "whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." *In re Integrated resources*, 157 B.R. 66 (S.D.N.Y. 1993) at 70 (quoting *In re Black & Geddes, Inc.*, 58 B.R. 547 (Bankr. S.D.N.Y. 1983). A claim relates back to a timely filed claim if it "(1) corrects a defect of form in the original claim; (2) describes the original claim with greater particularity; or (3) pleads a new theory of recovery on the facts set forth in the original claim," *In re Enron Corp.*, 419 F.3d 115 (2d Cir. 2005) at 133 (quoting *In re McLean Indus.*, Inc., 121 B.R. 704, 708 (Bankr.S.D.N.Y. 1990))

---

[11] Clearly, the Bankruptcy Court did not take kindly to SAI referring to Calpine's actions in terms such as "fraudulent" and "thieving." SAI will now simply set forth the facts and allow this Court to fashion a more appropriate term for Calpine's actions, if one exists.

*In re Calpine Corp.*, Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738 *4 (S.D.N.Y.

Nov. 21, 2007).

> If the "relation back" threshold is satisfied, courts then examine
> whether, under the facts of the case, it would be equitable to allow the
> amendment. *Id.* (citing 1 In re Integrated Resources, 157 B.R. at 70).
> Courts consider the following five equitable factors in determining
> whether to allow an amendment: (1) undue prejudice to the opposing
> party; (2) bad faith or dilatory behavior on the part of the claimant;
> (3) whether other creditors would receive a windfall were the
> amendment not allowed; (4) whether other claimants might be
> harmed or prejudiced; and (5) the justification for the inability to file
> the amended claim at the time the original claim was filed.*5 In re
> Integrated Resources, 157 B.R., at 70 (internal citation omitted). Rule
> 9006 of the Federal Rules of Bankruptcy Procedure governs the
> admission of late-filed new claims, as opposed to amendments. Rule
> 9006 provides in relevant part that "when an act is required or
> allowed to be done at or within a specified period ... by order of court,
> the court for cause shown may at any time in its discretion ... permit
> the act to be done where the failure to act was the result of excusable
> neglect." Fed. R. Bankr.P. 9006(b)(1). The "excusable neglect"
> standard was analyzed by the Supreme Court in *Pioneer Inv. Servs.
> Co. v. Brunswick Assocs.*, L.P., 507 U.S. 380, 395, 113 S.Ct. 1489,
> 123 L.Ed.2d 74 (1993), and involves consideration of similar
> equitable factors as the second-prong of the test governing
> amendments, including: "the danger of prejudice to the debtor, the
> length of the delay and its potential impact on judicial proceedings,
> the reason for the delay, including whether it was within the
> reasonable control of the movant, and whether the movant acted in
> good faith." *Id.* The justification for the delay is weighed most
> heavily in the "excusable neglect" analysis. *In re Enron,* 419 F.3d
> 122-23 (citing Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368
> (2d Cir.2003).

*In re Calpine Corp.*, Nos. 05-60200 (BRL), 07 Civ. 8493 (JGK), 2007 WL 4326738 *5 (S.D.N.Y.

Nov. 21, 2007).

SAI's proof of claim sets forth in unequivocal language that "these figures are preliminary"

due to the fact that the breach by Debtors was systemic and ongoing on a monthly basis. (A-1339).

42

There is no prejudice to Calpine by amending the damages to reflect the reality that with each passing month and each passing breach by Calpine, the amount of improperly charged expenses continues to mount. Debtors cannot claim surprise by this amendment, as they have willfully chosen to continue their unwarranted accounting practices vis-à-vis SAI and in breach of the Agreement for Purchase throughout the reorganization proceedings. Further, there has been no delay on the part of SAI as Calpine's breach has recurred monthly for the past seven years and will continue in the future.

**POINT VIII**

**ATTORNEYS' FEES AND COSTS**

Section 9.3 of the Agreement for Purchase (Membreno Dec., Exhibit "A") states:

> that if any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees and either costs incurred in that action or proceeding.

SAI's legal fees incurred in enforcing the Agreement for Purchase as of September 16, 2008 totaled $150,466.58[12]. In addition, SAI has incurred additional expenses for accountants it has hired to attempt to decipher the vague "support" Calpine has provided to determine if any of the improper charges are even legitimate.  These expenses total $14,659.30.

---

[12] SAI's legal fees are approaching $200,000.00 as of the date of this appeal and will continue to mount.

## POINT IX

### SUMMARY OF IMPROPER ALLOCATED EXPENSES & 15% OVERHEAD CHARGED BY CALPINE IN MONTHLY NPI STATEMENTS BEGINNING IN April 2001

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | Jan-01 | - | - | | |
| | Feb-01 | - | - | | |
| | Mar-01 | - | - | | |
| Jan-Mar True up | Apr-01 | $210,877.99 | $9,594.95 | $6,476.59 | $971.49 |
| | May-01 | 74,889.32 | 3,407.46 | 2,274.48 | 341.17 |
| | Jun-01 | 107,243.43 | 4,879.58 | 3,220.50 | 483.08 |
| | Jul-01 | 54,514.42 | 2,480.41 | 1,618.47 | 242.77 |
| | Aug-01 | 104,038.44 | 4,733.75 | 3,053.27 | 457.99 |
| | Sep-01 | 82,132.01 | 3,737.01 | 2,382.34 | 357.35 |
| | Oct-01 | 87,599.98 | 3,985.80 | 2,511.05 | 376.66 |
| | Nov-01 | 60,165.47 | 2,737.53 | 1,704.11 | 255.62 |
| | Dec-01 | 35,148.38 | 1,599.25 | 983.54 | 147.53 |
| | Jan-02 | 75,835.26 | 3,450.50 | 2,096.18 | 314.43 |
| | Feb-02 | 65,889.48 | 2,997.97 | 1,798.78 | 269.82 |
| | Mar-02 | 61,450.45 | 2,796.00 | 1,656.63 | 248.49 |
| | Apr-02 | 41,621.72 | 1,893.79 | 1,107.87 | 166.18 |
| | May-02 | 42,069.18 | 1,914.15 | 1,105.42 | 165.81 |
| | Jun-02 | 37,943.85 | 1,726.45 | 984.08 | 147.61 |
| | Jul-02 | 44,318.60 | 2,016.50 | 1,134.28 | 170.14 |
| | Aug-02 | 53,364.83 | 2,428.10 | 1,347.60 | 202.14 |
| | Sep-02 | 54,383.44 | 2,474.45 | 1,354.76 | 203.21 |
| | Oct-02 | 62,323.49 | 2,835.72 | 1,531.29 | 229.69 |
| | Nov-02 | 56,571.61 | 2,574.01 | 1,370.66 | 205.60 |
| | Dec-02 | 57,514.97 | 2,616.93 | 1,373.89 | 206.08 |
| | Jan-03 | 110,891.37 | 5,045.56 | 2,611.08 | 391.66 |
| | Feb-03 | 93,134.88 | 4,237.64 | 2,161.20 | 324.18 |
| | Mar-03 | 83,359.91 | 3,792.88 | 1,905.92 | 285.89 |
| | Apr-03 | 104,483.34 | 4,753.99 | 2,353.23 | 352.98 |
| | May-03 | 100,422.52 | 4,569.22 | 2,227.49 | 334.12 |
| | Jun-03 | 90,554.96 | 4,120.25 | 1,977.72 | 296.66 |
| | Jul-03 | 106,978.17 | 4,867.51 | 2,299.90 | 344.99 |
| | Aug-03 | 94,185.34 | 4,285.43 | 1,992.84 | 298.93 |
| | Sep-03 | 123,901.44 | 5,637.52 | 2,579.17 | 386.88 |
| | Oct-03 | 111,313.10 | 5,064.75 | 2,279.14 | 341.87 |
| | Nov-03 | 188,866.58 | 8,593.43 | 3,802.59 | 570.39 |
| | Dec-03 | 229,528.23 | 10,443.53 | 4,542.94 | 681.44 |
| | Jan-04 | 167,579.22 | 7,624.85 | 3,259.62 | 488.94 |
| | Feb-04 | 161,547.67 | 7,350.42 | 3,087.18 | 463.08 |
| | Mar-04 | 112,971.97 | 5,140.22 | 2,120.34 | 318.05 |
| | Apr-04 | 86,545.03 | 3,937.80 | 1,594.81 | 239.22 |

44

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | May-04 | 78,569.62 | 3,574.92 | 1,421.03 | 213.15 |
| | Jun-04 | 122,794.90 | 5,587.17 | 2,179.00 | 326.85 |
| | Jul-04 | 94,911.07 | 4,318.45 | 1,651.81 | 247.77 |
| | Aug-04 | 101,499.03 | 4,618.21 | 1,731.83 | 259.77 |
| | Sep-04 | 83,585.29 | 3,803.13 | 1,397.65 | 209.65 |
| | Oct-04 | 78,928.33 | 3,591.24 | 1,292.85 | 193.93 |
| | Nov-04 | 66,402.70 | 3,021.32 | 1,065.02 | 159.75 |
| | Dec-04 | 124,427.61 | 5,661.46 | 1,953.20 | 292.98 |
| | Jan-05 | 89,187.80 | 4,058.04 | 1,369.59 | 205.44 |
| | Feb-05 | 130,170.61 | 5,922.76 | 1,954.51 | 293.18 |
| | Mar-05 | 101,011.86 | 4,596.04 | 1,482.22 | 222.33 |
| | Apr-05 | 52,702.62 | 2,397.97 | 755.36 | 113.30 |
| | May-05 | 100,652.98 | 4,579.71 | 1,408.26 | 211.24 |
| | Jun-05 | 98,049.99 | 4,461.27 | 1,338.38 | 200.76 |
| | Jul-05 | 106,146.17 | 4,829.65 | 1,412.67 | 211.90 |
| | Aug-05 | 118,378.04 | 5,386.20 | 1,535.07 | 230.26 |
| | Sep-05 | 126,453.65 | 5,753.64 | 1,596.64 | 239.50 |
| | Oct-05 | 84,586.14 | 3,848.67 | 1,039.14 | 155.87 |
| | Nov-05 | 138,265.49 | 6,291.08 | 1,651.41 | 247.71 |
| | Dec-05 | 67,623.45 | 3,076.87 | 784.60 | 117.69 |
| | Jan-06 | 68,587.29 | 3,120.72 | 772.38 | 115.86 |
| | Feb-06 | 83,468.96 | 3,797.84 | 911.48 | 136.72 |
| | Mar-06 | 88,906.62 | 4,045.25 | 940.52 | 141.08 |
| | Apr-06 | 181,029.40 | 8,236.84 | 1,853.29 | 277.99 |
| | May-06 | 82,321.61 | 3,745.63 | 814.67 | 122.20 |
| | Jun-06 | 89,359.38 | 4,065.85 | 853.70 | 128.06 |
| | Jul-06 | 61,919.82 | 2,817.35 | 570.15 | 85.52 |
| | Aug-06 | 94,229.72 | 4,287.45 | 836.05 | 125.41 |
| | Sep-06 | 91,056.30 | 4,143.06 | 776.82 | 116.52 |
| | Oct-06 | 103,836.19 | 4,724.55 | 850.42 | 127.56 |
| | Nov-06 | 62,095.79 | 2,825.36 | 487.37 | 73.11 |
| | Dec-06 | 51,925.41 | 2,362.61 | 389.83 | 58.47 |
| | Jan-07 | 143,611.4 | 6,534.32 | 1,029.16 | 154.37 |
| | Feb-07 | 98,440.67 | 4,479.05 | 671.86 | 100.78 |
| | Mar-07 | 149,880.64 | 6,819.57 | 971.79 | 145.77 |
| | Apr-07 | 32,134.17 | 1,462.10 | 197.38 | 29.61 |
| | May-07 | 196,530.30 | 8,942.13 | 1,140.12 | 171.02 |
| | Jun-07 | 104,085.74 | 4,735.90 | 568.31 | 85.25 |
| | Jul-07 | 61,754.34 | 2,809.82 | 316.10 | 47.42 |
| | Aug-07 | 143,608.94 | 6,534.21 | 686.09 | 102.91 |
| | Sep-07 | 113,970.38 | 5,185.65 | 505.60 | 75.84 |
| | Oct-07 | 99,930.28 | 4,546.82 | 409.21 | 61.38 |
| | Nov-05 | 97,249.99 | 4,424.87 | 365.05 | 54.76 |
| | Dec-07 | 93,133.80 | 4,237.59 | 317.82 | 47.67 |
| | Jan-08 | 106,738.52 | 4,856.60 | 327.82 | 49.17 |
| | Feb-08 | 101,731.03 | 4,628.76 | 277.73 | 41.66 |
| | Mar-08 | 98,089.94 | 4,463.09 | 234.31 | 35.15 |
| | Apr-08 | 105,704.12 | 4,809.54 | 216.43 | 32.46 |

45

| | Month | Unauthorized Allocated Expense | @4.55% | Interest through 8/1/08 at 9% per annum | Interest on 15%Overhead at 9% per annum |
|---|---|---|---|---|---|
| | May-08 | 106,039.33 | 4,824.79 | 180.93 | 27.14 |
| | | | $378,190.43 | $129,373.59 | $19,406.03 |

Sub-total of unauthorized "Allocated Expenses"                     $378,190.43

Sub-total of unauthorized 15% of Allocated
Expenses added to Overhead                                         56,728.56

Interest on unauthorized "Allocated Expenses"                      129,373.59
at 9% per annum through 8/1/08

Interest on unauthorized 15% of Allocated                          19,406.03
Expenses added to Overhead at 9% per annum
through 8/1/08

Attorneys' Fees (as of 9/16/08)                                    150,466.58

Auditing Expenses                                                  14,659.30

TOTAL                                                              $748,824.49

## <u>CONCLUSION</u>

For the reasons set forth herein, the Memorandum Decision and Order granting the motion for summary adjudication of Calpine, disallowing and expunging under §502 of the Bankruptcy Code, SAI's Proofs of Claim Nos. 6309, 6314, 6315, 6316, 6327 and 6328 and denying SAI Trust's motion for summary judgment should be reversed and the case remanded with directions to enter judgment for appellant SAI Trust.

Dated:  New York, New York
        December 1, 2008

                       Respectfully submitted,

                       **NICOLETTI HORNIG & SWEENEY**
                       Attorneys for
                       *Robert Membeno, Trustee of SAI Trust*

                By:  /s/  *Lawrence C. Glynn*
                   Lawrence C. Glynn (LG-6431)
                   Wall Street Plaza
                   88 Pine Street
                   New York, New York 10005
                   (212) 220-3830
                   NH&S File No.:        00000840LCG