**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Robert Membreno as Trustee of SAI Trust, | ) | |
| | ) | |
| | ) | Case No. 08-CV-09797 (VM) |
| Appellant, | ) | |
| v. | ) | ECF Case |
| | ) | |
| Calpine Corporation, et al., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

---

**BRIEF OF APPELLEES**

---

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)

KIRKLAND & ELLIS LLP
555 California, 27th Floor
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Christopher W. Keegan (admitted *pro hac vice*)

## TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

JURISDICTION OF THIS COURT ...................................................................................3

STATEMENT OF ISSUES ON APPEAL .........................................................................3

STANDARD OF REVIEW ................................................................................................3

STATEMENT OF THE CASE............................................................................................4

    I.    CALPINE PROPERLY MANAGES THE WEST FORD PLANT ON A
CONSOLIDATED BASIS AND CALCULATES THE NPI PAYMENT. ...........4

        A.    The Purchase Agreement Unambiguously Defines The NPI
Calculation. ................................................................................................4

        B.    The Transition From A Stand-Alone Plant To A Consolidated
Operation.....................................................................................................5

        C.    Calpine Continuously Makes The NPI Payments Each Month To
SAI Trust.....................................................................................................6

        D.    Calpine Provides Monthly Reports And Additional Information To
SAI Trust.....................................................................................................7

        E.    Calpine And SAI Trust's Earlier Disputes Were Unrelated To
Direct Operating Expenses And Calpine's Consolidated
Operations. ................................................................................................8

    II.    THE BANKRUPTCY COURT PROCEEDINGS..................................................9

        A.    SAI Trust's Proofs Of Claim And Calpine's Bankruptcy .........................9

        B.    The Bankruptcy Court Granted Calpine's Motion Under Section
502 And Rule 3007 For All The Reasons Advocated By Calpine. ...........10

ARGUMENT.....................................................................................................................12

    I.    THE BANKRUPTCY COURT PROPERLY INTERPRETED THE
PURCHASE AGREEMENT AND CORRECTLY GRANTED
CALPINE'S MOTION. .......................................................................................12

        A.    Contract Interpretation Is A Pure Legal Question And Properly
Resolved By The Bankruptcy Court......................................................12

# TABLE OF CONTENTS
## (continued)

Page

B.    The Bankruptcy Court's Interpretation Of The Purchase Agreement Is The Only Reasonable Interpretation. ....................13

C.    SAI Trust Cannot Manufacture Grounds To Reverse The Bankruptcy Court's Ruling Below................................................14

    1.    SAI Trust's Focus On The Term "Project" Is Misplaced. .............15

    2.    The Bankruptcy Court's Ruling That SAI Trust's Interpretation Is Unreasonable Is Fully Supported And Should Be Affirmed........................................................................16

    3.    The Bankruptcy Court Did Not Err In Rejecting SAI Trust's Course Of Dealing Argument...........................................17

II.    THE BANKRUPTCY COURT PROPERLY DENIED SAI TRUST'S CROSS-MOTION ON ALL REMAINING ARGUMENTS. ...............................18

A.    The Bankruptcy Court Properly Held That SAI Trust's Estoppel And Preclusion Arguments Are Without Merit. ........................................18

B.    The Bankruptcy Court Properly Held That SAI Trust Cannot Establish Any Damages From The Lack Of Certification.........................20

C.    The Bankruptcy Court Properly Found No Breach Of An Implied Covenant Arising From Calpine's Consolidated Operations At The Geysers.....................................................................................................23

III.    THE BANKRUPTCY COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING SAI TRUST'S UNTIMELY AND PROCEDURALLY FLAWED EFFORT TO TRIPLE ITS CLAIM AMOUNT. .................................................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*Automatic Poultry Feeder Co. v. Wedel,*
 28 Cal. Rptr. 795 (Cal. Ct. App. 1963) ........................................................................... 20

*Barker v. Hull,*
 236 Cal. Rptr. 285 (Cal. Ct. App. 1987) ......................................................................... 19

*Barmalea Cal., Inc. v. Reliable Interiors, Inc.,*
 14 Cal. Rptr. 3d 302 (Cal. Ct. App. 2004) ..................................................................... 20

*Bionghi v. Metro. Water Dist. of So. Cal.,*
 83 Cal. Rptr. 2d 388 (Cal. Ct. App. 1999) ..................................................................... 24

*Careau & Co. v. Security Pacific Business Credit, Inc.,*
 272 Cal. Rptr. 387 (Cal. Ct. App. 1990) ......................................................................... 24

*Carma Developers (Cal.) Inc. v. Marathon Dev. Cal., Inc.,*
 826 P.2d 710 (Cal. 1992) ................................................................................................. 23

*Castillo v. City of Los Angeles,*
 111 Cal. Rptr. 2d 870 (Cal. Ct. App. 2001) ................................................................... 19

*Erlich v. Menezes,*
 981 P.2d 978 (Cal. 1999) ................................................................................................. 21

*Espinosa v. Little Co. of Mary Hospital,*
 37 Cal. Rptr. 2d 541 (Cal. Ct. App. 1995) ..................................................................... 21

*Guntert v. City of Stockton,*
 117 Cal. Rptr. 601 (Cal. Ct. App. 1974) ......................................................................... 24

*In re Enron Corp.,*
 419 F.3d 115 (2d Cir. 2005) ................................................................................... 4, 24, 25

*In re Gonzalez-Ruiz,*
 341 B.R. 371 (B.A.P. 1st Cir. 2006) .................................................................................. 4

*In re Ionosphere Clubs, Inc.,*
 922 F.2d 984 (2d Cir. 1990) .......................................................................................... 3, 4

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana SA de CV,*
 347 F.3d 589 (5th Cir. 2003) ............................................................................................ 4

# TABLE OF AUTHORITIES
## (continued)

Page

*Kremer v. Chem. Const. Corp.*,
 456 U.S. 461 (1982)................................................................20

*Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*,
 2 Cal. Rptr. 3d 408 (Cal. Ct. App. 2003)........................................19

*Linden Partners v. Wilshire Linden Assoc.*,
 73 Cal. Rptr. 2d 708 (Cal. Ct. App. 1998)......................................21

*Mitchell v. Gonzalez*,
 891 P.2d 872 (Cal. 1991)..........................................................21

*People v. Carmony*,
 120 Cal. Rptr. 2d 896 (Cal. Ct. App. 2002)....................................19

*People v. Lopez*,
 53 Cal. Rptr. 3d 549 (Cal. Ct. App. 2006)......................................19

*People v. R.J. Reynolds Tobacco Co.*,
 132 Cal. Rptr. 2d 151 (Cal. Ct. App. 2003)....................................13

*Roden v. AmerisourceBergen Corp.*,
 67 Cal. Rptr. 3d 26 (Cal. Ct. App. 2007)........................................12

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
 122 Cal. Rptr. 2d 267 (Cal. Ct. App. 1992)....................................23

*U.S. Cellular Inv. Co. of Los Angeles, Inc. v. GTE Mobilnet, Inc.*,
 281 F.3d 929 (9th Cir. 2002) ......................................................12

*United States v. Mitchell*,
 966 F.2d 92 (2d Cir. 1992)..........................................................4

**Statutes**

Cal. Civ. Code § 1636..................................................................12

Cal. Civ. Code § 1638..................................................................12

Cal. Civ. Code § 3300..................................................................20

**Other Authorities**

*BAJI No.* 3.76........................................................................21

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Rules**

Fed. R. Bankr. P. 8013 ................................................................................................ 3

## <u>INTRODUCTION</u>

SAI Trust asks this Court to grant it what the Bankruptcy Court would not – a right to control Calpine's operations at the West Ford Flat power plant. SAI Trust sold all rights at the West Ford Flat power plant (the "West Ford Plant") in exchange for a monthly Net Profit Interest payment. Yet today, SAI Trust argues that Calpine is not permitted to operate the West Ford Plant as part of its consolidated business operations of nineteen plants at the Geysers steam field. As the Bankruptcy Court properly held, no portion of the Agreement for Purchase and Sale of Asset (the "Purchase Agreement") limits Calpine's ability to operate its facilities, including the West Ford Plant, on a consolidated basis. As part of the consolidated operations and consistent with the Purchase Agreement, Calpine properly allocates direct operating costs in determining the monthly Net Profit Interest ("NPI") payment to SAI Trust.

Consistent with its core function to resolve proofs of claim, the Bankruptcy Court interpreted the unambiguous contract language of the Purchase Agreement, granted Calpine's Motion for Summary Adjudication (the "Motion"), and disallowed and expunged SAI Trust's six proofs of claim filed in the Calpine bankruptcy proceedings. In the same order disallowing SAI Trust's proofs of claim, the Bankruptcy Court denied SAI Trust's Cross-Motion for Summary Judgment (the "Cross-Motion"), finding that none of SAI Trust's arguments proved a breach of the Purchase Agreement by Calpine or grounds to save SAI Trust's proofs of claim.

Faced with the Bankruptcy Court's order rejecting its unreasonable interpretation of the Purchase Agreement, SAI Trust takes refuge in the asserted *de novo* standard of review and reiterates the same unsuccessful arguments that were rejected below. SAI Trust still fails to identify any portion of the Purchase Agreement that limits Calpine's authority to operate the West Ford Plant as part of its consolidated operations or any portion that requires Calpine to exclude permissible categories of expenses from the NPI calculation because those expenses are

1

accounted for on a consolidated basis.  The Bankruptcy Court properly rejected SAI Trust's unreasonable interpretation and this Court should as well.

In addition, the Bankruptcy Court properly rejected SAI Trust's three other grounds for summary judgment, finding there was no estoppel from earlier disputes, that SAI Trust cannot link any damages to a lack of certified annual reports and that Calpine acted in good faith when it consolidated operations at the Geysers and there is no breach of any implied covenant.

On appeal, SAI Trust ignores the proper standard of review, misconstrues the record and reiterates the same arguments rejected below.  Its arguments on appeal should fare no better than they did below for the following reasons:  *First*, there is no preclusion or estoppel from earlier disputes.  As the Bankruptcy Court held, there is no factual connection between SAI Trust's earlier complaints in 1992 and 1995 and those disputes arose years before Calpine's management decision to consolidate operations at the Geysers.  *Second*, the Bankruptcy Court properly held that there is no nexus between SAI Trust's claim related to certification of the annual NPI reports and its alleged damages.  SAI Trust receives the same monthly reports with detailed financial information and journal-specific backup detail today that it always has and there is no causal link between certification and its alleged damages.  *Third*, the Bankruptcy Court properly found that Calpine consistently pays SAI Trust the full value of its NPI every month and it receives the full benefit under the Purchase Agreement.  Further, there is no evidence that Calpine acted in bad faith when it consolidated the business operations at the Geysers and Calpine did not breach any implied covenant.

Finally, the Bankruptcy Court properly exercised its discretion in denying SAI Trust's untimely and procedurally improper effort to *triple* its proof of claim.  SAI Trust does not make any argument that the Bankruptcy Court abused its discretion in determining that SAI Trust's

"attempt to massage its damages claim from approximately $245,000 as set forth in its proofs of claim to over $700,000 in its summary judgment pleading is inappropriate and without justification."  The Bankruptcy Court properly exercised its discretion and its ruling should be affirmed.

## JURISDICTION OF THIS COURT

Calpine does not dispute the jurisdiction of this Court.

## STATEMENT OF ISSUES ON APPEAL

Calpine notes that SAI Trust raises sixteen issues on appeal in its Statement of Issues on Appeal, but only addresses a handful of those points in its brief.  To properly frame this appeal, the issues on appeal should be narrowed to:

1. Whether the Bankruptcy Court properly interpreted the unambiguous language of the Purchase Agreement in finding that Calpine properly calculated the monthly NPI, granting Calpine's Motion and denying SAI Trust's Cross-Motion;

2. Whether the Bankruptcy Court's factual findings supporting its denial of SAI Trust's preclusion claims are clearly erroneous;

3. Whether the Bankruptcy Court properly held that there was no nexus between SAI Trust's claim for damages  and the lack of certification on the annual NPI reports;

4. Whether the Bankruptcy Court properly rejected SAI Trust's claim for breach of the implied covenant of good faith; and,

5. Whether the Bankruptcy Court properly exercised its discretion in denying SAI Trust's untimely and improper effort to triple its proof of claim through its summary judgment papers.

## STANDARD OF REVIEW

On an appeal from the Bankruptcy Court, the District Court should accept all findings of fact unless they are "clearly erroneous."  Fed. R. Bankr. P. 8013; *see also In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir. 1990).  A finding is clearly erroneous only when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Mitchell*,

966 F.2d 92, 98 (2d Cir. 1992).  Conclusions of law are reviewed de novo.  *In re Ionosphere Clubs, Inc.*, 922 F.2d at 988.  Bankruptcy Court decisions denying untimely motions to amend claims are reviewed for abuse of discretion.  *In re Enron Corp.*, 419 F.3d 115, 124, 133 (2d Cir. 2005).  Bankruptcy Courts have broad discretion in resolving disputed proofs of claim and have flexibility in determining whether a matter has been sufficiently argued to resolve a claims objection.  *See In re Gonzalez-Ruiz*, 341 B.R. 371, 381 (B.A.P. 1st Cir. 2006); *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003).

## STATEMENT OF THE CASE

The Bankruptcy Court properly granted Calpine's Motion and denied SAI Trust's Cross-Motion.  After carefully considering all motions, supporting papers and oral arguments, the Bankruptcy Court found that Calpine properly calculates the NPI payment in accord with the unambiguous language of the Purchase Agreement and consistent with Calpine's right to manage the operation of its plants.  The Bankruptcy Court properly rejected SAI Trust's strained interpretation of the Purchase Agreement and properly held that SAI Trust failed to set forth sufficient evidence or arguments to succeed on its remaining claims.  The Bankruptcy Court's opinion is supported by the evidence and the applicable case law.

## I.    CALPINE PROPERLY MANAGES THE WEST FORD PLANT ON A CONSOLIDATED BASIS AND CALCULATES THE NPI PAYMENT.

### A.    The Purchase Agreement Unambiguously Defines The NPI Calculation.

In the Purchase Agreement, SAI Trust sold its interests in a long-term electricity purchase agreement related to the West Ford Plant and received the right to a monthly NPI payment.  *See* Appellant's Designated Items for Record on Appeal (hereafter "App.") at 998.  SAI Trust's NPI is set at 4.55% of Net Income, which in relevant part, is defined as:

> the gross revenues received by Buyer from the Project minus the sum of the following:

4

(ii) all Project direct operating expenses (excluding depreciation),

(iii) general and administrative expenses associated with the Project,

*Id.* at 1068 (other cost categories are not disputed and not cited here).  NPI is based on the performance of the West Ford Plant and is, essentially, revenue minus the cost of operating the West Ford Plant.  The definition of "Net Income" references Exhibit F "for purposes of calculating the direct operating expenses."  *Id.*

Exhibit F is a standard "Accounting Procedure Joint Operations" section of model contracts drafted by the Committee on Petroleum Accounting Standards.  App. at 998, 1104-08.  Exhibit F identifies twelve permissible categories of "Direct Charges" that can be charged against the "Operator," including certain labor, material, transportation, services, equipment and facilities costs, damages and losses, taxes and insurance, among other categories.  *Id.* at 1105-06.  As the Bankruptcy Court recognized, the twelfth category of costs is a "catchall provision, which allows for the deduction from NPI of any expenditure, incurred in the 'necessary and proper conduct of the Joint Operations.'"  *Id.* at 1758, *see also id.* at 1106.  Calpine charges only those categories of operating expenses that are permitted pursuant to Section 9.10 and Exhibit F in the NPI calculation.  *Id.* at 1569, *see also id.* at 1105-07.

**B.**     **The Transition From A Stand-Alone Plant To A Consolidated Operation.**

The West Ford Plant was constructed in the late 1980s as a stand-alone, single-unit facility.  App. at 998.  Calpine did not own or operate any power plants at the Geysers steam field until 1989, when it purchased a one megawatt interest in the Aidlin plant.  *Id.*  Between 1989 and 1998, Calpine came to own or have interests in four plants spread across the thirty square miles of the Geysers steam field, including the West Ford Plant.  *Id.*

When Calpine came to own the West Ford Plant, it continued to operate it as a stand-alone entity.  As a stand-alone entity, Calpine managed the plant apart from its other plants and

all costs and expenses necessary to operate West Ford Plant were accounted separately.  For example, a chemist employed at the West Ford Plant would have his salary accounted for at the West Ford Plant.  That salary was charged as a direct operating expense, consistent with the Purchase Agreement.  App. at 1109.

By 1999 Calpine acquired fourteen generating units and their related steam fields and owned substantially all of the generating units and steam fields at the Geysers.[1]  App. at 999.  In 1999, Calpine began to streamline and consolidate the operation of the plants and the steam fields into operational areas, and all its Geysers units into one consolidated operation.  For example, Calpine consolidated its technical employees (e.g., chemists, operators and engineers) into departments based upon job classification.  *Id.*  Calpine consolidated its operational and business units to achieve efficiencies and costs savings associated with economies of scale.  Once Calpine acquired substantially all of the power plants it managed the West Ford Plant as part of its consolidated operations and accounted for the costs necessary to operate West Ford Plant accordingly.  *Id.* at 441, 1569.

### C.    Calpine Continuously Makes The NPI Payments Each Month To SAI Trust.

Calpine has consistently and correctly interpreted the Purchase Agreement and paid SAI Trust all that it is due each month.  Throughout the life of the Purchase Agreement and the monthly NPI payments, Calpine has *always* included direct operating expenses in the NPI calculation.  App. at 1569.  After Calpine consolidated operations, the direct operating expenses included the West Ford Plant's allocated share of categories of expenses that are accounted for on a consolidated basis.  *Id.* at 1567.  Those direct operating expenses allocated by Calpine are

---

[1]    Calpine owns and operates nineteen of twenty-two power plants at the Geysers.

all permissible direct costs as set forth in the Purchase Agreement and the categories identified in Exhibit F. *Id.*

Calpine allocates direct operating expenses to each individual power plant and steam field by determining its share of various maintenance costs and operation expenses. App. at 441. The allocation percentage is determined by a pro rata sharing among the plants of the yearly budgeted costs and for the West Ford Plant, varies between 3% and 6% each year. *Id.* In calculating the NPI, Calpine charges SAI Trust its allocated percentage share of the direct operating expenses as they are incurred as well as direct charges that are accounted for solely at West Ford Plant. *Id.* at 440-41, 1567-69.

Each category of expense allocated to the NPI payment is included in Exhibit F as a permissible category. *See* App. at 444-57, 1126-1311 (examples of various monthly reports) and 1104-08 (Exhibit F) at II.2.A (outlining permissible salaries that may be charged), II.4 (certain materials costs that may be charged), II.6 (certain service charges for contract services, equipment and utilities may be charged), and II.12 ("Any other expenditure not covered or dealt with in the foregoing provisions of this Section II or in Section III and which is incurred by the Operator in the necessary and proper conduct of the Joint Operations.").

**D.    Calpine Provides Monthly Reports And Additional Information To SAI Trust.**

Every month SAI Trust receives financial reports showing the NPI calculations and specific allocation of costs. The monthly reports include supporting information for both the revenue and costs data used in the NPI calculation and the underlying data, down to specific journal entries. App. at 440-41, 1568-69 and examples at 444-57, 1126-1311. The journal entries are broken into three categories: (i) Lease Operating Expenses (consisting of permissible payroll for field and operations staff and certain direct charges); (ii) Allocated Expenses

(consisting of certain allowable costs for engineering, roads, central operations and maintenance); and (iii) non-allowable expenses (consisting of non-allowable overhead expenses). *Id.* at 440-41.  The non-allowable expenses are included to show that Calpine's calculation does not include "overhead" expenses that are not permitted under the Purchase Agreement.

While SAI Trust argues that it does not have access to adequate information from Calpine, there is no dispute that it receives the financial reports every month.  The financial reports include journal entries for every lease operating expense and every allocated expense. Additionally, Guy Tipton and other Calpine employees met with SAI Trust's representatives and accountant on two separate occasions to walk through the reports and even prepared pro forma financials requested by SAI Trust.  App. at 440-41, 1567-69.  SAI Trust never sought any audit of Calpine's books or records during this dispute.  *Id.* at 1568-69.  SAI Trust's allegation that it lacks sufficient information rings hollow given the monthly reports and Calpine's efforts to provide additional information.

### E.  Calpine And SAI Trust's Earlier Disputes Were Unrelated To Direct Operating Expenses And Calpine's Consolidated Operations.

This dispute is not the first raised by SAI Trust.  In 1992, SAI Trust obtained a judgment against Calpine.  SAI Trust included the "Judgment Following Court Trial" with its Cross-Motion without any additional documents related to the 1992 Judgment.  App. at 1326-30.  The 1992 Judgment is limited to Paragraphs 1.2(b) and (c) of the Purchase Agreement and the calculation of "Invested Capital."  *Id.* at 1327-28.  Paragraphs 1.2(b) and (c) of the Purchase Agreement focus solely on the "Purchase Price" paid, while "Invested Capital" is a defined term related to the Buyer's cost of constructing the West Ford Plant and other costs incurred ***prior*** to the Date of First Commercial Operation.  *Id.* at 1326-29.

After resolving the Invested Capital dispute, Calpine and SAI Trust resolved additional disputed issues in 1994, prior to any litigation, when they entered into the 1995 Settlement Agreement.  App. at 1314-24.  SAI Trust included the 1995 Settlement Agreement in its Cross-Motion without any additional documents.  The 1995 Settlement Agreement identified only three categories of adjustments to the NPI payments: (1) "Overnight Interest" for bank accounts holding revenues generated by West Ford Plant, (2) revenue related to the termination of an escrow account, and (3) funds related to re-financing of the West Ford Plant, with a lower interest rate and longer amortization period.  *Id.* at 1316-19.  The 1995 Settlement Agreement is limited to financing and interest charges which are a separate section of the NPI calculation from the currently disputed Operating Expenses.  *See id.* at 1126.

## II.  THE BANKRUPTCY COURT PROCEEDINGS.

### A.  SAI Trust's Proofs Of Claim And Calpine's Bankruptcy

SAI Trust filed six proofs of claims on July 27, 2006 against six different entities in the Calpine bankruptcy cases.  App. at 141-46.  Each proof of claim asserts the same allegations based on SAI Trust's lawsuit, *Robert Membreno, Trustee of the SAI Trust v. Freeport McMoRan Resource Partners, et al.,* No. 05-cv-041957 (Santa Clara Superior Court) (the "Complaint").  The Complaint asserts four causes of action based on the claim that Calpine improperly calculated the NPI payments by including allocated expenses.  *Id.* at 161-71.  On April 5, 2007, Calpine objected to SAI Trust's proofs of claim on the grounds that its six proofs of claim were unliquidated and invalid.  SAI Trust amended those claims to assert $245,723.09 in pre-petition damages and moved for permission to lift the stay.  *Id.* at 147-55, 461-69.

On January 30, 2008, after several months of unsuccessful settlement negotiations, the Bankruptcy Court heard argument on SAI Trust's Motion to Lift the Automatic Stay and denied SAI Trust's request.  App. at 1867-80.  At that time, the Bankruptcy Court ordered the parties to

mediate SAI Trust's proofs of claim. *Id.* at 859-60; 1882. The May 2008 mediation was unsuccessful and Calpine again renewed its objection to SAI Trust's proofs of claim. *Id.* at 873-95. After a chambers' conference, the parties agreed to a briefing and hearing schedule to resolve SAI Trust's proofs of claim.

After its initial April 5, 2007 amendment to assert $245,723.09 in damages, SAI Trust never amended its claims further. App. at 1562-65, 1702-03. The last bar date for unsecured claims in the Calpine bankruptcies was November 5, 2007 and for administrative claims was March 1, 2008. Calpine's Plan of Reorganization was approved on December 19, 2008 and went effective on January 31, 2008. At no point until its Cross-Motion in September, 2007 did SAI Trust take any steps to seek more than the $245,723.09 in damages. In its Cross-Motion, SAI Trust more than doubled that amount to seek $583,698.61. *Id.* at 1405, 1621. By the time it fully briefed its Cross-Motion, SAI Trust added another $165,000 in damages and tripled its original claim to $748,824.49. *Id.* at 1721.

**B.      The Bankruptcy Court Granted Calpine's Motion Under Section 502 And Rule 3007 For All The Reasons Advocated By Calpine.**

On August 13, 2008, Calpine filed its Motion on the grounds that it correctly interpreted the Purchase Agreement and paid SAI Trust all that it is due. The same day, SAI Trust filed its Cross-Motion. The parties completed their briefing on September 16, 2008 and the Bankruptcy Court heard argument on September 24, 2008. App. at 1895-1923. On September 30, 2008, Judge Lifland entered a memorandum decision and order granting Calpine's Motion, denying SAI Trust's Cross-Motion, and disallowing and expunging SAI Trust's proofs of claim. *Id.* at 1751-60, 1761-63.

The Bankruptcy Court held that the language of the Purchase Agreement was unambiguous and could be construed as a matter of law. App. at 1756-58. The Bankruptcy

Court then found that the only reasonable interpretation of the Purchase Agreement is that Calpine may manage its operations, consolidate the plants and allocate the West Ford Plant's share of direct operating expenses in calculating NPI.  The Bankruptcy Court specifically held that the relevant language controlling the calculation of NPI, including the categories in Exhibit F, is broad enough to include allocated expenses from Calpine's consolidated operations.  *Id.* at 1757.  The Bankruptcy Court stated that SAI Trust's interpretation of the Purchase Agreement is unreasonable and would "result in a windfall to SAI Trust allowing it to avoid application of any direct operating expenses associated with centralized operations and maintenance and properly allocated to West Ford Plant."  *Id.* at 1757-58.

After resolving the contract interpretation dispute, the Bankruptcy Court properly held that SAI Trust's remaining arguments for summary judgment were deficient.  It held that SAI Trust's estoppel and preclusion arguments were without merit because the previous disputes "were resolved years before [Calpine's] management made the decision to consolidate operations at the Geysers," and were factually unrelated because "neither disagreement addressed the method of calculating 'operating expenses' at issue here."  App. at 1759.  The Bankruptcy Court also properly found there is no nexus between SAI Trust's alleged damages from the use of allocated expenses in calculating the NPI and the lack of certification.  Calpine has provided SAI Trust the same monthly NPI reports throughout the duration of the relationship and as the Bankruptcy Court held, each report includes the "underlying information necessary to confirm [the] calculations of NPI."  App. at 1759, n.2, *see also id.* at 444-48, 1126-1311.  The Bankruptcy Court also rejected SAI Trust's breach of implied covenant of good faith claim when it held that SAI Trust receives all it is entitled to under the Purchase Agreement.

The Bankruptcy Court then denied SAI Trust's procedurally improper and untimely effort to triple its proof of claim through its Cross-Motion. App. at 1759, n.2. SAI Trust cannot bootstrap an amended claim into its briefing without seeking leave from the Bankruptcy Court through a motion for its untimely amendment. The Bankruptcy Court recognized SAI Trust's efforts for what they were and found they were "inappropriate and without justification." *Id.*

## ARGUMENT

## I.   THE BANKRUPTCY COURT PROPERLY INTERPRETED THE PURCHASE AGREEMENT AND CORRECTLY GRANTED CALPINE'S MOTION.

The Bankruptcy Court properly held that the unambiguous language of the Purchase Agreement is broad enough to permit Calpine to allocate direct operating expenses in calculating the NPI. That interpretation – that Calpine may operate the West Ford Plant as part of the consolidated Geysers and allocate consolidated expenses – is the only reasonable interpretation of the Purchase Agreement. SAI Trust's interpretation, properly rejected by the Bankruptcy Court, is not supported by the language of the contract and is an unreasonable interpretation that would result in a windfall to SAI Trust.

### A.   Contract Interpretation Is A Pure Legal Question And Properly Resolved By The Bankruptcy Court.

Under California law, contract interpretation is a question of law and the plain language of the agreement should be followed. *See* Cal. Civ. Code § 1638; *Roden v. AmerisourceBergen Corp.*, 67 Cal. Rptr. 3d 26, 39 (Cal. Ct. App. 2007). As the Bankruptcy Court held, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting. App. at 1755, *see also* Cal. Civ. Code § 1636; *U.S. Cellular Inv. Co. of Los Angeles, Inc. v. GTE Mobilnet, Inc.,* 281 F.3d 929, 934 (9th Cir. 2002). Courts should determine the "express intent" based on an objective standard and the subjective intent of

either party cannot contradict the express intent as understood by a reasonable person.  *See*

*People v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 159 (Cal. Ct. App. 2003).

### B.    The Bankruptcy Court's Interpretation Of The Purchase Agreement Is The Only Reasonable Interpretation.

As the Bankruptcy Court held, the language of the Purchase Agreement is clear and

explicit.  App. at 1756-57.  Calpine is required to pay SAI Trust its portion of the Net Income,

calculated profit derived from the plant.  The profit is calculated by subtracting the necessary

costs and expenses to operate the West Ford Plant from the revenues related to the West Ford

Plant's generation of energy.  The language of the Purchase Agreement and Exhibit F is broad

enough to include the West Ford Plant's share of direct operating expenses accounted for on a

consolidated basis.  *Id.* at 1757.

The plain language of the Purchase Agreement and the categories in Exhibit F identify

those expenses permissibly charged in the NPI calculation.  While SAI Trust focuses on the term

"Project," its argument is misplaced and does not undermine the Bankruptcy Court's analysis or

interpretation.   There  is  nothing  in  the  Purchase  Agreement  that  prohibits  Calpine  from

allocating the West Ford Plant's share of the twelve categories of expenses in Exhibit F.

SAI Trust recognized this core point when it stated, in its response to Calpine's Motion

for Summary Judgment:

> Calpine uses the example of an employee who spends ten percent of his or her
> time at an adjacent plant in the Geysers field and ninety percent at the West Ford
> Plant.  Prior to Calpine's unilateral alteration of the [Purchase Agreement], such
> an expense would be properly included as a Project direct operating expense and
> included in either "Lease Operating Expenses" or "Overhead."

App. at 1608-09.  Prior to consolidation, SAI Trust would concede that the salary is a proper

direct operating expense, but it seeks to exclude that cost now because Calpine manages the

worker in a consolidated business operation and allocates a portion of that salary to the West

Ford Plant.  Calpine's management decision on how to best operate the West Ford Plant does not change the status of the worker's salary – it remains a permissible cost properly included as a direct operating expense.  SAI Trust's concession is core to the dispute and further supports the Bankruptcy Court's ruling that the only reasonable interpretation of the Purchase Agreement is one that permits Calpine to operate the Geysers as one operational and business unit and still charge the permissible categories of expenses in determining the monthly NPI.

SAI Trust offers no argument to refute the Bankruptcy Court's holding that SAI Trust's interpretation would "result in a windfall to SAI Trust allowing it to avoid application of any direct operating expense associated with centralized operations and maintenance and properly allocated to West Ford Plant."  App. at 1757-58.  The Bankruptcy Court properly rejected SAI Trust's unreasonable interpretation and granted Calpine's Motion.

**C.    SAI Trust Cannot Manufacture Grounds To Reverse The Bankruptcy Court's Ruling Below.**

SAI Trust raises a number of arguments in an effort to obtain an interpretation of the contract that is unreasonable and inconsistent with the plain language.  First, SAI Trust repeats its "Project"-based interpretation argument which was flatly rejected by the Bankruptcy Court. *See* SAI Trust's Brief for Claimant-Appellant Robert Membreno, As Trustee Of SAI Trust ("App. Br.") at 21-23, App. at 1757-58.  SAI Trust provides no additional case law or facts supporting its interpretation and simply argues that the Bankruptcy Court erred with the hope that this Court will agree.  Second, SAI Trust attempts to manufacture confusion on appeal by misconstruing the Bankruptcy Court's ruling and the record below, incorrectly asserting that Calpine includes expenses from other plants and that Calpine calculates the NPI based on budgeted numbers.  Third, SAI Trust reiterates its rejected argument that a 1989 letter and subsequent monthly NPI reports created a "course of dealing" that prohibits Calpine from

14

consolidating its operations at the Geysers.  As the Bankruptcy Court properly held below, this Court should reject SAI Trust's strained contract interpretation.

### 1.    SAI Trust's Focus On The Term "Project" Is Misplaced.

As the Bankruptcy Court stated, SAI Trust's focus on the term "Project" needlessly ignores the broader plain language of the Purchase Agreement.  SAI Trust's argument, based on "Project" fails for three independent reasons.

First, Calpine does not allocate any other plants' share of costs in calculating the monthly NPI payments.  App. at 1757-58, *see also id.* at 1569.  Allocated expenses represent West Ford Plant's share of the operating expenses, determined by the pro rata share of the annual budgeted costs.  *Id.* at 1569.  There is nothing in the record to substantiate the claims that allocating direct operating expenses results in charges from other plants.[2]  SAI Trust's arguments are wholly unsupported and were properly rejected by the Bankruptcy Court.

Second, as the Bankruptcy Court held, SAI Trust's interpretation would force Calpine to operate the West Ford Plant on a stand-alone basis – giving SAI Trust a management right over the West Ford Plant that it no longer has.  Alternatively, its interpretation would exclude entire categories of expenses that are permissible under the Purchase Agreement, enriching SAI Trust in a manner never intended under the Purchase Agreement.  App. at 1757-58.  Neither is a reasonable interpretation and neither is consistent with the plain language of the Purchase Agreement.  *Id.* at 1068, 1104-08.

---

[2]    Further, both Lease Operating Expenses and Allocated Expenses are "Operating Expenses" and "costs of Operating the Joint Property" under the Purchase Agreement and Calpine properly includes Allocated Expenses as a portion of the Overhead charges pursuant to the definition in the Purchase Agreement.  App. at 1106-07.

Third, while SAI Trust seeks to narrowly limit the calculation of NPI to costs "solely" or "exclusively" at the West Ford Plant by focusing on the definition of "Project," the relevant language is broader.  The plain language of the Purchase Agreement contains language like "cost associated with," and Exhibit F to the Purchase Agreement permits "any cost … necessary and proper to Joint Operations."   App. at 1068, 1104-08.   In particular, the only reasonable interpretation of the categories in Exhibit F, including the catchall twelfth category, is that they are broad enough to include the direct operating expenses utilized by Calpine in calculating the NPI.  *Id.* at 1567, 1104-08.  The plain language supports the Bankruptcy Court's holding that the language is broad enough to include allocated direct operating expenses and that the focus on "Project" is unnecessary and unreasonable.  *Id.* at 1567.

### 2.   The Bankruptcy Court's Ruling That SAI Trust's Interpretation Is Unreasonable Is Fully Supported And Should Be Affirmed.

On appeal, SAI Trust misconstrues the record below in an effort to create confusion where none exists.  SAI Trust argues that Calpine charges costs from other projects and that Calpine uses "fictional" budgeted numbers.  App. Br. at 23-28, 37-39.  As set forth above, the Bankruptcy Court properly held that Calpine does not charge costs from other plants.  App. at 1757-58.   The allocated expenses category represents the West Ford Plant's share of direct operating expenses that are accounted for on a consolidated basis.  That allocation is set as a percentage of budgeted costs across all of Calpine's plants.   As costs are incurred that are permissibly charged to the NPI, the West Ford Plant's allocated share of those costs are charged to the NPI.  Nothing in the record supports SAI Trust's claims that Calpine improperly charges costs from other plants or that Calpine utilizes solely budgeted numbers.  SAI Trust's rhetoric here and in the Bankruptcy Court below does not change the record.  *See id.* at 1400, 1607, 1910 and App. Br. at 41.

16

SAI Trust attempts to create additional confusion by citing to excerpts of Calpine's arguments over the course of the this long standing dispute.  App. Br. at 25.  Its efforts do not support its argument though, as the explanations provided by Calpine are consistent and accurate.  While SAI Trust resorts to rhetoric ("confusing, duplicitous, circuitous double speak") it does not identify how Calpine's explanations are inconsistent or confusing.  SAI Trust's attacks on Calpine's explanation do not support its contract interpretation or undermine the Bankruptcy Court's ruling that SAI Trust's interpretation is unreasonable.

> 3.    **The Bankruptcy Court Did Not Err In Rejecting SAI Trust's Course Of Dealing Argument.**

There is no course of dealing that limits Calpine's ability to utilize the West Ford Plant's share of direct operating expenses in determining the monthly NPI.  SAI Trust focuses on a December 13, 1989 letter and early monthly NPI reports to argue that Calpine cannot consolidate its operations at the Geysers and allocate West Ford Flat's share of direct operating expenses.  However, the December 13, 1989 letter, which identifies Lease Operating Expenses as "actual costs incurred in the operation of the Plant [and] [l]abor costs and related payroll burden are limited to those individuals identified as billable under Exhibit F" of the Purchase Agreement, bolsters Calpine's argument.  App. at 1122-23.  Both in 1989 and today, those costs necessary to operate the West Ford Plant are charged in calculating the NPI.  Both in 1989 and today, those costs are limited to categories of costs and expenses identified in the Purchase Agreement and Exhibit F.  Throughout the duration of its relationship with SAI Trust, Calpine has charged only allowable categories of expenses in calculating the NPI.  That allocated expenses are included as a subset does not change the fact that they are permissible costs pursuant to the Purchase Agreement, Exhibit F and the 1989 letter.

## II.   THE BANKRUPTCY COURT PROPERLY DENIED SAI TRUST'S CROSS-MOTION ON ALL REMAINING ARGUMENTS.

This Court should affirm the Bankruptcy Court's denial of SAI Trust's Cross-Motion on SAI Trust's three remaining arguments.  The Bankruptcy Court properly found that SAI Trust could not succeed on summary judgment or save its proofs of claim.

### A.   The Bankruptcy Court Properly Held That SAI Trust's Estoppel And Preclusion Arguments Are Without Merit.

The Bankruptcy Court properly held there is no estoppel or preclusion arising from the 1995 Settlement Agreement or the 1992 Judgment.  App. at 1759.  The Bankruptcy Court's ruling is based on its factual findings that:  (1) the earlier disputes were resolved years before Calpine's management decision to consolidate operations and use allocated expenses, and (2) the subject matter of the earlier disputes are unrelated to the current dispute about the calculation of direct operating expenses.  *Id*.[3]  SAI Trust does not address the Bankruptcy Court's factual findings, based on the face of the documents submitted by SAI Trust, and does not even attempt to argue that those findings are clearly erroneous.  Without putting forth any argument for this Court to find that the Bankruptcy Court's factual findings are clearly erroneous, SAI Trust's arguments on appeal fail and the Bankruptcy Court's denial of its Cross-Motion should be affirmed.

Further, there cannot, as a matter of law, be any preclusive effect from either the 1992 Judgment or the 1995 Settlement Agreement.  The collateral estoppel or preclusive effect of a

---

[3]   The 1995 Settlement Agreement, which was entered into in 1994, was executed in 1995.  *See* App. 99-108.  SAI Trust now attempts to create confusion on appeal by arguing that the Bankruptcy Court erred when it stated that "[i]n 1994, *a* dispute arose between SAI Trust and Calpine regarding the calculation of NPI payments."  *See* App. 1752 (emphasis added); App. Br. at 24, n.4.  There is no confusion and no error.  The Bankruptcy Court referred to "*a*" dispute in 1994, which is supported throughout the record by SAI Trust's own pleadings.  *See, e.g.*, App. at 17 ¶ 10, 149, 164 ¶ 15, 522 ¶ 22, 613 ¶ 22, and 706 ¶ 25.

judgment only extends to the facts in issue as they existed ***at the time the prior judgment was rendered***. *See People v. Lopez*, 53 Cal. Rptr. 3d 549, 555 (Cal. Ct. App. 2006) (*citing People v. Carmony*, 120 Cal. Rptr. 2d 896, 899 (Cal. Ct. App. 2002)).  Both disputes were resolved years before the management decision to consolidate operations.  Further, prior private settlement agreements cannot be the basis for any collateral estoppel because they are not final judgments. *See e.g*, *Le Parc Cmty. Ass'n v. Workers' Comp. Appeals Bd.*, 2 Cal. Rptr. 3d 408, 417-18 (Cal. Ct. App. 2003).  SAI Trust provided ***no*** evidence that the 1995 Settlement Agreement resolved any judicial proceedings or was ever approved by any court in any manner, much less as a final judgment.

Additionally, under any standard of review, SAI Trust still fails to show any possible preclusion or estoppel.  The party asserting issue preclusion has the burden of proving that the disputed issue "was raised, actually submitted for determination and determined," or "actually litigated" in an earlier dispute.  *Barker v. Hull*, 236 Cal. Rptr. 285, 288 (Cal. Ct. App. 1987).  An issue is "actually litigated" when that issue is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined."  *Id.* at 288.  An issue is "necessarily decided" when the issue was "not entirely unnecessary" to the judgment in the prior proceeding. *Castillo v. City of Los Angeles*, 111 Cal. Rptr. 2d 870, 876 (Cal. Ct. App. 2001).  SAI Trust has the burden of proving each element and failed to do so before the Bankruptcy Court.  *See Barker*, 236 Cal. Rptr. at 288.

On the face of the 1992 Judgment, the court's decision rested solely on the narrow provisions of the Purchase Agreement related to "Invested Capital" and "Purchase Price."  Those provisions, sections 1.2(b) and (c), are separate from any provision currently disputed.  App. 1326-30.  There was no discussion of sections 1.5, 9.10, Exhibit F or Operating Expenses.  From

the face of the 1992 Judgment it is clear that the definitions of "Net Profits Interest" or "Net Income" were not "actually litigated" or "necessarily decided" in the dispute about the interpretation "Purchase Price" and "Invested Capital."   Similarly, the 1995 Settlement Agreement focused on a dispute regarding financing and interest charges and direct operating expenses were neither "actually litigated" or "necessarily decided".  Further, the 1995 Settlement agreement expressly states that all other portions of the monthly NPI calculation  (including direct operating expenses) shall be prepared "in accordance with the terms of the Agreement for Purchase."  *Id*. at 1321-22.

Finally, collateral estoppel is limited to those matters where the party against whom the earlier decision is asserted had a ***full and fair*** opportunity to litigate the issue.  *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480-481 (1982).  In 1992 and 1995, the West Ford Plant operated as a stand-alone plant and Calpine did not allocate any operating expenses.  Calpine did not have and could not have had a full and fair opportunity to litigate whether consolidating operations at the Geysers and allocating direct operating expenses was appropriate under the Purchase Agreement.   Calpine cannot be precluded from doing so now and the Bankruptcy Court's denial of SAI Trust's Cross-Motion should be affirmed.

**B.     The Bankruptcy Court Properly Held That SAI Trust Cannot Establish Any Damages From The Lack Of Certification.**

The Bankruptcy Court properly denied SAI Trust's Cross-Motion because in California, a "breach of contract is not actionable without damages."  App. at 1759, *see also Barmalea Cal., Inc. v. Reliable Interiors, Inc.*, 14 Cal. Rptr. 3d 302, 306 (Cal. Ct. App. 2004).  Damages for breach of contract are limited to those with a proximate connection "between the breach of the contract and the detriment thereby inflicted on the plaintiff."  *Automatic Poultry Feeder Co. v. Wedel*, 28 Cal. Rptr. 795, 799 (Cal. Ct. App. 1963); Cal. Civ. Code § 3300 ("In an action for

breach of contract, the measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby…"); *Erlich v. Menezes*, 981 P.2d 978, 982 (Cal. 1999).

A breach is only a proximate cause of alleged damages if it is a "substantial factor in bringing about that loss or damage."  *See Linden Partners v. Wilshire Linden Assoc.* 73 Cal. Rptr. 2d 708, 721 (Cal. Ct. App. 1998) (affirming the trial court's jury instructions on proximate and substantial factor in breach of contract case); *see also BAJI No.* 3.76; *Mitchell v. Gonzalez*, 819 P.2d 872, 878-79 (Cal. 1991).   A "substantial factor" is something "which is more than slight, trivial, negligible or theoretical factor in producing a particular result." *Espinosa v. Little Co. of Mary Hosp.*, 37 Cal. Rptr. 2d 541, 547 (Cal. Ct. App. 1995).  While the court of appeals in *Linden Partners* affirmed the jury's judgment that the defendants' actions were a "substantial factor" and proximate cause of the damages, the Bankruptcy Court properly found that SAI Trust failed to show that Calpine's actions caused any damages.  The Bankruptcy Court held that SAI Trust receives "the underlying information necessary to confirm their calculations of NPI" and there is no nexus between the lack of certification and SAI Trust's damages.  App. at 1759.

The Bankruptcy Court's finding is supported by the record, as SAI Trust submitted monthly NPI reports showing that it receives the same detailed financial information now that it always has, both before and after Calpine's management decision to consolidate operations. App. at 444-57, 1126-1311.  Those reports include the costs and expenses broken down by category and include journal-specific entries as backup.  *Id.*, *see also id.* at 1567-69.  The unrefuted evidence below is that the reports are created in the ordinary course of Calpine's business operations, utilizing the same PeopleSoft database and procedures as it does for

numerous other royalty payments and are fair and accurate to the best of Calpine's abilities at the time they are prepared and provided to SAI Trust. *Id.* at 1566.

In stark contrast to the record below and the Bankruptcy Court's findings, SAI Trust continues its unsubstantiated argument that the monthly NPI reports are inaccurate because they are not certified.  However, SAI Trust does not identify any specific inaccuracies, other than the use of allocated expenses in general.  Its lack of evidence is telling because in addition to the monthly reports SAI Trust receives, Calpine met with SAI Trust and its outside accountant on two occasions to explain the NPI calculations.  Calpine provided supplemental information to SAI Trust including lists of employees' names, titles and salaries/wage rates, various budgets, outlines of how the allocation percentages were calculated for each category of costs and expenses; and pro forma financials of a hypothetical stand-alone West Ford Plant.  App. at 439-40, 1570.  SAI Trust's assertion that it cannot audit Calpine's books is not supported by the plain language of the Purchase Agreement.  Section 1.6 of the Purchase Agreement permits SAI Trust access, on reasonable notice, to audit Calpine's books and records.  That audit right is independent of any certification of the annual reports and is available to SAI Trust.

The Bankruptcy Court properly held that SAI Trust's alleged damages do not arise from a lack of fair and accurate financial information or a lack of access to Calpine's books and records. Instead, the alleged damages arise from the dispute over interpretation of which categories of operating expenses are permissibly charged in the NPI calculation.  There is no nexus between the lack of certification and the accuracy of the financial information provided by Calpine. Without a nexus between the alleged breach and damages, SAI Trust's claim fails.

**C.** **The Bankruptcy Court Properly Found No Breach Of An Implied Covenant Arising From Calpine's Consolidated Operations At The Geysers.**

The Bankruptcy Court properly rejected SAI Trust's argument that Calpine breached the implied covenant of good faith and fair dealing.  Calpine's decision to manage and operate the West Ford Plant as part of the consolidated Geysers unit was made to achieve efficiencies by consolidating the West Ford Plant with eighteen other plants to create one of the most efficient steam fields in the United States.  Calpine's management decision is not in violation of any provision of the Purchase Agreement, does not interfere with SAI Trust's monthly NPI payments and cannot be the basis for a breach of the implied covenant of good faith.

While California law imposes an implied covenant of good faith, the implied covenant cannot contradict the express terms of a contract.  The scope of conduct prohibited by the covenant of good faith is "circumscribed by the purposes and express terms of the contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr. 2d 267, 277 (Cal. Ct. App. 2002), *see also Carma Developers (Cal.) Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 727 (Cal. 1992).  The express terms of the Purchase Agreement are "clear and explicit" and should be allowed to govern the parties' actions over any implied covenant.  *Carma Developers*, 826 P.2d at 729 ("[t]he language of a contract is to govern its interpretation, if the language is clear and explicit." ) (internal citations omitted).  As the Bankruptcy Court held, "there is nothing in the Purchase Agreement that can be read or construed to limit Calpine's ability to manage the operations of the West Ford Plant as a part of the consolidated Geysers unit."  App. at 1758-59.

Further, under California law, SAI Trust needs to establish a prima facie case that Calpine acted objectively unreasonable or exercised discretion with a lack of good faith.  *Storek*, 122 Cal. Rptr. 2d at 279 (discussing discretion granted pursuant to contractual terms).  "A decision is unreasonable when it is arbitrary, capricious or lacking in evidentiary support" and "a

23

lack of good faith . . . suggest[s] a moral quality, such as dishonesty, deceit or unfaithfulness to duty." *Id.* at 279 (*citing Guntert v. City of Stockton*, 117 Cal. Rptr. 601, 605-06 (Cal. Ct. App. 1974)).  SAI Trust offered no evidence to show that Calpine's decision to consolidate nineteen plants at the Geysers into one of the most efficient steam fields in the United States was "arbitrary, capricious or lacking in evidentiary support."

Separate and independent, the Bankruptcy Court's denial of SAI Trust's Cross-Motion should be affirmed because under California law a claim for breach of the implied covenant of good faith and fair dealing that relies on the same facts and seeks the same damages as a breach of contract claim  "may be disregarded as superfluous as no additional claim is actually stated." *Bionghi v. Metro. Water Dist. of S. Cal.*, 83 Cal. Rptr. 2d 388, 396 (Cal. Ct. App. 1999) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Cal. Ct. App. 1990)). Here, SAI Trust's claim for breach of the implied covenant relies on the same facts and seeks the same damages as its breach of contract claim and may be disregarded.

## III.   THE BANKRUPTCY COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING SAI TRUST'S UNTIMELY AND PROCEDURALLY FLAWED EFFORT TO TRIPLE ITS CLAIM AMOUNT.

The Bankruptcy Court properly rejected SAI Trust's "bootstrap attempt" to triple its damages claim from $245,723.09 to $748,824.49.  *See* App. at 1759.  If claimants could triple disputed claims months or years after the bar date, then the ability to efficiently handle claims in bankruptcy proceedings would be severely impacted.  Even when parties seek leave to file untimely proofs of claim (or amend timely claims after the bar date), bankruptcy courts have broad discretion to allow or disallow those requests.  *In re Enron Corp.*, 419 F.3d 115, 124, 133 (2d Cir. 2005).  On appeal, SAI Trust does not provide any grounds to find that the Bankruptcy Court abused its discretion in denying SAI Trust's procedurally improper and untimely effort to triple its claim.  It was entirely appropriate and responsible for the Bankruptcy Court to deny SAI

24

Trust's altered numbers for being exactly what they are: an "attempt to massage its damages" in a manner that is "inappropriate and without justification."  App. at 1759, n.2.

The cases cited by SAI Trust are inapplicable because they address claimants' efforts to **seek approval** for their untimely claims.  SAI Trust never did so and none of the cases address a claimant attempting to triple its claims without amending its proof of claim.  Even if the cases did apply, the Bankruptcy Court properly exercised its discretion in rejecting SAI Trust's trebled damages claim.  As the Second Circuit held in *In re Enron Corp.*, a claimant seeking to untimely amend its claim must show that its failure to act was because of "excusable neglect."  *In re Enron Corp.*, 419 F.3d at 133.  Applying the Supreme Court's "*Pioneer* Test" to determine excusable neglect, the Second Circuit focuses, in part, on the "reason for the delay, including whether it was within the reasonable control of the movant."  *Id.* at 122-23.  Here, SAI Trust has asserted no rationale for any "excusable neglect" nor offered any "reason for the delay" in amending its claim.  Under any standard, the Bankruptcy Court properly rejected SAI Trust's bootstrap efforts to triple its damages through its Cross-Motion.

<u>**CONCLUSION**</u>

For all of the reasons set forth herein and presented to the Bankruptcy Court below, Calpine respectfully requests that this Court affirm the Bankruptcy Court's Order granting Calpine's Motion, denying SAI Trust's Cross-Motion, and disallowing and expunging SAI Trust's proofs of claim.

Dated: December 29, 2008
     San Francisco, California

Respectfully submitted,

    */s/ Christopher W. Keegan*
Richard M. Cieri (RC 6062)
Edward O. Sassower (ES 5823)
Christopher W. Keegan (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP

Counsel for Appellees

25