*To be Argued by:*
LAWRENCE C. GLYNN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

CALPINE CORPORATION, et al,                          Case No.:   08 Civ. 9797 (VM )

                 Debtor-Appellee.


ON APPEAL FROM THE UNITED STATES
BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK


-----------------------------------------------------------------x


═══════════════════════════════════════════════════

# REPLY BRIEF FOR CLAIMANT-APPELLANT
# ROBERT MEMBRENO, AS TRUSTEE OF SAI TRUST

═══════════════════════════════════════════════════


**NICOLETTI HORNIG & SWEENEY**
**Attorneys for Robert Membreno,**
***As Trustee of SAI Trust***
**Wall Street Plaza**
**88 Pine Street**
**New York, New York 10005**
**(212) 220-3830**


═══════════════════════════════════════════════════


Of Counsel:
Lawrence C. Glynn

## <u>TABLE OF CONTENTS</u>

<u>TABLE OF AUTHORITIES</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

<u>REPLY ARGUMENT</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

      SAI TRUST SEEKS ONLY TO BE PAID THAT WHICH IT IS OWED UNDER
      THE TERMS OF THE AGREEMENT FOR PURCHASE . . . . . . . . . . . . . . . . . . . . . . . 1

      A.     SAI Does Not Seek to Manage Calpine's Consolidated Plants . . . . . . . . . . . . . . 1

      B.     The Project Is and Always Has Been One and Only One Plant - West
              Ford Flat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT II

      CALPINE'S INABILITY TO EXPLAIN THE NATURE AND BASIS OF THESE
      NEWLY CHARGED EXPENSES UNDERMINES THEIR POSITION THAT ITS
      INTERPRETATION OF THE AGREEMENT FOR PURCHASE IS REASONABLE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT III

      CALPINE DOES NOT EVEN ADDRESS THE CLEAR EQUATION PRESENTED
      IN SAI'S PRINCIPAL BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT IV

      THIS NEW CATEGORY EXPENSES WAS NOT INSERTED BY CALPINE
      UNTIL 3 YEARS FOLLOWING ITS CONSOLIDATION OF THE PLANTS AT
      THE GEYSERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT V

      AN ANALYSIS OF THE FIGURES BELIES CALPINE'S INSISTENCE THAT
      NOTHING HAS CHANGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

POINT VI

      THE QUALITY OF CALPINE'S SUPPORTING DOCUMENTATION IS NIL . . . . . 16

POINT VII

      CALPINE'S DELIBERATELY MISSTATES ONE OF SAI'S ARGUMENTS  . . . . . . 18

POINT VIII

      THE TERM "JOINT OPERATIONS" IN A BOILERPLATE ACCOUNTING
MODEL DO NOT ALTER THE PLAIN LANGUAGE OF THE CONTRACT  . . . . . . 19

POINT IX

      REMOVING THE WORD "PROJECT" DOES NOT   ALTER THE ONLY
REASONABLE INTERPRETATION OF THIS AGREEMENT . . . . . . . . . . . . . . . . . 21

POINT X

      CALPINE HAS ADMITTED NUMEROUS TIMES THAT THESE ALLOCATED
EXPENSES ARE BASED SOLELY ON BUDGETED, I..E., FICTITIOUS
FIGURES AND ITS LATEST ARGUMENTS TO THE CONTRARY ARE
WITHOUT MERIT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

POINT XI

      THE LOWER COURT ERRED IN FAILING TO RECOGNIZE THAT THE WEST
FORD FLAT WAS THE ONLY PLANT MENTIONED IN BOTH THE
AGREEMENT FOR PURCHASE AND THE 1995 SETTLEMENT AGREEMENT
AND THAT CALPINE MUST NOW HONOR THESE TWO CONTRACTS  . . . . . . . 26

POINT XII

      THE BANKRUPTCY COURT ERRED IN FINDING THAT THE 1992 TRIAL
AND RESULTING JUDGMENT DOES NOT ACT AS AN ESTOPPEL OF NOW
RE LITIGATING THE ISSUE OF WHETHER CALPINE MAY UNILATERALLY
ALTER THE MANNER IN WHICH THE MONTHLY NPI STATEMENTS ARE
CALCULATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

POINT XIII

      CALPINE'S BREACH OF THE AGREEMENT FOR PURCHASE WAS A
SUBSTANTIAL FACTOR CONTRIBUTING TO SAI'S DAMAGES . . . . . . . . . . . . 28

POINT XIV

      DAMAGES AND ATTORNEYS' FEES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

**Cases**

*Eastern Airlines, Inc. v. Insurance Co. of Pennsylvania*, No. 96 Civ. 7113(MGC), 2001 WL 1111514 *6 (S.D.N.Y., Sept. 21, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Espinosa v. Little Co. of Mary Hosp.*, 37 Cal. Rptr. 2d 541, 547 (Cal. Ct. App. 1995) . . . . . . . 30

*Federal Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (1ˢᵗ Dep't 1999) . . . . . . . . . . . . . 8

*In re Black & Geddes, Inc.*, 58 B.R. 547 (Bankr. S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Fibermark, Inc.* 349 B.R. 385 (Bkrtcy.D.Vt., 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Integrated resources*, 157 B.R. 66 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Linden Partners v. Wilshire Linden* Assoc. 73 Cal.Rptr. 2d 708, 721 (Cal. Ct. App. 1998) . . . . 30

*Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Lawyers' Mut. Ins.*, 885 F.Supp. 202 (S.D.Cal., 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) . . . . . . . . . . . . . . . . . . . . . . . 8

**Rules**

Cal. Civ. Proc. Code. § 1856(c) (West 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Treatises**

31 Cal.Jur.3d Evidence § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## REPLY ARGUMENT

### POINT I

### SAI TRUST SEEKS ONLY TO BE PAID THAT WHICH IT IS OWED UNDER THE TERMS OF THE AGREEMENT FOR PURCHASE

**A.     SAI Does Not Seek to Manage
        Calpine's Consolidated Plants**

Lest there be any confusion, SAI has absolutely no desire to control Calpine's operations at the West Ford Flat power plant.  See Appellee's Brief ("Appellee Br.") at p 1, 15 and Memorandum Decision on Reorganized Debtors' Motion for Summary Adjudication of SAI Claims and SAI Trust's Countermotion for Summary Judgment ("Decision") at p 8. For the lower court to have made such a finding and for Calpine to argue repeatedly as it does that SAI is seeking to somehow wrest control of the operation of West Ford Flat, demonstrates a complete inability or unwillingness to truly grasp the core issues now on appeal. While such subterfuge was not only successful but was endorsed by the Bankruptcy Court, it should not be entertained here. Quite simply, SAI only seeks to have the terms of the Agreement for Purchase enforced and followed by Calpine in accordance with the letter of that agreement and in accordance with the manner in which accounting for the West Ford Flat plant took place for eleven years prior to Calpine's unilateral breach.

This case is, at its core, a dispute over royalty payments and SAI is only seeking to have its royalty paid in strict conformance with the terms of the Agreement, as opposed to the diluted version that Calpine began offering some 2-3 years following its consolidation of 19 power plants known as the Geysers. Calpine is free to manage its business in any way it pleases. Calpine is not free, however, to account for SAI's NPI in any way it pleases. Rather, Calpine is contractually obligated to account for SAI's NPI in accordance with the Agreement for Purchase. Thus, while SAI has no

interest in the management of Calpine's plants, SAI most certainly has retained its rights to monthly net profit interest from the operation of one, and only one, power plant.

**B.      The Project Is and Always Has Been
         One and Only One Plant - West
         Ford Flat**

"SAI Trust sold its interest in the 1984 QF power purchase agreement between PG&E and SAI Geothermal, Inc. to Freeport, but retained the rights to monthly net profit interest payments from operation of the *West Ford Plant (the 'Project')*." See Declaration of Guy Tipton in Support of Reorganized Debtors' Motion for Summary Judgment dated August 13, 2008 (A-998, emphasis added). That SAI has retained its right to receive monthly NPI payments and that these payments are derived from operation of the West Ford Plant (the "Project") and no other plant, has been conceded by Calpine. Importantly, these are Mr. Tipton's own words. Mr. Tipton mentioned no other plant when explaining what the "Project" encompassed and what profits were owed. His own words limit the profits to be paid to SAI to the West Ford Flat plant. As SAI has rights to profits derived only from West Ford Flat, as conceded by Mr. Tipton, then so too should it only be charged expenses derived exclusively from West Ford Flat. However, since 2001, while SAI's profits have been limited to the revenue generated exclusively from the West Ford Flat plant, it has been charged expenses from not only the West Ford Flat plant, but also an arbitrary percentage of pooled expenses from Calpine's consolidated operations of 18 other plants.

Calpine's argument from the outset has been that since the Agreement for Purchase doesn't specifically proscribe charging these additional, unexplained and unjustified expenses, which even Calpine has great difficulty defining, then it is perfectly acceptable for Calpine to include these charges as deductions to SAI's NPI. SAI posits that as the language of the Agreement for Purchase

2

is specifically and inextricably woven into the definition of one and only one power plant, West Ford Flat, that any expenses derived from the operation of one or more plants other than West Ford Flat simply are not permitted. Even Mr. Tipton recognized this fact in his own declaration. (A-998).

In addition, the Agreement for Purchase specifically uses the word "project" twice, in order to clearly set forth and limit the parameters of the agreement. See §9.10, definitions of Net Income and Net Profits Interest, A-1068.[1] The word "project" immediately preceding the term "direct operating expenses" modifies that term so as to preclude all other interpretations. "California principles of contract construction make it very clear that courts should give effect to all terms of a [contract] where it is possible, reading [the contract] as a whole to determine the meaning of any disputed provisions." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Lawyers' Mut. Ins.*, 885 F.Supp. 202, 206 (S.D.Cal., 1995). The lower court inexplicably decided that the word "project"

---

[1] Net Income is defined as the gross revenues being received by Buyer from the Project minus the sum of the following:

> (ii) all **Project** *direct operating expenses* (excluding depreciation).
>
> (iii) general and administrative expenses associated with the Project,
>
> (iv) if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of the Project Financing.

(A-1068, §9.10, definition of Net Income). Emphasis added.

The term "Net Profits Interest" is defined next in the Agreement for Purchase.

> "Net Profits Interest": shall mean, *with respect to the **Project***, the right to receive a payment each month, commencing as provided in Section 1.5, for the life of the **Project**, but not longer than 30 years from the Date of First Commercial Operation, in an amount equal to 6% of Net Income for the month.

(A-1068, §9.10, definition of Net Profits Interest). Emphasis added.

3

was of no import and instead agreed with Calpine that the otherwise clear, unambiguous contractual language should be broadened. See Memorandum Decision at p 7, A-1757.  As set forth in appellant's principal brief at p 23, the Court erred in finding that "Calpine has neither suggested nor attempted to, deduct expenses from NPI that were attributable to any plant other than West Ford Plant." (A-1757). Yet this is precisely what Calpine has been doing since 2001 and Calpine did not contest this point in its opposition to this appeal. The Court then mistakenly went on to expand the language of §9.10[2] and held it was "broad enough to encompass overhead costs allocated by the Reorganized Debtor to the West Ford Plant." A-1757. However, the court failed to explain how it is that overhead costs attributable to the West Ford Plant, which are now and have always been charged under the category of "Overhead," are properly chargeable under the newly inserted category of "Allocated Expenses" as well. This was a clear error on the part of the Bankruptcy Court.

## POINT II

### CALPINE'S INABILITY TO EXPLAIN THE NATURE AND BASIS OF THESE NEWLY CHARGED EXPENSES UNDERMINES THEIR POSITION THAT ITS INTERPRETATION OF THE AGREEMENT FOR PURCHASE IS REASONABLE

As set forth in SAI's principal brief, Calpine has referred to various expenses which they claim are chargeable to NPI and has used terms and definitions such as "direct operating expenses," (See Debtors' Brief in Support of its Motion for Summary Adjudication, hereinafter "Debtors Br.", generally at A-876-895); "allocated expenses," (Debtors Br., generally, A-876-895 and the actual term used in each monthly NPI since April 2001, see e.g. A-1129-1148); "lease operating expenses" and/or "lease overhead expenses," (see Third Tipton Declaration, hereinafter "Third Tipton Dec.", A-1567 at ¶5 and  Debtors' Response in Opposition to SAI's Motion for Summary Judgment,

---

[2] Which it mistakenly and repeatedly refers to as §9.1.

4

hereinafter "Debtors Resp." at A-1410); "budgeted share of various maintenance costs and operation expenses," (Debtors Br., A-883, ¶19); "direct operating expenses associated with departments that directly support the plant on a non-exclusive basis," (Debtors' Br., A-883, ¶20); "direct operating costs associated with departments that are fully and exclusively dedicated to supporting the plant,"(Debtors' Br., A-883, ¶20); "a further refinement of direct operating expenses necessitated by the implementation of operational efficiencies," (Debtors' Br., A-885, ¶24), and "direct operating expenses as the West Ford Plant's specific share of the consolidated operating expenses," (Debtors' Br., A-888, ¶31). SAI will be most impressed if this Court is able to comprehend and interpret any of these definitions as Calpine itself has demonstrated time and again its inability to do so.

Calpine labels as "rhetoric" SAI's valid argument that these numerous definitions are wholly devoid of meaning, instead of actually countering it with fact and law. Not surprisingly, Calpine has now offered yet another nebulous definition for these mystery charges, referring to them in its opposition brief as "West Ford Plant's allocated share of categories of expenses that are accounted for on a consolidated basis." See Calpine's Appellate Brief in Opposition (hereafter "Appelle Br.") at p6. This is a contract interpretation of a very specific term, i.e., "project direct operating expenses." Calpine has offered so many confusing iterations to define this term so as to be bereft of any meaning whatsoever. How can it be, then, that Calpine can argue that the term is unambiguous (in its favor) on the one hand, yet must resort to nearly a dozen different definitions of the term on the other? The fact that Calpine needs so many definitions for what it believes is an "unambiguous" term severely undermines their position. The lower court, in error, assisted Calpine in its quirky endeavor to sock SAI with these unexplained mystery charges by deciding that the word "project" wasn't important, thereby completely altering the essence of the agreement.

5

By contrast, SAI has offered but one clear definition for "project direct operating expenses" that are properly chargeable to NPI. Those are the direct operating expenses attributable to the "project" and nothing else. The "project" is clearly identified in the Agreement for Purchase, i.e., West Ford Flat. Under SAI's clear, intelligible, reasonable interpretation, any attempt to charge "Allocated Expenses," which take into account pooled expenses from 18 other power plants, is nullified by the language of the Agreement for Purchase which limits expenses to only the West Ford Flat power plant.

SAI's position is bolstered by the 1989 letter explanation provided by Calpine's predecessor (A-1122 through A-1124) which was provided simultaneously with the very first NPI statement which makes no mention of "Allocated Expenses." This position is further reinforced by the eleven year course of dealing from 1989 through 2000, a position which the lower court failed to address. In fact, where SAI has been seeking to limit the scope of the Agreement to the natural language used therein, e.g., "*project* direct operating expenses," the lower court ruled that the scope of the agreement should be substantially broadened by ignoring the word "project" altogether.

The Court then ruled that "SAI Trust has not pointed to a single legal authority in support of its interpretation." (A-1757). This is untrue as SAI thoroughly briefed the issue that the terms of a written contract may be explained or supplemented by the parties' course of dealing. (A-1391-1392, A-1618-1620). *See* Cal. Civ. Proc. Code. § 1856(c) (West 2008) ("The terms set forth in a writing ... may be explained or supplemented by course of dealing or usage of trade or by course of performance."); *see also* 31 Cal.Jur.3d Evidence § 371 ("[T]he terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may be explained or supplemented by course of dealing or usage of trade or by course of

6

performance.")  The parties' course of dealing may determine the meaning of a contract term or may

add an agreed but unstated term. *See Marin Storage & Trucking, Inc. v. Benco Contracting and*

*Engineering, Inc.*, 89 Cal.App.4th 1042, 1051, 107 Cal.Rptr.2d 645 (Cal.App. 1 Dist. 2001).

In *Eastern Airlines, Inc. v. Insurance Co. of Pennsylvania*, No. 96 Civ. 7113(MGC), 2001

WL 1111514 *6 (S.D.N.Y., Sept. 21, 2001) a similar issue arose wherein Eastern Airlines received

monthly loss runs from its insurance broker which combined the amount paid out on claims for

indemnity and medical with allocated loss expenses in a single total. Eastern, similar to SAI,

objected to the inclusion of allocated loss expenses and identical to the situation presented here, the

term "allocated expenses" was not specifically addressed in the governing contract. However, unlike

SAI, Eastern did not question the inclusion of allocated loss expenses for eight years. In ruling

against Eastern, the Southern District held that "[g]enerally speaking, the practical interpretation of

a contract by the parties to it for any considerable period of time before it comes to be the subject

of controversy is deemed of great, if not controlling, influence" citing *Federal Ins. Co. v. Americas*

*Ins. Co.*, 691 N.Y.S.2d 508, 512 (1ˢᵗ Dep't 1999), quoting *Old Colony Trust Co. v. City of Omaha*,

230 U.S. 100, 118 (1913).

Here, the practical interpretation assigned to this agreement by both SAI and Calpine for

eleven years, did not include any category of expenses other than that which was set forth in the

Agreement for Purchase and the December 1989 letter explanation accompanying the very first NPI.

The Court is respectfully referred to the very first NPI found at A-1126 through A-1137, and the

excerpt of NPI statements covering the period from January 1998 through December 2002 (A-1160

through1269). The Court will notice that at no time prior to April 2001 was there an entry on any

NPI for "Allocated Expenses" or any other expenses derived from pooling consolidated expenses

7

and then charging an arbitrary percentage thereof to SAI's NPI. The practical interpretation maintained by both parties was that all overhead and project direct operating expenses were sufficiently accounted for under the categories that existed for eleven years and outlined in the December 1989 explanatory letter authored by Calpine's predecessor. While the lower court apparently ignored SAI's briefing on the issue of course of dealing and incorrectly found that SAI had not set forth a case in support of its position, the lower court failed to set forth any legal authority in support of its misguided interpretation. Nor has Calpine for that matter. The Court compounded this error by stating incorrectly that "In 1994, a dispute arose between SAI Trust and Calpine regarding the calculation of NPI payments." (A-1752). The dispute at issue before this Court arose in 2001, not 1994.  The decision of the Bankruptcy Court must therefore be reversed.

## POINT III

### CALPINE DOES NOT EVEN ADDRESS THE CLEAR EQUATION PRESENTED IN SAI'S PRINCIPAL BRIEF

The clear equation set forth in SAI's principal brief demonstrates its point succinctly. The calculation of NPI from the outset of the agreement between these parties and for eleven years following was:

**NPI = Revenue - Lease Operating Expenses - Overhead**

where Overhead = .15 x Lease Operating Expenses.

After April 2001, the equation was altered to include a heretofore unheard of category of expenses called "Allocated Expenses" and overhead was altered from 15% of "Lease Overhead Expenses" to 15% of the sum of "Lease Overhead Expenses" plus "Allocated Expenses."  The equation thus became:

**NPI = Revenue - Lease Operating Expenses - Allocated Expenses - Overhead**

> where **Allocated Expenses** = a category of expenses which Calpine has been completely unable to satisfactorily define or explain, and
>
> **Overhead** = .15 x (Lease Operating Expenses + Allocated Expenses).

Notably, Calpine does not even attempt to counter the accuracy of this equation in its opposing brief and, in fact, does not even address this entire key point. Nevertheless, in the interest of completeness, using these accurate equations which clearly define the issue before the court, and inserting sample figures, it can be proven to a mathematical certainty that SAI has received less than it has been owed for the last eight years, and that this will continue so long as Calpine is permitted to breach the Agreement.

For argument's sake, if "Revenue" = $1,000, "Lease Operating Expenses" = $100 and "Allocated Expenses" = $100, then under the terms of the agreement, as understood by all parties for eleven years, NPI would equal 4.55% of ($1,000 - $100 - $15) = $40.27. However, under the new formula, as unilaterally imposed by Calpine in April 2001, NPI now equals 4.55% of ($1,000 - $100 - $100 - $30) = $35.04. In fact, no matter what numbers are plugged into these equations, SAI receives less each and every month than it had when the Agreement for Purchase was followed by Calpine. Thus, as a result of Calpine's breach which began in April 2001, has continued each month since, and will continue each month going forward, SAI has received less than that to which it is entitled. Putting aside for the moment Calpine's failure to adequately support the validity of these new "Allocated Expenses" or explain how they differ from the expenses already encompassed in "Lease Operating Expenses" or "Overhead," exactly how this can be construed as a windfall to SAI

9

(as argued by Calpine and agreed to by court below) is quite mystifying to say the least. To the contrary, this is very much a windfall to Calpine. In light of the Bankruptcy Court having improperly found this to be a windfall to SAI, this factual finding was clearly erroneous and reversal is warranted.

It should also be pointed out that if, in fact, these expenses were legitimate but not charged prior to 2001, then why did Calpine not seek to recover these uncharged expenses by litigation or otherwise? If, as Calpine is now arguing, the method used in calculating NPI for eleven years which (SAI seeks to have reinstated) would provide a windfall to SAI, wouldn't Calpine have had a legitimate basis to sue SAI for all pre-2001 windfalls? Calpine's duplicitous positions and arguments, like its mystery charges, are whole cloth.

## POINT IV

## THIS NEW CATEGORY EXPENSES WAS NOT INSERTED BY CALPINE UNTIL THREE YEARS FOLLOWING ITS CONSOLIDATION OF THE PLANTS AT THE GEYSERS

Calpine (and the lower court) gloss over the fact that Calpine never charged SAI for Allocated Expenses prior to the consolidation. Undeterred, Calpine repeats its insistence that such charges are permissible under its interpretation of the Agreement for Purchase, i.e., the one that ignores the word "Project" completely, and cavalierly states in its brief at p 6 that "Calpine has always included direct operating expenses in the NPI calculation." This disingenuous argument, which was quite unbelievably accepted by the lower court, ignores the reality that since 2001, in addition to including all "direct operating expenses" previously encompassed under Lease Operating and Overhead expenses, Calpine began inserting indirect expenses associated with 18 other plants

which were never contemplated under the Agreement for Purchase under the guise of "Allocated Expenses."

Importantly, the lower court also ignored the fact that Calpine consolidated its operations in 1998-1999[3] yet didn't add the category of "Allocated Expenses" until April 2001. (A-1233). Once again, a review of the excerpts of NPI statements included in the record is most telling. A-1150 through A-1232 contains the NPI statements provided for each month from January 1998 until March 2001. There is not a single mention of any category of expenses called "Allocated Expenses." The term springs from out of the blue in the April 2001 statement (A-1233) and has been inserted in each statement since. (See A-1233 through A-1269). This begs the question that if the operations were consolidated in 1999 (Calpine's Br., p6; A-441; A-1567), then why weren't these supposedly legitimate, necessary and "properly" chargeable expenses included in any of the NPI statements in 1999 or 2000? Thus, Calpine's insistence that inclusion of the new category of "Allocated Expenses" was necessary to maintain transparency rings hollow. If it was so necessary, it would not have taken 2-3 years to implement.

Which brings us to yet another clearly erroneous factual finding by the lower court, i.e., its finding that "in 1998, however, after Calpine came to own a majority of the consolidated geysers field (the "Geysers") and power plants in the area surrounding the West Ford Plant, Calpine consolidated the Geysers into a single business entity and began allocating costs and expenses to departments and individual plants." (A-1752). As demonstrated in the preceding section, this is clearly not true. While the consolidation occurred in 1998-1999, the allocating of costs and expenses

_____

[3] See Calpine's Brief in Opposition ((Calpine Br.)) at p6, and Declarations of Guy Tipton at A-441 and 1567)

11

to departments (sic) and individual plants did not occur until April 2001. The lower court's decision should be reversed based upon this clearly erroneous finding of fact.

In addition, neither Calpine nor the Bankruptcy Court bothered to address SAI's related argument that there is no rational basis for Calpine's unilateral decision to alter the overhead expense, which for eleven years had been 15% of Lease Operating Expenses, to the arbitrary figure of 15% of the *sum* of Lease Operating Expenses and Allocated Expenses. In fact, neither Calpine nor the lower court has explained how it is that if the purpose of consolidation was to "streamline" and "eliminate the cost of duplicating" (Tipton Dec., A-999) then how is it that SAI has seen its expenses increase precipitously immediately following the April 2001 accounting change? It is precisely this type of highly questionable accounting that smacks of Enron, Tyco, WorldCom, i Village, Peregrine Systems, Adelphia, and more recently, FannieMae, FreddieMac and Madoff.

With nary a deposition taken nor a shred of documentary evidence produced in response to SAI's valid requests for production[4], the Bankruptcy Court deemed SAI's arguments to be "blivet"[5] and treated them as such when rendering its flawed decision. At oral argument, Judge Lifland spent more time dressing down counsel for SAI for its "excessive zeal and emotion" (A-1910) and ignored the reality of what is going on. SAI urges that this Court recognize that peoples' livelihoods are at stake, and that counsel's zeal and emotion in this regard is commensurate with the gravity of the situation.

---

[4] See Reorganized Debtors' Response to Robert Membreno's, as Trustee of SAI Trust, Second Request for Production of Documents and Things and Entry upon Land for Inspection, A-1656-1701.

[5] At an in chambers conference on July 17, 2008, Judge Lifland advised counsel for SAI that SAI's position was a "blivet." Judge Lifland then asked counsel if he knew what that term meant. Counsel replied that he was not familiar with the term. Judge Lifland advised that blivet means ten pounds of manure stuffed into a five pound bag.

## POINT V

### AN ANALYSIS OF THE FIGURES BELIES CALPINE'S INSISTENCE THAT NOTHING HAS CHANGED

The gist of Calpine's argument both in the lower court and now is that nothing has changed as a result of its decision to consolidate its operations and that SAI has received everything it is owed. However, inserting actual numbers into the equations set forth above further drives home the point that very much has changed and Calpine has been inaccurate, to say the least, in its accounting of the NPI.

The annual NPI payments to SAI in 2000 were $887,356.78, the year before the breach of the Agreement for Purchase and unilateral change to accounting procedures. By contrast, the NPI payments in 2001 were $632,806.41, a 29% decline. How is it that SAI's expenses increase after Calpine's "streamlining" which was, by Mr. Tipton's own words, an effort to eliminate duplicate expenses? When comparing the 2001 total NPI to the year 1998 ($936,766.60) the decline is an even more stark 32%. These numbers bear out the truism that the only party receiving a windfall as a result of Calpine's breach of the Agreement for Purchase was Calpine. This windfall came at the expenses of SAI and Debtors protestations to the contrary are belied by the numbers. These facts were ignored by the Court below and that failure on the Court's part was clearly erroneous.

Delving further into the numbers (something that Calpine refuses to do), the Total Operating Expenses from January 1990 through December 2000 were $39,528,663.63, which is an average monthly Total Operating Expense of $299,459.57 (over a 132 month period). Conversely, Total Operating Expenses for the period December 2001 through May 2008 were $35,831,899.80, which is an average monthly Total Operating Expense of $391,369.66 (over an 89 month period). This

means that under the new Calpine accounting method, Total Operating Expenses charged to SAI's NPI increased an average of 31% or $91,910.09 each month.

These numbers belie Calpine's repeated, erroneous assertions that nothing has changed and that all of the expenses charged to NPI prior to 2001 are the same expenses charged since, merely under new terminology. If nothing has changed, as Calpine argues, then how does one explain an average 31% increase in monthly expenses over a 7 1/2 year period? This is the antithesis of what Mr. Tipton and Calpine believe is streamlining and eliminating duplicate expenses. Further, if nothing has really changed, then what harm would it be to any party if the method that was used for eleven years was reinstated? Perhaps Calpine doth protest too much. Nevertheless, the lower court, in error, ignored all of these stark comparisons as well.

Delving even further into the monthly NPI statements reveals that during the period of 1994-2000, the seven year period immediately prior to Calpine's breach of the Agreement for Purchase and unilateral change of the method of accounting, the total NPI paid to SAI was $4,402,730.77. Conversely, during the period 2001 through 2007, the seven year period immediately following Calpine's breach of the Agreement for Purchase and unilateral change of the method of accounting, the total NPI paid to SAI was $3,679,851.94, a decline of $722,878.83. The monthly NPI payment to SAI over these two periods decreased from an average of $628,961.54 prior to 2001 to $525,693.13 after Calpine's change in accounting that, according to them and accepted by the lower court, wasn't really any change at all. The numbers confirm that Calpine's breach and unwarranted, unilateral amendment to the Agreement for Purchase has translated into a windfall of $722,878.83 to Calpine over that 7 year period and completely contradicts Debtors assertion that 1) their efforts to consolidate operations were in order to reduce costs and 2) they have paid SAI that which is

14

proper under the Agreement for Purchase. These facts, too, were completely ignored by the Court below when it determined that SAI has been paid all that it is owed under the Agreement for Purchase. The lower court proceeded to disdainfully refer to SAI's valid arguments as an "attempt to massage its damages" and referred to it as inappropriate and without justification.

### SUMMARY OF ANNUAL NPI PAYMENTS TO SAI FOR YEARS 1994-2007

| Year | Annual NPI to SAI |
|------|------------------|
| 1994 | $668,188.29 |
| 1995 | 605,274.72 |
| 1996 | 627,501.76 |
| 1997 | 701,429.83 |
| 1998 | 936,766.60 |
| 1999 | -23,787.21 |
| 2000 | 887,356.78 |
| **Total** | **$4,402,730.77** |
| | |
| 2001 | 632,806.41 |
| 2002 | 455,362.07 |
| 2003 | 522,886.08 |
| 2004 | 522,256.22 |
| 2005 | 424,463.50 |
| 2006 | 560,518.83 |
| 2007 | 561,558.83 |
| **Total** | **$3,679,851.94** |

The Bankruptcy Court overlooked the obvious when it held that "clearly the overhead allocations deducted by Calpine were 'necessary and proper' to the operation of the West Ford Plant once Calpine began operating the West Ford Plant as a part of the centralized Geysers." A-1758. This ignores the reality that all necessary and proper expenses charged to SAI have been, and continue to be, included under the category of Lease Operating Expenses. Calpine has failed to distinguish the expenses charged under Lease Operating Expenses and Allocated Expenses. SAI does not argue that properly supported expenses cannot be charged to NPI. SAI has only argued that all direct operating expenses have already been accounted for under Lease Operating Expenses and there is no basis under the Agreement for Purchase for an additional category of expenses that has now been unilaterally inserted by Calpine. Simply stated, Calpine is charging for the same thing twice. The Bankruptcy Court neglected to address this critical argument which, at the very least, raises a triable issue of fact precluding summary judgment.

## POINT VI

## THE QUALITY OF CALPINE'S SUPPORTING DOCUMENTATION IS NIL

Calpine disingenuously argues that it has provided financial reports to support Allocated Expenses. SAI does not dispute that Calpine sends pieces of paper with numbers on them. SAI does not dispute that it receives these pieces of paper every month. SAI does not dispute that Calpine believes this suffices as proper support for its mystery charges. SAI also does not dispute that Calpine could send cocktail napkins with notes scribbled on them that would contain more accurate and useful supporting data than that which it actually provides. For SAI's argument is not with the quantity of financial data provided by Calpine, it is with the quality of the data. Calpine repeatedly confuses the two concepts, both in briefing the issue at the Bankruptcy Court level and now. While

16

this verbal chicanery may have yielded a victory in the lower court, it should not be countenanced by this court.

To demonstrate the point, Guy Tipton proffered a third declaration (after failing to satisfactorily explain these mystery charges in either of his first two attempts) wherein he sets forth a seemingly exhaustive list of all the data provided in support of the mystery charges. (A-1566-1570). The first nine paragraphs of this declaration are a barrage of Calpine double speak and non answers, carefully crafted to give the unwary reader a sense of comfort that Calpine's mystery charges are both legitimate and supported. However, at paragraph 10, Mr. Tipton admits that the "detailed" data provided relates *only* to the total expenses of consolidated operations and not to any specific, actual expenses directly attributable to the West Ford Flat plant.

> While the line-item journal entries included as back-up support represent the *full consolidated expenses*... only West Ford Plant's allocated share of those journal entries are charged to SAI Trust." (A-1569, ¶10, emphasis added).

SAI's Requests for Admissions, Request No. 25 asked Calpine to admit that journal entries Debtors claim support the "Allocated Expenses" are not specific to the West Ford Plant. Calpine responded that "Consistent with their General Objections, the Reorganized Debtors admit this request." A-1641.  For the lower court to have found as it did that "Calpine has neither suggested, nor attempted to, deduct expenses from NPI that were attributable to any plant other than the West Ford Plant" (A-1757) and that "the Reorganized Debtors have in fact provided SAI Trust with the underlying information necessary to confirm their calculations of NPI" is belied by Calpine's own admissions and the record now on appeal. These findings were in clear error and must be reversed as there can be little doubt that Calpine is not providing the detailed support it claims and is not

17

accounting for actual expenses incurred from the operation of West Ford Flat. It is providing journal entries that apply generally to its consolidated operations and then arbitrarily charging a percentage[6] of those total expenses to SAI regardless of whether or not said expenses relate directly to the West Ford Flat plant. This is in complete contradiction to the language of the agreement which allows only the deduction of "all **Project** *direct operating expenses*."   The lower court overlooked these critical admissions, in clear error.

## POINT VII

## CALPINE'S DELIBERATELY MISSTATES ONE OF SAI'S ARGUMENTS

Calpine accuses SAI of confusing the issue and proceeds to misstate SAI's argument citing the following passage from SAI's brief in opposition in the lower court:

> Calpine uses the example of an employee who spends ten percent of his or her time at an adjacent plant in the Geysers field and ninety percent at the West Ford Flat plant. Prior to Calpine's unilateral alteration of the Agreement for Purchase terms, such an expense would be properly included as a Project direct operating expense and included in either "Lease Operating Expenses" or "Overhead."

Appellee Br., p 13.

Calpine argues that the foregoing is some sort of acquiescence by SAI as to the legitimacy of the mystery charges but neglects to cite the entire passage leaving off the following:

> However, since April 2001, such an expense is covered not only in "Lease Operating Expenses" and "Overhead", but also in "Allocated Expenses."

(A-1608-1609).

---

[6] Which is 3-6% of the total consolidated expenses. Appellee Br., p7. However, there is absolutely no mention by Calpine as to the basis for using 3, 4, 5, or 6% and there has been no supporting documentation provided to justify using say 6% as opposed to 3%. Apparently, it is whatever Calpine believes is a fair amount.

Thus, instead of countering the crux of SAI's argument, Calpine simply chose to omit it and pretend it doesn't exist.

## POINT VIII

### THE TERM "JOINT OPERATIONS" IN A BOILERPLATE ACCOUNTING MODEL DO NOT ALTER THE PLAIN LANGUAGE OF THE CONTRACT

Calpine and the Bankruptcy court consider SAI's focus on the term "Project" to be "needless" and "ignores the broader plain language of the Purchase Agreement." Appellee Br., p15. Calpine relies upon the "catchall" language of Exhibit "F" which allows the inclusion of "any other expenditure...which is incurred by the Operator in the necessary and proper conduct of the Joint Operations." First, Calpine has conceded that Exhibit F to the Agreement for Purchase is a "standard 'Accounting Procedure Joint Operations' section of model contracts drafted by the Committee on Petroleum Accounting Standards. There is no reference to SAI Geothermal or Freeport in Exhibit F, and the parties did not draft Exhibit F." A-880, ¶13. Debtors thus agree that Exhibit F is mere boilerplate. Debtors desperately attempt to use this boilerplate accounting model to vastly expand the scope of the actual Agreement for Purchase to include 18 other plants which were never contemplated at the time this agreement was drafted. This significant leap ignores the clear, unmistakable definition of the term "Project," which is the West Ford Flat Power Plant.

The lower court bought into Calpine's subterfuge and held that:

> Exhibit F identifies twelve permissible categories of "Direct Charges" that may be charged against the "operator." Included among those twelve categories is a catch-all provision, which allows for the deduction from NPI of any expenditure, incurred "in the necessary and proper conduct of the Joint Operations." (A-1758).

19

Lost on the lower court was the fact that while necessary and proper expenses are rightfully charged to NPI, they were at all times included in the category of "Lease Operating Expenses" and "Overhead." However, Since 2001, SAI has been charged for these "necessary and proper" expenses under not only the categories of "Lease Operating Expenses" and "Overhead," but under the newly conjured category of "Allocated Expenses." Calpine and the lower court have not explained the justification for charging SAI for these expenses again under the fictitious category of "Allocated Expenses." Calpine is charging for the same thing twice and has been doing so since April 2001.

Calpine appears to merely be echoing the sentiment of the Bankruptcy Judge who incorrectly held:

> While SAI Trust has repeatedly (and needlessly) sought to call attention to the use of the phrase "all Project" in the Purchase Agreement and 1995 Settlement Agreement in hopes of narrowly limiting the calculation of NPI, the Court agrees with the Reorganized Debtor that the relevant language is actually much broader. Section 9.1 (sic) of the Purchase Agreement is clear and unambiguous on its face, and it calls for the deduction of <u>all</u> "direct operating expenses" from the calculation of net income.

A-1757, emphasis in original.

Putting aside for the moment that the lower court repeatedly refers to the section at issue as "9.1" when it is actually "9.10", which is undeniably erroneous, of course the language will appear much broader as set forth by the Court, as it excludes the critical term "Project" which was purposely placed between the words "all" and "direct" in §9.10 so as to eliminate all doubt as to what expenses could and could not be charged. Calpine now opposes this appeal based upon this judicial rewrite of the contract, and hangs its entire argument on the words "joint operations" contained in a boilerplate accounting model. Also lost on Calpine and the lower court is the fact that there were no

20

"joint operations" at the time this contract was formed in 1987. There was only but one project and that project was known as West Ford Flat.

## POINT IX

### REMOVING THE WORD "PROJECT" DOES NOT  ALTER THE ONLY REASONABLE INTERPRETATION OF THIS AGREEMENT

Webster's Dictionary (print version)[7] definition of "direct" is, in pertinent part:

> **direct** *adj* [ME, fr. L *directus*, fr. pp. of *dirigere*] **3 :** characterized by close logical, causal, or consequential relationship <direct evidence> **4 :** NATURAL, STRAIGHTFORWARD  **5 a :** marked by absence of an intervening agency, instrumentality, or influence.

Thus, applying these definitions to the term "operating expenses" means that the expenses must have a "close logical, causal, or consequential relationship" and are "marked by absence of an intervening agency, instrumentality, or influence." Calpine and the lower court are hard pressed to reconcile the numerous, contorted definitions ascribed to "operating expenses" by Calpine with the word "direct." Having gone through such linguistic gymnastics as Calpine has is akin to putting a square peg in a round hole and is, in any event, the polar antithesis of "direct." Black's Law Dictionary defines direct, in pertinent part, as:

> **2.** (Of a thing or a person) straightforward <a direct manner>. **3.** Free from extraneous influence; immediate.

Thus, the only "straightforward" definition that can be applied to the term "operating expenses" is that such expenses are related directly and straightforwardly to the "project" and that project is, as defined in the Agreement for Purchase, West Ford Flat. These expenses apply to West

---

[7] Meriam Webster's on-line dictionary is virtually identical to the print version. The Court is respectfully referred to http://www.merriam-webster.com/dictionary last viewed August 19, 2008

Ford Flat exclusive and absent of any intervening agency, instrumentality or influence such as the 18 other plants that Calpine has since acquired or the hopes and whims of Calpine's accountants and counsel.

Equally important is the fact that all "direct" expenses have already been accounted for and charged under the categories of "Lease Operating Expenses" and "Overhead," a point overlooked by the lower court and one that Calpine has not denied.

## POINT X

## CALPINE HAS ADMITTED NUMEROUS TIMES THAT THESE ALLOCATED EXPENSES ARE BASED SOLELY ON BUDGETED, I.E., FICTITIOUS FIGURES AND ITS LATEST ARGUMENTS TO THE CONTRARY ARE WITHOUT MERIT

Calpine has the audacity to argue that these mystery expenses are not based upon budgeted numbers and states that "nothing in the record supports SAI Trust's claims that Calpine improperly charges costs from other plants or that Calpine utilizes solely budgeted numbers." Appellee Br., p 16. By its own admission, Calpine stated as follows:

> costs are attributed pro rata among the plants based on the yearly **budgeted** costs. Thus, for example, assuming all other things being equal, in a year in which West Ford Plant is required and budgeted to have an overhaul, a greater portion of the maintenance costs would be attributed to it than in a year in which no such overhaul was scheduled." (A-882-883, footnote 3).

Further, SAI's Rule 56.1 Statement of Undisputed Facts, no. 37 states:

> The uncertified NPI statements that Calpine has provided since April, 2001 use budgeted figures as opposed to actual figures.

Calpine responded to this statement as follows:

> **Undisputed** but immaterial. The Reorganized Debtors use a commercially reasonable method of allocation to determine direct

22

> operating expenses when calculating the Net Profits Interest. Because the West Ford Plant is no longer a stand-alone plant, Calpine allocates costs (sic) the West Ford Plant based on **yearly budgeted costs** in relation to the other plants at the Geysers' facility.

A-1541-1542. Emphasis added.

Thus, Calpine is most certainly 1) pooling expenses from its consolidated operations and then charging a portion of these pooled expenses from 18 other plants to West Ford Flat in contradiction to any reasonable interpretation of "direct operating expenses" and in clear contradiction to the Bankruptcy Court's finding of fact and 2) using budgeted numbers. For Calpine to argue the opposite to this Court is untrue. Further, the lower court overlooked these admissions and failed to address the critical argument that Calpine's "Allocated Expenses" are based upon budgeted, i.e., un-incurred expenses.

In its opposition, Calpine goes on to contradict itself by arguing that:

> the allocated expenses category represents the West Ford Plant's share of direct operating expenses that are accounted for on a consolidated basis. That allocation is set as a percentage of budgeted costs across all of Calpine's plants. As costs are incurred that are permissibly charged to the NPI, the West Ford Plant's allocated share of those costs are charged to the NPI."

Appellee Br., p 16.

Buried somewhere in this thoroughly confusing and nonsensical passage appears to be yet another admission that Calpine indeed uses budgeted numbers and charges SAI accordingly. For how on earth can the figures Calpine uses to calculate SAI's NPI be both "budgeted" and "incurred" as this deceptive passage states? SAI has not received any amended NPI's reflecting when actual incurred expenses were charged and Calpine has never before argued that any such revised statements were ever prepared and provided. That being said, the terms "budgeted" and "incurred"

23

are mutually exclusive and the duplicity on the part of Calpine time and time again is readily apparent. Nevertheless, the lower court accepted such double speak and rewarded it by the granting of Calpine's motion for summary judgment, and denial of SAI's motion. The decision must be reversed.

A useful analogy, which was apparently ignored by the Bankruptcy Judge, is nevertheless helpful to further highlight the level of deceit and corruption that is potentially involved as a result of Debtors' actions. The Court will appreciate that attorneys must account for their time devoted to working on each matter and must provide detailed bills setting forth the nature of the work done and the amount of time for each task.

Imagine if attorneys were to adopt the new Calpine accounting method. Imagine a firm which represented a single power plant company beginning in, say, 1987. Imagine further that for 11 years, that firm worked on this power plant company's cases and accounted for and billed its time accordingly. However, somewhere during that time period, other power plant companies began using this firm's services. Then, one day, out of the blue and in order to make life simpler for the law firm's accounting department, the firm arbitrarily decided that going forward, instead of itemizing the work done specifically for each client, it was going to lump all of its power plant company clients together and allocate an arbitrary percentage of the total hours spent working for all of these various clients to each of its individual clients, while continuing to charge each client separately for another category of expenses. Certainly, under Calpine's accounting method, this would be justified, so long as the Retainer Agreement didn't specifically proscribe such unethical practices.

Taking this analogy one step further, now imagine that the firm was going to use budgeted figures in addition to the previously described arbitrary percentage of the total work it did for all of

24

its power plant clients. Thus, the firm was not going to bill the individual client for work actually done, but instead was going to bill the client based upon an arbitrary percentage for work that the firm *expected it will have to do*, i.e., "budgeted" work.  Under the new Calpine accounting method, the firm would justify this unheard of practice by telling its individual client, for example, that "we believe that your company is going to need to file three law suits against certain vendors this year, and defend 257 law suits that we anticipate will be brought by customers, vendors, competitors, state, local and the federal government." Unfettered, this firm could then bill its client 1) for a percentage of the firm's total work it does for all of its power plant clients; 2) a separate category of charges for each individual client, and 3) for fictitious work it predicts it will have to do, regardless of whether the work actually gets done or whether any of this theoretical work would even be necessary. Nevertheless, in the world of the "Calpine accounting method," all of these unperformed attorney services would be billable, so long as the Retainer Agreement did not preclude this method. The lower court ignored this very real analogy and proceeded to not only deny SAI's motion for summary judgment, but grant Calpine's. The court's decision must be reversed.

As an attorney fully familiar with the pressure of reaching annual goals for billing, the Calpine method would be a welcome change and would seem too good to be true. Attorneys would be free to bill for all kinds of work that they "anticipated" needed to be done. For in reality, it would be too good to be true. It would be unethical and illegal. It would be stealing. The Court must see the sheer insanity of Calpine's position and must deny its motion for summary judgment and grant SAI's motion for summary judgment. Should Calpine believe that the preceding section is "rhetoric" than it is referred to *In re Fibermark, Inc.* 349 B.R. 385 (Bkrtcy.D.Vt., 2006), wherein a host of

25

consolidated expenses by the reorganized debtors' attorney were disallowed as not being "actual,

necessary and justified."

## POINT XI

## THE LOWER COURT ERRED IN FAILING TO RECOGNIZE THAT THE WEST FORD FLAT WAS THE ONLY PLANT MENTIONED IN BOTH THE AGREEMENT FOR PURCHASE AND THE 1995 SETTLEMENT AGREEMENT AND THAT CALPINE MUST NOW HONOR THESE TWO CONTRACTS

Calpine's opposition to SAI's estoppel arguments are as flawed as the Bankruptcy Court's

decision, as neither Calpine nor the lower court have set forth a single case that stands for the

proposition that the concepts of claim and issue preclusion do not apply when circumstances change

years later. Under this absurd ruling, the principles of res judicata and collateral estoppel have been

virtually eradicated. There is not now, nor has there ever been, any contract between SAI Trust and

Calpine, nor any of their respective predecessors, subsidiaries, affiliates and related entities, where

the subject of the contract was any power plant other than West Ford Flat. (A-1037, ¶¶28-30; A-

1314-1324).  The Bankruptcy Court failed to appreciate that this Settlement Agreement reinforced

the notion that the mutual intent of the parties at the time of the Agreement for Purchase was that

it applied to only one plant, West Ford Flat, and that NPI would be calculated based upon expenses

from that plant alone. There are no new facts or issues that alter the agreement's preclusive effects.

The 1995 settlement agreement states:

> As a result of said Agreement for Purchase, SAI Geothermal, Inc.
> Received a 6% Net Profits Interest ["NPI" herein] in the gross
> revenues received by Freeport-McMoRan Resource Parnters in the
> operation of a geothermal power plant known as West Ford Flat
> located in Sonoma County, California.

Note that the 1995 Settlement Agreement does not mention any other plant. The agreement then specifically limits expenses that could be charged to NPI to that one plant:

> SAI Trust holds a right to conduct annual audits of the operation of West Ford Flat after receipt of an annual certified NPI statement.

A-1315.

That agreement also sets forth that SAI's right to audit is triggered by Calpine's contractual obligation to provide certified NPI statements, something that has not been done for 8 years. The agreement further states that:

> CALPINE agrees to prepare said Annual NPI reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement.

There is no mention of any other power plant in either the Agreement for Purchase or the Settlement Agreement, ergo, Calpine is not permitted to base NPI on any plant other than that which is specifically mentioned in these agreements. Calpine must now honor these contracts to which it is a party and return to the status quo that existed for eleven years prior to 2001and calculate NPI based exclusively on the West Ford Flat plant without any inclusion of Allocated Expenses derived from its other plants.

### POINT XII

### THE BANKRUPTCY COURT ERRED IN FINDING THAT THE 1992 TRIAL AND RESULTING JUDGMENT DOES NOT ACT AS AN ESTOPPEL OF NOW RE LITIGATING THE ISSUE OF WHETHER CALPINE MAY UNILATERALLY ALTER THE MANNER IN WHICH THE MONTHLY NPI STATEMENTS ARE CALCULATED

With respect to the preclusive effects of the 1992 Judgment, Calpine argues that SAI "still fails to show any possible preclusion or estoppel." (Appellee Br., p 19). Calpine and the Court are

respectfully referred to pp 34-37 of SAI's principal brief wherein SAI sets forth at length the basis for asserting estoppel. It bears repeating, however, that one of the issues decided at the conclusion of trial and resulting Judgment in 1992 was identical to the issue *sub judice*, i.e., an attempt by Calpine to unilaterally alter the manner in which NPI was calculated.[8] The trial court determined that this tactic was not permitted as the COPAS percentage rates (which Calpine took upon itself to insert) "were not part of the (Agreement of Purchase)." (A-1038, ¶33; A-1328, ¶2). Accordingly, the issue of what can and cannot be used in calculating the NPI has already been fully litigated and adjudicated by these identical parties. The trial court determined that Calpine was not permitted to unilaterally change the terms of the agreement then, and accordingly, Calpine is precluded from altering the terms of the agreement now. The issue is identical.

## POINT XIII

### CALPINE'S BREACH OF THE AGREEMENT FOR PURCHASE WAS A SUBSTANTIAL FACTOR CONTRIBUTING TO SAI'S DAMAGES

The lower court erred in focusing solely on the fact that Calpine has failed to certify its annual NPI statements. Lost on the court below is the fact that Calpine has failed to provide any annual NPI statements, certified or otherwise. This finding was clearly erroneous.

Thankfully, Calpine does not dispute that it is contractually obligated to provide annual NPI statements and that same are to be certified by its chief financial officer. Importantly, Calpine does not now (nor has it ever) disputed that it has continuously breached this contractual obligation since 2001 in that it has not provided any annual statements, certified or otherwise. Calpine sought to escape this contractual obligation by distracting and confusing the lower court to focus only on its

---

[8] by varying the COPAS (Council of Petroleum Accountants Societies, Inc.) percentage rates.

28

failure to certify without mentioning its failure to provide the statements altogether. Calpine was surprisingly successful employing such underhanded tactics in the lower court. However, even the cases cited now by Calpine in support of its misguided argument strongly support SAI's position, i.e., that Calpine's failure to provide certified annual statements are a "substantial factor" and proximate cause of SAI's damages. *Linden Partners v. Wilshire Linden* Assoc. 73 Cal.Rptr. 2d 708, 721 (Cal. Ct. App. 1998); *Espinosa v. Little Co. of Mary Hosp.*, 37 Cal. Rptr. 2d 541, 547 (Cal. Ct. App. 1995).

Further, having failed to provide annual NPI statements as required has frustrated any efforts by SAI to determine the legitimacy of these mystery charges by conducting a proper audit. SAI's ability to audit the monthly NPI statements (which Calpine admits are based solely on budgeted numbers) is contingent upon receiving annual NPI statements under the Agreement for Purchase. The Agreement for Purchase is very clear on this issue:

> Within 60 days after the end of each fiscal year...[Calpine] shall furnish [SAI] with a statement certified by [Calpine's] chief financial officer showing in reasonable detail the calculation of the Net Profits Interest.... SAI and its authorized representative shall have the right, upon reasonable notice to [Calpine]...to audit [Calpine's] records to determine whether the calculation of Net Profits Interest during the fiscal year then ended was in accordance with this Agreement.

(A-1053-1054, Agreement for Purchase §1.6). Thus, if it turns out that a "budgeted" expense actually does become an "incurred" expense, this type of information would be included on an annual NPI statement. SAI could then verify that what once was deemed "budgeted" by Calpine actually became "incurred" and thus verify the legitimacy of the expense. As Calpine does not deny that it has never once provided an annual NPI statement since 2001, SAI has been unable to conduct a proper audit and confirm the validity of these mystery charges. This continuous breach by Calpine is therefore

29

a substantial factor and proximate cause of SAI's damages. Calpine's failure to provide certified annual NPI statements has only served to confirm SAI's correct suspicion that the monthly NPI's are erroneous and improper.

The lower court further erred in ignoring the fact that not only did Calpine fail to provide certified annual NPI statements, Calpine has failed to provide any annual NPI statements, as it is contractually obligated to do. This failure on the part of Calpine is a substantial factor and proximate cause of SAI's damages, *Id* and the failure of the lower court to address this distinction was clearly erroneous. Accordingly, the decision must be reversed.

## POINT XIV

## DAMAGES AND ATTORNEYS' FEES

In response to Calpine's third point in its opposition brief, SAI respectfully refers the Court to the arguments and case law set forth in SAI's principal brief and requests that this Court now find that in light of the continuing nature of Calpine's breach since 2001 and throughout its reorganization, and given that SAI had placed Calpine on notice of its intent to hold Calpine responsible for its continuous breach in the originally filed proof of claim. (A-1339). *In re Integrated resources*, 157 B.R. 66 (S.D.N.Y. 1993) at 70 (quoting *In re Black & Geddes, Inc.*, 58 B.R. 547 (Bankr. S.D.N.Y. 1983).

Notably, Calpine does not address SAI's demand for attorneys' fees and expenses. Section 9.3 of the Agreement for Purchase (Membreno Dec., Exhibit "A") states:

> that if any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be

entitled to recover reasonable attorneys' fees and either costs incurred in that action or proceeding.

SAI's legal fees incurred in enforcing the Agreement for Purchase as of September 16, 2008 totaled $150,466.58 and continue to mount each month that Calpine breaches the Agreement for Purchase. In addition, SAI has incurred additional expenses for accountants it has hired to attempt to decipher the vague and improper "support" Calpine has provided to determine if any of the improper charges are even legitimate. These expenses total $14,659.30.

## CONCLUSION

For the reasons set forth herein, the Judgment of the Bankruptcy Court granting Calpine's motion for summary adjudication and denying SAI's motion for summary judgment should be reversed and the case remanded with directions to enter judgment for claimant-appellant SAI and denying debtor-appellee Calpine's motion for summary adjudication.

Dated:  New York, New York
          January 12, 2009

Respectfully submitted,

**NICOLETTI HORNIG & SWEENEY**
Attorneys for
*Robert Membeno, Trustee of SAI Trust*


By: _/s/ Lawrence C. Glynn_
     Lawrence C. Glynn (LG-6431)
     Wall Street Plaza
     88 Pine Street
     New York, New York 10005
     (212) 220-3830
     NH&S File No.:      00000840LCG

31