USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6 - 9 - 09

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
In re                           :
                                :
CALPINE CORP. et al.,           :       Chapter 11 Case
                                :       No. 05-B-60200(BRL)
                                :       Jointly Administered
          Debtor-Appellee.      :
-------------------------------:
ROBERT MEMBRENO as trustee      :
of SAI TRUST,                   :
                                :       District Court
               Appellant,       :       08 Civ. 9797 (VM)
                                :
     - against -                :
                                :       DECISION AND ORDER
CALPINE CORP. et al.,           :
                                :
               Appellees.       :
-------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

In this appeal from a decision of the Bankruptcy Court, claimant-appellant is Robert Membreno, as trustee of the SAI Trust (referred to as "SAI Trust"). Debtors-appellees are Calpine Corporation and its affiliated reorganized debtors (collectively, "Calpine"). SAI Trust appeals from the Bankruptcy Court's memorandum decision dated September 26, 2008 and order dated September 30, 2008 granting Calpine's motion for summary adjudication on and discharging claims numbered 6309, 6314, 6315, 6316, 6327, and 6328, and denying SAI Trust's motion for summary adjudication on those claims.

For the reasons stated below, the decision and order of the Bankruptcy Court are REVERSED in part and AFFIRMED in part.

## I. BACKGROUND

A.   FACTUAL BACKGROUND[1]

    1.   Agreement for Purchase

In May of 1987, SAI Geothermal, Inc. ("SAI Geothermal") entered into an "Agreement for Purchase and Sale of Asset" (the "Agreement for Purchase") with Freeport McMoran Resource Partners, LP ("Freeport"), through which SAI Geothermal sold to Freeport its interest in a power plant known as West Ford Flat. (See Agreement for Purchase, A-1048 through A-1118.) The parties also agreed that Freeport would pay SAI Geothermal a monthly payment of 6% of the West Ford Flat plant's net income. This monthly payment is referred to as the Net Profits Interest ("NPI"). SAI Geothermal subsequently transferred a portion of its right to receive the NPI to SAI Trust, which is entitled to a monthly NPI payment of 4.55% of net income. (See Declaration of Robert Membreno in Support of Motion for Summary Judgment, dated August 12, 2008 ("Membreno Decl."), ¶ 5, A-1033.) Freeport assigned its rights and obligations under the Agreement for Purchase to the predecessor entity to Calpine in 1990. (See id. ¶ 6, A-1033.)

The parties do not dispute that the term "Project," as used in the Agreement for Purchase, refers to the West Ford

---

[1]   The following facts are derived from the appellate record. Below, references to the record are indicated by "A-."

2

Flat power plant.   The Agreement for Purchase defines net income as gross revenues from the West Ford Flat plant minus: (1) "all Project direct operating expenses (excluding depreciation)"; (2) "general and administrative expenses associated with the Project"; (3) "the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation"; and (4) "if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of project financing."   (Agreement for Purchase, 21, A-1068.)   The Agreement for Purchase defines "Net Profits Interest" as, "with respect to the Project, the right to receive a payment each month ... in an amount equal to 6% of Net Income for the month."   (Id.)

The Agreement for Purchase specifies that the calculation of direct operating expenses and general and administrative expenses shall be governed by "the Accounting Procedure provided in Exhibit F."   (Id.)   Exhibit F is entitled "Accounting Procedure Joint Operations," and lists twelve categories of "Direct Charges," including "Other Expenditures." (Agreement for Purchase, Ex. F at 2-3, A-1105 to A-1106.)   "Other Expenditures" is defined as "[a]ny other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is

3

incurured by the Operator in the necessary and proper conduct
of the Joint Operations." (Id. 3, A-1106.)

The Agreement for Purchase also requires, within sixty
days of the end of each fiscal year, a statement "certified by
[Freeport's] chief financial officer showing in reasonable
detail the calculation of the Net Profits Interest."
(Agreement for Purchase ¶ 1.6, A-1053.) SAI Geothermal, and
subsequently SAI Trust, "shall have the right, upon reasonable
notice ... to audit [Freeport's] records to determine whether
the calculation of the Net Profits Interest during the fiscal
year then ended was in accordance with" the Agreement for
Purchase. (A-1053 to A-1054.)

    2.   1989 NPI Statement Explanation

On December 13, 1989, Freeport wrote to SAI Trust with an
"explanation of the line items comprising the SAIT-APT Net
Profits Interest Statement for the West Ford Flat power
plant," attaching a copy of the August 1989 NPI statement.
(Letter from Freeport to R.J. Membreno, dated December 13,
1989, A-1122.) The document describes thirteen line items:
electric revenue, interest income from overnight deposits,
escrow balance, royalty payments, lease operating expenses,
overhead, property taxes, capital additions (major
construction), capital additions (overhead), capital additions
(development capital), project financing, invested capital,

4

and loan proceeds.  (See id., A-1122 to A-1124.)  Lease
operating expenses are described as: "Actual costs incurred in
the operation of the Plant.  Labor costs and related payroll
burden are limited to those individuals identified as billable
under Exhibit F of the Agreement for Purchase and Sale of
Asset ...."  (Id., A-1123.)  Overhead is described as:
"Computed at 15% of Lease Operating Expenses as specified in
the Agreement."  (Id.)

   3.   1992 Judgment After Trial

       At some point after NPI payments began, a dispute arose
between SAI Trust and Freeport, and a trial was held in the
California Superior Court for the County of Santa Clara, in
the matter of Membreno v. Freeport McMoran Resource Partners,
LP, No. 708898.  On May 11, 1992, a judgment (the "1992
Judgment") was entered, ordering that "[w]ith respect to the
calculation of Invested Capital" as used to determine NPI
payments, defendants could not use Council of Petroleum
Accountants Societies, Inc. ("COPAS") percentage rates "to
determine the amount of ... overhead with respect to the
construction of" the West Ford Flat power plant because those
rates "were not a part of the Agreement."  (1992 Judgment 3,
A-1328.)

4.   <u>1995 Settlement Agreement</u>

Subsequently, another dispute arose relating to an audit by SAI Trust of the operations of the West Ford Flat power plant for part of 1990 and all of 1991.   In a settlement agreement between Calpine, Freeport, and SAI Trust, dated February 28, 1995 (the "Settlement Agreement"), the parties agreed that

> adjustments be made to previously issued NPI statements prepared by Calpine Geysers, to the manner by which future NPI statements will be prepared, to the payment of net profits found owing to SAI Trust as the result of the 1990 and 1991 audit, and to the payment of net profits for 1992 and thereafter.

(Settlement Agreement 3, A-1316.)   The Settlement Agreement details, among other things, the adjustments to be made to calculations of "Overnight Interest" and "Escrow Balance," as well as changes in debt amortization resulting from a new loan with a lower interest rate.

The Settlement Agreement also states,

> Except as specifically set forth herein, nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement for Purchase, specifically including, but not limited, to Sections 1.6 and 9.5.   Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPINE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

(<u>Id.</u> 8-9, A-1321 to A-1322.)

6

5.   <u>Consolidation of Calpine Operations</u>

The West Ford Flat plant is located at the Geysers steam field ("the Geysers"), in Sonoma County, California.  By 1998, Calpine owned or had interests in four power plants at the Geysers.  In 1999, Calpine acquired fourteen plants at the Geysers.  Calpine now owns nineteen out of twenty-two power plants at the Geysers site.  (<u>See</u> Declaration of Guy Tipton in Support of Calpine's Motion for Summary Judgment, dated August 13, 2008, ¶ 6, A-999.)

In 1999, "Calpine began to streamline and consolidate the operation of the plants and the steam fields into operational areas, and all its Geysers units into one consolidated operation."  (<u>Id.</u>)  Calpine then "consolidated its operation and business units with the intent to achieve efficiencies and cost savings associated with economies of scale."  (<u>Id.</u>)

6.   <u>2001 Changes to NPI Calculations and Certification</u>

Beginning in April 2001 with the NPI statement for January 2001, the NPI statements prepared by Calpine include a line item called "Allocated Expenses."  SAI Trust contends that the Allocated Expenses figure relies upon "budgeted figures, as opposed to actual figures," and that the NPI statements containing this line item have included "costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under

the Agreement for Purchase and not chargeable to SAI."
(Membreno Decl. ¶ 38, A-1038.)  Since its introduction, the
Allocated Expenses line item has been included in the
calculation of the 15% overhead charge, which had previously
consisted of 15% of Lease Operating Expenses only.

According to Guy Tipton ("Tipton"), Regional Controller
for the Geysers facilities for Calpine, Allocated Expenses
consist of "West Ford Plant's share of the operating expenses,
determined by the pro rata share of the annual budgeted
costs."  (Declaration of Guy Tipton in Support of Calpine's
Response to SAI Trust's Motion for Summary Judgment, dated
September 10, 2008, ¶ 4, A-1567.)  Tipton's review of the
relevant documents has led him to conclude

> that the allocated expenses subcategory included in the
> monthly NPI report represents those categories of
> expenses and operations that are permitted under the
> Purchase Agreement and Exhibit F to the Purchase
> Agreement that are allocated from consolidated business
> operations.  Prior to the consolidation, those categories
> of expenses were included, in their entirety in the
> 'Lease Operating Expenses' subcategory.

(Id.)  Tipton contends that the categories for "Lease Overhead
Expenses" and Allocated Expenses "do not overlap and are
exclusive of each other."  (Id. ¶ 5, A-1567.)

In addition, Calpine has not provided annual
certification of the NPI statements since 2001, although
Calpine had previously provided these certifications pursuant
to the Agreement for Purchase.  SAI Trust argues that the lack

of certified NPI statements has prevented it from auditing the NPI statements since 2001, as it is entitled to do under the Agreement for Purchase.

B.   <u>PROCEDURAL HISTORY</u>

SAI Trust filed six proofs of claim relating to the facts described above against six different entities in the Calpine bankruptcy cases on July 27, 2006.  On April 5, 2007, SAI Trust amended its claims to assert $245,723.09 in damages. Calpine objected to the proofs of claim on April 11, 2007.

The Bankruptcy Court confirmed Calpine's sixth amended joint plan of reorganization on December 19, 2007, and that plan took effect on January 31, 2008.  SAI Trust and Calpine filed the instant cross-motions on August 13, 2008; Calpine moved for summary adjudication discharging the six SAI claims, and SAI Trust moved for summary judgment on those claims.

SAI Trust argued that the 2001 change in NPI calculations and Calpine's failure to certify NPI statements since 2001 constituted breaches of the Agreement for Purchase.  SAI Trust also argued that the method for calculating NPI payments was already the subject of the 1992 Judgment, as well as the Settlement Agreement from 1995, and that Calpine was precluded from contesting whether Allocated Expenses may be included in NPI calculations.  Finally, in its opening summary judgment papers SAI Trust sought attorneys' fees pursuant to the

Agreement for Purchase, as well as damages of $583,698.61.  In its reply papers, SAI Trust sought a judgment of $748,824.49, a figure that includes attorneys' fees.

Calpine argued that the Allocated Expenses fell within the direct operating expenses which the Agreement for Purchase permits Calpine to include in its NPI calculations; that only expenses attributable to the West Ford Flat plant are included in the Allocated Expenses line item; and that neither the 1992 Judgment nor the 1995 Settlement Agreement precluded Calpine from including such expenses in the NPI calculations.  Calpine also argued that SAI Trust could not prove that any damages were proximately caused by Calpine's failure to certify NPI statements.

On September 24, 2008, the Bankruptcy Court heard oral argument and denied SAI Trust's petition for attorneys' fees. On September 26, 2008, the Bankruptcy Court issued a memorandum decision granting Calpine's motion for summary adjudication to discharge the six claims and denying SAI Trust's motion for summary judgment.  The Bankruptcy Court applied California law in finding that Section 9.1 of the Agreement for Purchase was "clear and unambiguous on its face" in "call[ing] for the deduction of all 'direct operating expenses' from the calculation of net income." (A-1757) (emphasis in original).  The Bankruptcy Court determined that

10

"the language of section 9.1 is broad enough to encompass overhead costs allocated by [Calpine] to the West Ford Plant." (<u>Id.</u>)   The Bankruptcy Court noted that Exhibit F of the Agreement for Purchase "identifie[d] twelve permissible categories," and that one of those categories was a "catch-all provision" allowing for the deduction of "any expenditure, incurred 'in the necessary and proper conduct of the [West Ford Flat plant].'" (alterations added) (A-1758).   The Bankruptcy Court concluded, "Clearly the overhead allocations deducted by Calpine were 'necessary and proper' to the operation of the West Ford Plant once Calpine began operating the West Ford Plant as a part of the centralized Geysers." (<u>Id.</u>)

The Bankruptcy Court also found that Calpine had not deducted expenses from NPI payments "that were attributable to any plant other than the West Ford Plant." (A-1757.)   The Bankruptcy Court observed that SAI Trust's reading of section 9.1 "would result in a windfall to SAI Trust allowing it to avoid application of any direct operating expenses associated with centralized operations and maintenance and properly allocated to the West Ford Plant." (A-1757 to A-1758.)

In addition, the Bankruptcy Court pointed out that SAI Trust "sold its management interest in the West Ford Plant" by signing the Agreement for Purchase, and that there was

11

"nothing in the [Agreement for Purchase] that can be read or construed to limit the Reorganized Debtors' ability to manage the operations of the West Ford Plant as part of the consolidated Geysers unit." (A-1758.)

The Bankruptcy Court also rejected SAI Trust's estoppel arguments, finding "no possible estoppel or preclusive effects from the resolution of either the 1995 dispute or the 1992 State Court Action." (A-1759.) The court noted that the disputes were resolved "years before [Calpine] made the decision to consolidate the operations at the Geysers and neither disagreement addressed the method of calculating 'operating expenses' at issue here." (Id.)

Finally, the Bankruptcy Court determined that SAI Trust could not prove "any damages proximately caused from Calpine's failure to provide certified NPI statements," noting that "SAI Trust's attempt to massage its damages claim from approximately $245,000 as set forth in its proofs of claim to over $700,000 in its summary judgment pleading is inappropriate and without justification." (Id.; id. n.2)

By order dated September 30, 2008, the Bankruptcy Court granted Calpine's motion for summary adjudication, denied SAI Trust's motion for summary judgment, and disallowed and expunged SAI Trust's six claims. The Bankruptcy Court did not address SAI Trust's argument that Calpine had breached the

12

implied covenant of good faith and fair dealing.  SAI Trust appealed the September 26, 2008 memorandum decision and the September 30, 2008 order to this Court.

## II. **DISCUSSION**

A.   <u>LEGAL STANDARD</u>

A district court reviews a bankruptcy court's factual findings under a clearly erroneous standard and reviews its legal conclusions de novo.  <u>See</u> <u>In re Duffy</u>, 344 B.R. 237, 242 (S.D.N.Y. 2006).

In connection with a motion under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  <u>Id.</u> at 248.  A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Id.</u>  The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."  <u>Knight v. U.S. Fire Ins. Co</u>., 804 F.2d 9, 11 (2d Cir. 1986).  The moving party bears the burden

of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994).  When deciding cross-motions for summary judgment, the standard to be applied "is the same as that for individual summary judgment motions and a court must consider each motion independent of the other." Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

The Agreement for Purchase specifies that California law applies.  (See Agreement for Purchase ¶ 9.6, A-1066.)  Under California law, a court interprets a contract "by examining the contract's language, the parties' clear intentions as expressed in the contract and the circumstances under which the parties contracted." Kassbaum v. Steppenwolf Prods., Inc., 236 F.3d 487, 491 (9th Cir. 2000).

Summary judgment in a contract dispute is normally appropriate if the contract is not ambiguous.  See Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) ("We may grant summary judgment motions touching upon contract interpretation when the agreement is unambiguous.").  A contract is ambiguous if it is susceptible to more than one reasonable interpretation.  See  ASP Props.

14

Group v. Fard, Inc., 133 Cal. App. 4th 1257, 1270 (Cal. Ct. App. 2005).

However, a court applying California contract law may also consider extrinsic evidence regarding contract interpretation, even if it does not find the language of the contract to be ambiguous. "In contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). Under California law, "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (Cal. 1968); see also Foad Consulting Group, 270 F.3d at 826 (quoting Pacific Gas & Elec., 442 P.2d at 644).

A bankruptcy court's denial of a request to amend a claim is reviewed for abuse of discretion. See In re Enron Corp., 419 F.3d 115, 124 (2d Cir. 2005); In re Calpine Corp., No. 07 Civ. 8493, 2007 WL 4326738, at *3 (S.D.N.Y. Nov. 21, 2007).

B.   <u>APPLICATION</u>

The Court will first address the Bankruptcy Court's determination that neither the 1992 Judgment nor the 1995 Settlement Agreement have any effect on the issues implicated by SAI Trust's six claims.   The Court will next consider the Bankruptcy Court's conclusion that Calpine's use of the Allocated Expenses line item in calculating NPI payments comports with the Agreement for Purchase, as well as the determination that SAI Trust failed to demonstrate that it suffered damages as a result of Calpine's failure to certify the NPI statements since 2001.   The Court will then address SAI Trust's argument that Calpine has breached the implied covenant of good faith and fair dealing inherent in all contracts.   Finally the Court will consider SAI Trust's request for attorneys' fees.

1.   <u>1992 Judgment</u>

The Bankruptcy Court ruled that the 1992 Judgment had "no possible estoppel or preclusive effects" because the 1992 Judgment was handed down "years before [Calpine's] management made the decision to consolidate the operations at the Geysers" and because the disagreement in the 1992 state court action did not address "the method of calculating 'operating expenses' at issue here."   (A-1759.)

"In deciding the preclusive effect of a state court judgment in federal court," a bankruptcy court should apply "the law of the state that rendered the judgment to determine whether the courts of that state would afford the judgment preclusive effect." <u>In re Weiss</u>, 255 B.R. 115, 118 (S.D.N.Y. 2000.)   Under California law, a party is precluded from relitigating an issue addressed in an earlier action if the following conditions are met:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.   Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

<u>In re Cantrell</u>, 329 F.3d 1119, 1123 (9th Cir. 2003) (internal quotation marks and citation omitted).

SAI Trust contends that the issue of whether Calpine may use Allocated Expenses in calculating NPI payments was already the subject of the 1992 Judgment because that judgment represents the trial court's rejection of "an attempt by Calpine to unilaterally alter the manner in which NPI was calculated." (Appellant's Br. 24-25.)  In the 1992 Judgment, the California Superior Court determined that "[w]ith respect to the calculation of Invested Capital," Calpine's successor, Freeport, had wrongly used COPAS percentage rates in its

17

calculations.  (1992 Judgment 3, A-1328.)  The Superior Court ruled that the COPAS percentage rates "were not a part of the Agreement [for Purchase]" and that Freeport "may not use those COPAS percentage rates to determine the amount of its overhead with respect to the construction" of the West Ford Flat plant. (Id.)  The Superior Court ordered that SAI Trust be paid $58,000.00 in additional NPI payments, based on the "recalculation of the proper overhead attributable to the construction of the project."  (Id.)

The Court affirms the Bankruptcy Court's determination on this issue.  The 1992 Judgment concerned sections of the Agreement for Purchase that are not at issue here, and SAI Trust has failed to carry its burden of demonstrating that all of the collateral estoppel factors have been met.  The Superior Court's ruling on the calculation of Invested Capital, which is the subject of what SAI Trust holds out as the relevant portion of the 1992 Judgment, was not a final ruling on the issue of the items that may be used in calculating NPI payments.  Although the SAI Trust characterizes the Superior Court's statement that "the COPAS percentage rates utilized by defendants were not a part of the Agreement [for Purchase]" as a ruling that NPI calculations can be based only on line items or other elements that are explicitly part of the Agreement for Purchase, the Court

18

rejects this interpretation.   The 1992 Judgment gives no
indication that it addresses the appropriate method for
carrying out all facets of NPI payment calculations.   The
issue of whether the category of Allocated Expenses, as used
by Calpine, may be included in NPI calculations was not
"actually litigated" or "necessarily decided" in the 1992
Judgment, Cantrell, 329 F.3d at 1123.   Therefore, the
Bankruptcy Court correctly ruled that the 1992 Judgment has no
preclusive effect on this action.

>    2.   1995 Settlement Agreement

In addition to finding no preclusive effect from the 1992
Judgment, the Bankruptcy Court found that the 1995 Settlement
Agreement had "no possible estoppel or preclusive effects"
because the 1995 Settlement Agreement was handed down "years
before [Calpine's] management made the decision to consolidate
the operations at the Geysers" and because the disagreement in
the 1992 state court action did not address "the method of
calculating 'operating expenses' at issue here."   (A-1759.)

The Court affirms the Bankruptcy Court's determination
that the 1995 Settlement Agreement has no preclusive effect in
this action.   The 1995 Settlement Agreement is not a final
judgment on the merits, and the issue of whether the Allocated
Expenses line item, as used by Calpine, may be included in NPI
calculations was not "actually litigated" or "necessarily

decided" by the 1995 Settlement Agreement. <u>Cantrell</u>, 329 F.3d at 1123.

### 3.   Allocated Expenses in NPI Calculations

The Bankruptcy Court determined that Calpine's use of the Allocated Expenses line item in calculating NPI payments, which began in 2001, was permissible under the Agreement for Purchase.  SAI Trust argues that the Bankruptcy Court erred in interpreting the Agreement for Purchase "to cover 18 plants that were never contemplated at the time the agreement was entered into in 1987," as well as in "ignoring the term 'project'" as it was used in the Agreement for Purchase and "holding that the term 'direct operating expenses' was broad enough to include expenses derived from these 18 other plants." (Appellant's Br. 18.)  SAI Trust's argument is based in part on the course of dealing between the parties in the period between 1989 and 2001.  Calpine does not address this argument, and contends that "[t]here is nothing in the [Agreement for Purchase] that prohibits Calpine from allocating the West Ford Plant's share of the twelve categories of expenses in Exhibit F." (Appellee's Br. 13.)

The Court finds that the Bankruptcy Court erred when it failed to consider the course of dealing between the parties from 1989 to 2001 in its interpretation of the Agreement for Purchase.  Under California law, extrinsic evidence may be

used to interpret the terms of a contract if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible," Pacific Gas & Elec., 442 P.2d at 644, even if the language of the contract is not ambiguous.  See Foad Consulting Group, 270 F.3d at 826. Although the parol evidence rule "generally prohibits the introduction of any extrinsic evidence ... to vary, alter or add to the terms of an integrated written instrument," this does not "prohibit the introduction of extrinsic evidence to explain the meaning of a written contract" when "the meaning urged is one to which the written contract terms are reasonably susceptible." Casa Herrera, Inc. v. Beydoun, 83 P.3d 497, 502 (Cal. 2004) (internal quotation marks and citations omitted).

A course of dealing is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  Cal. Com. Code § 1303(b). Contract parties' "prior course of dealings may determine the meaning of a contract term or may add an agreed but unstated term." Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc., 89 Cal. App. 4th 1042, 1051 (Cal. Ct. App. 2001). The explanation of the NPI statements sent by Calpine's

21

predecessor to SAI Trust in  December 1989, combined with NPI
payments from 1989 to 2001 consistent with this explanation,
created a course of dealing sufficient to explain the meaning
of the contract terms in dispute here.    See, e.g., id.
(conduct that was consistent across dozens of transactions was
a course of conduct incorporating terms of a written agreement
into an oral agreement); Insurance Co. of No. Am. v. NNR
Aircargo Serv. (USA), Inc., 201 F.3d 1111, 1114 (9th Cir.
2000) ("receipt of 47 identical invoices for 47 separate
transactions" was sufficient to establish course of dealing
with respect to a term inherent to the type of contract at
issue).

     The existence of a course of dealing would normally be a
question of fact that the Bankruptcy Court would determine in
the first instance, but the facts surrounding the course of
dealing are not in dispute.  This Court may thus interpret the
Agreement for Purchase in light of the course of dealing.[2]

     When the parties' prior course of conduct is considered,
the Court finds that the Agreement for Purchase does not
permit the inclusion of the Allocated Expenses line item.  The

---

[2]    Although several courts in the Ninth Circuit have held that "[a]n
inference of the parties' common understanding that is based upon a prior
course of dealing is a question of fact," Insurance Co., 201 F.3d at 1113
(citing In re CFLC, Inc., 166 F.3d 1012, 1017 (9th Cir. 1999)), that
conclusion appears to be based upon cases from the Second and Seventh
Circuits that do not apply California law.  See CFLC, 166 F.3d at 1017
(citing New Moon Shipping Co., Ltd. v. Man B&W Diesel, Ag, 121 F.3d 24, 31
(2d Cir. 1997) (citing Capitol Converting Equip., Inc. v. LEP Transp.,
Inc., 965 F.2d 391, 395 (7th Cir. 1992)).

meaning of the Agreement for Purchase suggested by the December 1989 explanation and the NPI payments from 1989 to 2001, with respect to calculation of NPI payments, is that the line items to be included in the NPI calculations were those reflected in the December 1989 explanation and the NPI payments from 1989 to 2001. At the very least, the course of dealing shows that the parties did not contemplate that NPI calculations would include an Allocated Expenses line item reflecting the West Ford Flat plant's share of consolidated business operations expenses. This interpretation is one to which the terms of the Agreement for Purchase are "reasonably susceptible," <u>Casa Herrera</u>, 83 P.3d at 502, in part because at the time the Agreement for Purchase was signed Freeport was not operating the West Ford Flat plant as part of a consolidated enterprise, and Calpine did not begin to consolidate operations at the Geysers until at least 1999, and possibly later.

This course of dealing continued even after Calpine began to acquire interests in other power plants at the Geysers. Calpine contends that by 1999 it owned fourteen plants at the Geysers, and that it began to consolidate its operations at the Geysers that same year. However, Calpine did not add the Allocated Expenses line item to NPI calculations for the West Ford Flat plant until 2001. At no time was there mutual

assent to the addition of the Allocated Expenses line item, and the NPI payments from 2001 forward cannot constitute a subsequent course of dealing affecting the interpretation of the Agreement for Purchase because that conduct is not "fairly to be regarded as establishing a common basis of understanding" between the parties. Cal. Com. Code § 1303(b).

The Bankruptcy Court's denial of SAI Trust's motion for summary judgment and grant of Calpine's application for summary adjudication are reversed as to the use of the Allocated Expenses line item in the calculation of NPI payments. The Court notes that the Bankruptcy Court's determination that SAI Trust's damages claim of "over $700,000 in its summary judgment pleading is inappropriate and without justification" (A-1759) is based partly on its finding that there was no breach of the Agreement for Purchase. The Bankruptcy Court did not consider the course of dealing between the parties from 1989 to 2001 in reaching its conclusion. A ruling based upon an erroneous view of the law is an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990). The Court therefore reverses the Bankruptcy Court's denial of SAI Trust's damages claim with respect to the addition of the Allocated Expenses line item beginning in 2001.

The Court does not have information regarding the steps SAI Trust took to contest the change to the NPI payments that occurred in 2001, beyond SAI Trust's assertion in its appellate brief that it brought the matter to Calpine's attention.  (See Appellant's Br. 15.)  Assuming, however, that SAI Trust has not forfeited its objection to the use of the Allocated Expenses line item, the Bankruptcy Court should determine and award SAI Trust the damages caused by Calpine's inclusion of the Allocated Expenses line items from 2001 forward.

4.   Damages from Failure to Certify NPI Statements

SAI Trust appeals the Bankruptcy Court's finding that SAI Trust was not able to prove that it suffered damages proximately caused by Calpine's failure to certify NPI statements beginning in 2001.  The Bankruptcy Court found that Calpine had "provided SAI Trust with the underlying information necessary to confirm [its] calculations of NPI.  Specifically, each month SAI Trust receives financial reports which provide detailed information on, among other things, monthly revenue, monthly interest calculations and costs associated with the West Ford Plant."  (A-1759.)

SAI Trust contends that when calculating the Allocated Expenses line item, Calpine has used budgeted or projected expenses "that may or may not have ever been actually

incurred," and that Calpine's failure to annually certify the NPI statements has reinforced or exemplified "the reality that no one on behalf of [Calpine] is willing to ascribe their name to such questionable accounting practices." (Appellant's Br. 38.)   SAI Trust argues that the Agreement for Purchase authorizes it to conduct an audit of the annual certifications, but that it was prevented from conducting any audit of the NPI statements, and thus investigating the basis for the Allocated Expenses line items, when Calpine stopped providing the certifications in 2001.

Although there may be outstanding factual questions regarding the precise composition of the Allocated Expenses line item, the Court affirms the Bankruptcy Court's determination that SAI Trust did not show that it suffered damages proximately caused by Calpine's failure to annually certify the NPI statements.   It is not clear that SAI Trust was actually prevented from carrying out an audit of the records that were provided to it by Calpine, even if those records were not certified.   However, the absence of an audit has not caused damages to SAI Trust; rather, it was the use of the Allocated Expenses line item in the NPI calculations that caused damages to SAI Trust.

    5.   <u>Implied Covenant of Good Faith and Fair Dealing</u>
    The Bankruptcy Court did not rule on SAI Trust's claim

that Calpine breached the implied covenant of good faith and fair dealing.  Because the Court is not required to resolve any factual disputes to address this claim, the Court will rule on the merits of the implied covenant claim.  See, e.g., In re Treco, 240 F.3d 148, 163 (2d Cir. 2001) (affirming district court's determination of forum clause selection argument that was not addressed by the bankruptcy court); In re Persky, 893 F.2d 15, 17-18 (2d Cir. 1989) (resolving standing claim not addressed by the bankruptcy court).

In its summary judgment papers and in its papers on appeal, SAI Trust argues that Calpine breached the implied covenant when it changed its accounting methods with respect to the West Ford Flat plant, stopped providing certified NPI statements, and used projected or inaccurate figures in its NPI calculations, "all in contradiction to that which was set forth in the Agreement for Purchase."  (A-1402; Appellant's Br. 40.)

Under California law, a claim for breach of the implied covenant of good faith and fair dealing cannot be sustained if the basis for that claim is duplicative of a breach of contract claim.  See Careau & Co. v. Security Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1271, 1395 (Cal. Ct. App. 1990).  SAI Trust's claim for breach of the implied covenant relies on precisely the conduct complained of in the breach of

27

contract claim.  The implied covenant claim should therefore
be dismissed.

     6.   <u>Attorneys' Fees</u>

     The Bankruptcy Court denied SAI Trust's request for
attorneys' fees at the hearing on this matter, before it
issued its memorandum decision denying SAI Trust's motion for
summary judgment and granting Calpine's application for
summary adjudication.   Section 9.3 of the Agreement for
Purchase provides that the prevailing party shall recover its
"attorneys' fees and other costs incurred" in "any legal
action ... brought for the enforcement" of the Agreement for
Purchase.  (A-1064.)  Because the Court has determined that
Calpine has breached the Agreement for Purchase such that SAI
Trust should be granted summary judgment and Calpine should be
denied summary adjudication on the issue of the use of the
Allocated Expenses line item, SAI Trust is entitled to
attorneys' fees and other costs with respect to the litigation
of this issue.  The Bankruptcy Court's ruling on attorneys'
fees is therefore reversed.

### III. <u>ORDER</u>

     For the reasons stated above, it is hereby

     **ORDERED** that the order of the Bankruptcy Court dated
September 30, 2008, based on its decision dated September 26,
2008 granting the motion of the Reorganized Debtors

28

("Calpine") for summary adjudication disallowing claims numbered 6309, 6314, 6315, 6316, 6327, and 6328 filed by Robert Membreno, as trustee of SAI Trust ("SAI Trust"), denying the motion of SAI Trust for summary judgment on those Proofs of Claim, and disallowing and expunging those claims, is REVERSED as to the finding that Calpine did not breach the Agreement for Purchase, the rejection of SAI Trust's damages claim for that breach, and the ruling denying SAI Trust's request for attorneys' fees; and is AFFIRMED as to the finding that SAI Trust did not prove any damages proximately caused by Calpine's failure to provide certified Net Profits Interest statements.  It is further

**ORDERED** that the action is remanded to the Bankruptcy Court for further proceedings consistent with this opinion, including the dismissal of the claim for breach of the implied covenant of good faith and fair dealing, and a determination and award of damages and attorneys' fees.

The Clerk of the Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          9 June 2009

Victor Marrero
U.S.D.J.

29